Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
Ryan Goldberg (RG 7570)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE  COMPANY and GEICO CASUALTY CO.,

Docket No. 15-7236

Plaintiffs,

-against-

**Plaintiff Demands a Trial by Jury**

BRUCE JACOBSON, D.C.,
BMJ CHIROPRACTIC, P.C.,
NJ PAIN TREATMENT, P.C.,
JACOBSON CHIROPRACTIC, P.C.,
DR. BRUCE JACOBSON DC P.C.,
NJ NEURO & PAIN, P.C.,
DIANA BEYNIN, D.C.,
PETER ALBIS, D.C.,
GERLANDO ZAMBUTO, D.C.,
STEPHEN GIORGIO, D.C.,
ROBERT KLASS, D.C.,
DIPTI PATEL, D.C.,
JONGDUG PARK, D.C.,
HAROLD JAMES, M.D.,
TIMOTHY MORLEY, D.O.,
ANTONIO CORONA, M.D.,
AZUBUOGO AJUDUA, M.D. a/k/a AZU AJUDUA, M.D.,
THOMASINA STRIANO, D.C.,
BHUPINDER SINGH SAWHNEY, M.D.,
SHEILA SOMAN, M.D., and
JOHN DOE DEFENDANTS "1" – "10",

Defendants.

------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,000,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including initial examinations, electrodiagnostic testing, chiropractic manipulation under anesthesia, chiropractic manipulation without anesthesia, and physical therapy services (collectively the "Fraudulent Services"), that allegedly were provided to New York automobile accident victims ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,400,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Bruce Jacobson, D.C., BMJ Chiropractic, P.C., NJ Pain Treatment, P.C., Jacobson Chiropractic, P.C., Dr. Bruce Jacobson DC P.C., and NJ Neuro & Pain, P.C. because:

   (i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

   (ii)     in many cases, the Fraudulent Services never were provided in the first instance;

   (iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others;

(v)    NJ Pain Treatment, P.C. and NJ Neuro & Pain, P.C. failed to meet applicable New York licensing requirements necessary to perform the Fraudulent Services;

(vi)    Bruce Jacobson, D.C., NJ Pain Treatment, P.C. and NJ Neuro & Pain, P.C. were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey;

(vii)    the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey;

(viii)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Bruce Jacobson, D.C., BMJ Chiropractic, P.C., NJ Pain Treatment, P.C., Jacobson Chiropractic, P.C., Dr. Bruce Jacobson DC P.C., or NJ Neuro & Pain, P.C., and therefore were unreimbursable.

3.    The Defendants fall into the following categories:

(i)    Defendants BMJ Chiropractic, P.C. ("BMJ"), NJ Pain Treatment, P.C. ("NJ Pain"), Jacobson Chiropractic, P.C. ("Jacobson PC"), Dr. Bruce Jacobson DC P.C. ("Bruce PC"), and NJ Neuro & Pain, P.C. ("NJ Neuro")(collectively the "PC Defendants") are a series of closely-related New York and New Jersey chiropractic professional corporations through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(ii)    Defendant Bruce Jacobson, D.C. ("Jacobson") is a chiropractor licensed to practice chiropractic in New York and New Jersey, purported to own the PC Defendants, and purported to perform many of the Fraudulent Services.

(iii)    Defendants Diana Beynin, D.C. ("Beynin"), Peter Albis, D.C. ("Albis"), Gerlando Zambuto, D.C. ("Zambuto"), Stephen Giorgio, D.C. ("Giorgio"), Robert Klass, D.C. ("Klass"), Dipti Patel, D.C. ("Patel"), and Jongdug Park, D.C. ("Park")(collectively the "Treating Defendants") are chiropractors licensed to practice chiropractic in New York and New Jersey who were associated with Jacobson and the PC Defendants as independent contractors, and purported to perform many of the Fraudulent Services.

(iv)    Defendants Harold James, M.D. ("James"), Timothy Morley, D.O. ("Morley"), Antonio Corona, M.D. ("Corona"), Azubuogo Ajudua, M.D. a/k/a Azu Ajudua, M.D. ("Ajudua"), Thomasina Striano, D.C. ("Striano"), Bhupinder Singh Sawhney, M.D. ("Sawhney"), Sheila Soman, M.D. ("Soman"), and John Doe

Defendants "1" – "10" (collectively the "Referral Defendants") are licensed healthcare services providers who aided and abetted the fraudulent scheme perpetrated against GEICO by their co-Defendants, by referring Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson and the PC Defendants.

4.     As discussed herein, the Defendants at all relevant times have known that:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others;

(v)     NJ Pain Treatment, P.C. and NJ Neuro & Pain, P.C. failed to meet applicable New York licensing requirements necessary to perform the Fraudulent Services;

(vi)    Bruce Jacobson, D.C., NJ Pain Treatment, P.C., and NJ Neuro & Pain, P.C. were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey;

(vii)   the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey; and

(viii)  in most cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of Jacobson or the PC Defendants.

5.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were to GEICO through the PC Defendants or Jacobson's unincorporated chiropractic practice.

6. The charts annexed hereto as Exhibits "1" – "6" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

7. The Defendants' fraudulent scheme began as early as 2012 and has continued uninterrupted since that time.

8. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,000,000.00.

**THE PARTIES**

I. **Plaintiffs**

9. Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New Jersey.

II. **Defendants**

A. **Jacobson**

10. Defendant Jacobson resides in and is a citizen of New Jersey. Jacobson was licensed to practice chiropractic in New York on June 21, 2001 and in New Jersey on August 21, 2000, purported to own the PC Defendants, and purported to perform many of the Fraudulent Services.

11. Jacobson has a history of disregard for the regulatory requirements applicable to chiropractic practice and the authority of the pertinent regulators.

12. For instance, on or about September 9, 2008, the New Jersey Attorney General commenced professional disciplinary proceedings against Jacobson before the New Jersey Board

of Chiropractic Examiners (the "NJ Chiropractic Board"), alleging that Jacobson had: (i) engaged in professional or occupational misconduct; (ii) violated or failed to comply with NJ Chiropractic Board regulations; (iii) performed electrodiagnostic testing without the required knowledge, training, and certification; and (iv) referred patients for electrodiagnostic testing without first performing and documenting appropriate clinical examinations to support the need for the testing. See May 5, 2010 NJ Chiropractic Board Final Decision and Order, annexed hereto as Exhibit "7".

13.     Jacobson was served with the professional disciplinary charges on or about September 9, 2008, and had 15 days to respond to the charges. See Exhibit "7". Even so, Jacobson did not respond to the professional disciplinary charges within 15 days. Id.

14.     By August 25, 2009, almost a year after being served with the professional disciplinary charges, Jacobson still had not responded to the professional disciplinary charges. See Exhibit "7". Accordingly, on August 25, 2009, the NJ Chiropractic Board advised Jacobson that it would rule on the charges on October 22, 2009. Id.

15.     On or about October 22, 2009, Jacobson finally appeared by counsel in the professional disciplinary proceedings, and requested an extension of time in which to respond to the professional disciplinary charges. See Exhibit "7".

16.     The NJ Chiropractic Board granted Jacobson a 30 day extension of time in which to respond to the professional disciplinary charges, despite the fact that – by that point – Jacobson had been in default of his obligation to respond to the professional disciplinary charges for more than a year. See Exhibit "7".

17.     Nonetheless, Jacobson did not respond to the professional disciplinary charges within the 30 day extension granted by the NJ Chiropractic Board. See Exhibit "7".

18.     Accordingly, on April 22, 2010, the NJ Chiropractic Board found that Jacobson was in default, and by order dated May 5, 2010 held that Jacobson had committed the statutory and regulatory violations set forth in the professional disciplinary charges. <u>See</u> Exhibit "7".

19.     In its May 5, 2010 order, the NJ Chiropractic Board imposed various types of professional discipline on Jacobson. <u>See</u> Exhibit "7". In particular, the NJ Chiropractic Board:

(i)     ordered Jacobson to cease and desist from performing electrodiagnostic tests without first performing the required pre-test examinations;

(ii)    reprimanded Jacobson for his various statutory and regulatory violations; and

(iii)   ordered Jacobson to pay a civil penalty of $5,000.00, and to pay investigative costs of $740.83.

<u>See</u> Exhibit "7".

20.     Pursuant to the NJ Chiropractic Board's May 5, 2010 order, Jacobson was required to pay the $5,000.00 civil penalty and the $740.83 investigative costs within 30 days, or by early June 2010. <u>See</u> Exhibit "7".

21.     However, Jacobson did not pay the $5,000.00 civil penalty and the $740.83 investigative costs within 30 days, or by early June 2010. <u>See</u> July 23, 2015 NJ Chiropractic Board Final Order of Discipline, annexed hereto as Exhibit "8".

22.     Indeed, by December 12, 2014 – more than <u>four years</u> after Jacobson had been ordered to pay the $5,000.00 civil penalty and the $740.83 investigative costs within 30 days – Jacobson still had not paid the $5,000.00 civil penalty and the $740.83 investigative costs. <u>See</u> Exhibit "8".

23.     Accordingly, on December 12, 2014, the NJ Chiropractic Board entered a provisional order of discipline suspending Jacobson's license to practice chiropractic in New Jersey. <u>See</u> Exhibit "8".

24.     Then, on July 23, 2015, the NJ Chiropractic Board entered a final order of discipline suspending Jacobson's license to practice chiropractic in New Jersey until he:

(i)     paid the $5,000.00 civil penalty and the $740.83 investigative costs due under the NJ Chiropractic Board's May 5, 2010 order; and

(ii)    appeared before the NJ Chiropractic Board to demonstrate that he had complied with the NJ Chiropractic Board's May 5, 2010 order,

<u>See</u> Exhibit "8".

25.     In its July 23, 2015 final order of discipline, the NJ Chiropractic Board noted that several of its attempts to serve Jacobson with notice of the December 12, 2014 provisional order of discipline were unsuccessful, because Jacobson had failed to provide the NJ Chiropractic Board with notice of his change of address in further violation of NJ Chiropractic Board regulations. <u>See</u> Exhibit "8".

26.     As a result, in its July 23, 2015 final order of discipline, the NJ Chiropractic Board specifically determined that "adequate service has been made at the licensee's last known address of record with the Board and that he failed to provide the agency with notice of a change of address pursuant to N.J.A.C. 13:45C-1.3(a)7", and further noted that "Respondent cannot evade process by failing to inform the Board of his address." <u>See</u> Exhibit "8".

27.     Jacobson still has not complied with the NJ Chiropractic Board's disciplinary orders and, as a result, his license to practice chiropractic in New Jersey remains suspended.

**B.     NJ Pain**

28.     Defendant NJ Pain is a New Jersey chiropractic professional corporation with its principal place of business in New York. NJ Pain was incorporated in New Jersey on or about October 2, 2012, purported to be owned by Jacobson, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

C.    **BMJ**

29.    Defendant BMJ is a New York chiropractic professional corporation with its principal place of business in New York. BMJ was incorporated in New York on or about June 14, 2013, purported to be owned by Jacobson, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

D.    **Jacobson PC**

30.    Defendant Jacobson PC is a New York chiropractic professional corporation with its principal place of business in New York. Jacobson PC was incorporated in New York on or about October 16, 2013, purported to be owned by Jacobson, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

E.    **Bruce PC**

31.    Defendant Bruce PC is a New York chiropractic professional corporation with its principal place of business in New York. Bruce PC was incorporated in New York on or about February 5, 2014, purported to be owned by Jacobson, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

F.    **NJ Neuro**

32.    Defendant NJ Neuro is a New Jersey chiropractic professional corporation with its principal place of business in New York. NJ Neuro was incorporated in New Jersey on or about December 8, 2014, purported to be owned by Jacobson, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

**G. Beynin**

33.     Defendant Beynin resides in and is a citizen of New Jersey. Beynin was licensed to practice chiropractic in New York on June 22, 2001 and in New Jersey on June 1, 1999, and purported to perform many of the Fraudulent Services while working as an independent contractor at Bruce PC, NJ Pain, Jacobson PC, BMJ, NJ Neuro, and Jacobson's unincorporated chiropractic practice.

**H. Albis**

34.     Defendant Albis resides in and is a citizen of New York. Albis was licensed to practice chiropractic in New York on January 30, 1998 and in New Jersey on October 24, 2012, and purported to perform many of the Fraudulent Services while working as an independent contractor at NJ Pain and NJ Neuro.

**I. Zambuto**

35.     Defendant Zambuto resides in and is a citizen of Florida. Zambuto was licensed to practice chiropractic in New York on January 30, 2014 and in New Jersey on September 7, 1994, and purported to perform many of the Fraudulent Services while working as an independent contractor at Bruce PC, NJ Pain, and NJ Neuro.

**J. Giorgio**

36.     Defendant Giorgio resides in and is a citizen of New York. Giorgio was licensed to practice chiropractic in New York on January 13, 1986, and purported to perform many of the Fraudulent Services while working as an independent contractor at BMJ.

## K. Klass

37.     Defendant Klass resides in and is a citizen of New York. Klass was licensed to practice chiropractic in New York on May 18, 1989 and in New Jersey on October 13, 2006, and purported to perform many of the Fraudulent Services while working as an independent contractor at Bruce PC and Jacobson's unincorporated chiropractic practice.

## L. Patel

38.     Defendant Patel resides in and is a citizen of New York. Patel was licensed to practice chiropractic in New York on May 13, 2004 and in New Jersey on June 11, 2009, and purported to perform many of the Fraudulent Services while working as an independent contractor at NJ Pain and NJ Neuro.

## M. Park

39.     Defendant Park resides in and is a citizen of New York. Park was licensed to practice chiropractic in New York on February 21, 2012, and purported to perform many of the Fraudulent Services while working as an independent contractor at Bruce PC and Jacobson's unincorporated chiropractic practice.

## N. James

40.     Defendant James resides in and is a citizen of Connecticut. James was licensed to practice medicine in New York on May 6, 1999, and referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

**O.    Morley**

41.    Defendant Morley resides in and is a citizen of Connecticut. Morley was licensed to practice medicine in New York on October 20, 2011, and referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

**P.    Corona**

42.    Defendant Corona resides in and is a citizen of New York. Corona was licensed to practice medicine in New York on March 5, 1976, and referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

**Q.    Ajudua**

43.    Defendant Ajudua resides in and is a citizen of New York. Ajudua was licensed to practice medicine in New York on April 22, 1977, and referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

**R.    Striano**

44.    Defendant Striano resides in and is a citizen of New York. Striano was licensed to practice chiropractic in New York on January 6, 1993, and referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in

exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

**S.      Sawhney**

45.      Defendant Sawhney resides in and is a citizen of New Jersey. Sawhney was licensed to practice medicine in New York on July 19, 2001, and referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

**T.      Soman**

46.      Defendant Soman resides in and is a citizen of New York. Sawhney was licensed to practice medicine in New York on June 24, 1999, and referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

**U.      John Doe Defendants "1" – "10"**

47.      Upon information and belief, John Doe Defendants "1" – "10" reside in and are citizens of New York. John Doe Defendants "1" – "10" are individuals and entities, presently not identifiable, who – along with the other Referral Defendants – referred Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice for the Fraudulent Services in exchange for kickbacks from Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice.

## JURISDICTION AND VENUE

48.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

49.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

50.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

51.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

52.    GEICO underwrites automobile insurance in New York and  New Jersey.

**I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.    Pertinent New York Law Governing No-Fault Insurance Reimbursement**

53.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

54.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R.

§§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

55.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including chiropractic services.

56.     In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

57.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

58.     In the alternative, in New York a healthcare services provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

59.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

60.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

61.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

62.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients to healthcare practices in which they have an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

63.     What is more, with limited exceptions that are not applicable here, New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from referring patients for electrodiagnostic testing to healthcare practices in which they have an ownership interest, whether or not the healthcare services providers disclose their ownership interest to the patient. See New York Public Health Law § 238-a.

64.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it engages in illegal self-referrals.

65.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

66.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP

Benefits. There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

67. Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

68. In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

69. When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

70. Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**B.      Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

71.      Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

72.      As in New York, under the New Jersey no-fault insurance laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the HCFA-1500 form.

73.      In order for a healthcare services provider to be eligible to receive PIP Benefits in New Jersey, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

74.      Thus, a healthcare services provider in New Jersey is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at * 4 - * 5 (N.J. App. Div. 2009)("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano,

Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (N.J. App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515-519 (N.J. App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (N.J. Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620 (N.J. 1999)("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare services provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

75.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement in New Jersey, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs., supra; Orthopedic Evaluations, Inc., supra.

76.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers in New Jersey that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

77.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits in New Jersey for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

78.     Pursuant to New Jersey law, only licensed chiropractors can own a chiropractic professional corporation, or own an unincorporated chiropractic practice. See, e.g., N.J. Stat. § 14A:17-10; N.J.A.C. 13:44E-2.15.

79.     Chiropractors with suspended New Jersey chiropractic licenses may not own a New Jersey chiropractic professional corporation, or an unincorporated New Jersey chiropractic practice. See, e.g., N.J. Stat. § 14A:17-10; N.J.A.C. 13:44E-2.15; see also N.J. Stat. § 14A:17-11 ("If any officer, shareholder, agent or employee of a professional corporation becomes legally disqualified to render the same professional service as that for which the corporation was organized, he shall forthwith sever all employment with such corporation and shall not, directly or indirectly, participate or share, as a shareholder, in any earnings or profits realized by such corporation on account of professional services rendered on or after the effective date of such disqualification."); Selective Ins. Co. of America v. Medical Alliances, LLC, 362 N.J. Super. 392 (Law Div. 2003)("The Professional Corporation Act provides that only licensed professionals may hold a shareholder interest in a professional service corporation. … Thus, unlike a general business corporation or an LLC, if a managing member loses his license to perform chiropractic, he would no longer be permitted by law to control or be a member of the professional service corporation.")

80.     Therefore, New Jersey chiropractic professional corporations or unincorporated chiropractic practices that are unlawfully owned by chiropractors with suspended licenses are not eligible to receive PIP Benefits.

81.     Pursuant to N.J.A.C. 13:44-E-2.6, chiropractors in New Jersey are prohibited from paying or receiving kickbacks, either directly or indirectly, in exchange for patient referrals.

82. Therefore, chiropractors and chiropractic practices in New Jersey that pay kickbacks in exchange for patient referrals are not eligible to receive PIP Benefits.

83. In New Jersey, chiropractors generally may not refer patients to a healthcare practice in which they have a significant beneficial interest. Specifically, N.J.S.A. 45:9-22.5 (the "Codey Law") provides that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . . .

84. Pursuant to N.J.S.A. 45:9-22.4:

> "Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

85. Pursuant to N.J.S.A. 45:9-22-5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

86. Pursuant to N.J.S.A. 45:9-22-5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to:

> ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by

the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)    the practitioner who provided the referral personally performs the procedure;

(b)    the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c)    all clinically-related decisions at a facility owned in part by non-practitioners are made by practitioners and are in the best interests of the patient; and

(d)    disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9-22.6).

87.    Therefore, chiropractors and chiropractic practices in New Jersey which engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

88.    Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits in New Jersey for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider in New Jersey is only eligible to receive PIP Benefits for medically necessary services.

89.    Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

(1)    is not primarily for the convenience of the injured person or provider,

(2)    is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the

Department of Law and Public Safety, or by a nationally recognized professional organization, and

(3)     does not involve unnecessary diagnostic testing.

90.     Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for PIP Benefits.

91.     When a healthcare services provider submits a claim for PIP Benefits using the CPT codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

92.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

93.     A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

94.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

95.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A-7(b).

96.     The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

## II.    The Defendants' Fraudulent Scheme

97.     Beginning in 2012, and continuing through the present day, Jacobson and the PC Defendants masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise unreimbursable services.

## A.    The Creation of Multiple, Ostensibly Distinct Professional Corporations as a Means to Conceal the Defendants' Scheme

98.     In January 2012, Jacobson began to submit a large amount of fraudulent billing for electrodiagnostic testing through his unincorporated chiropractic practice under his own, personal tax identification number.

99.     In late 2012, Jacobson wanted to begin submitting billing for the other Fraudulent Services.

100. However, Jacobson was concerned that, if he submitted billing for the other Fraudulent Services under his own tax identification number, the volume of the fraudulent billing might draw the attention of insurer investigative departments, regulatory authorities, and law enforcement.

101. As a result, in late 2012, Jacobson decided to begin to serially incorporate a series of chiropractic professional corporations, and to split the Defendants' billing for the Fraudulent Services across the various chiropractic professional corporations.

102. As an initial step, Jacobson incorporated NJ Pain on or about October 2, 2012, and began to submit the bulk of the Defendants' fraudulent billing for chiropractic manipulation under anesthesia through NJ Pain.

103. Then, on or about June 14, 2013, Jacobson incorporated BMJ, and began to submit the bulk of the Defendants' fraudulent billing for electrodiagnostic testing through BMJ.

104. Concomitantly, in or about June 2013, Jacobson stopped submitting the bulk of the Defendants' fraudulent billing for electrodiagnostic testing through his unincorporated chiropractic practice under his own, personal tax identification number, and instead began to use his unincorporated chiropractic practice as a vehicle to submit the Defendants' fraudulent billing for "ordinary" chiropractic services such as chiropractic manipulation without anesthesia and physical therapy.

105. By late 2013, Jacobson grew concerned that the volume of fraudulent billing for "ordinary" chiropractic services such as chiropractic manipulation without anesthesia and physical therapy that he was submitting through his unincorporated chiropractic practice under his own, personal tax identification number might draw the attention of insurer investigative departments, regulatory authorities, and law enforcement.

106.    Accordingly, on or about October 16, 2013, Jacobson incorporated Jacobson PC, and began to divide the Defendants' fraudulent billing for "ordinary" chiropractic services between Jacobson PC and his unincorporated chiropractic practice.

107.    Even so, by early 2014, not even Jacobson PC and Jacobson's unincorporated chiropractic practice were sufficient to serve as vehicles for the massive amount of fraudulent billing the Defendants were submitting for "ordinary" chiropractic services such as chiropractic manipulation without anesthesia and physical therapy.

108.    Rather, by early 2014, Jacobson once again was concerned that the volume of fraudulent billing for "ordinary" chiropractic services such as chiropractic manipulation without anesthesia that he was submitting through Jacobson PC and his unincorporated chiropractic practice might draw the attention of insurer investigative departments, regulatory authorities, and law enforcement.

109.    Accordingly, on or about February 5, 2014, Jacobson incorporated Bruce PC, and began to divide the Defendants' fraudulent billing for "ordinary" chiropractic services between Bruce PC, Jacobson PC, and his unincorporated chiropractic practice.

110.    What is more, and as set forth above, on December 12, 2014, the NJ Chiropractic Board suspended Jacobson's New Jersey chiropractic license.

111.    Jacobson knew that insurer claims departments were aware of the fact that he owned NJ Pain.

112.    Jacobson was concerned that – when insurers became aware of the fact that his New Jersey chiropractic license had been suspended – they might stop paying NJ Pain's claims because NJ Pain was a New Jersey chiropractic professional corporation that no longer was owned by a chiropractor who was properly licensed in New Jersey.

113.    Accordingly, on or about December 8, 2014, Jacobson incorporated NJ Neuro, and – once Jacobson's chiropractic license was suspended on December 12, 2014 – he began to submit all of the Defendants' fraudulent billing for chiropractic manipulation under anesthesia through NJ Neuro, rather than through NJ Pain.

114.    Jacobson was well-aware of the fact that his New Jersey chiropractic license was suspended as of December 12, 2014, and was well-aware of the fact that the suspension of his New Jersey chiropractic license rendered both NJ Pain and NJ Neuro ineligible to collect PIP Benefits.

115.    For instance, between mid-January 2013 and mid-December 2014, Jacobson caused hundreds of individual bills containing thousands of individual chiropractic manipulation under anesthesia charges to be submitted through NJ Pain to GEICO.

116.    Then, suddenly, within days after his New Jersey chiropractic license was suspended on December 12, 2014, Jacobson stopped submitting chiropractic manipulation under anesthesia bills through NJ Pain and started submitting chiropractic manipulation under anesthesia billing through NJ Neuro.

117.    GEICO received its last bill from NJ Pain on December 15, 2014 – three days after Jacobson's New Jersey chiropractic license was suspended, at or around the time when he received notice of the suspension.

118.    GEICO received its first bill from NJ Neuro on January 10, 2015, covering chiropractic manipulation under anesthesia services allegedly provided on December 18, 2014.

119.    Jacobson's decision to stop submitting his chiropractic manipulation under anesthesia billing through NJ Pain, and to start submitting his chiropractic manipulation under anesthesia billing through NJ Neuro, was a calculated effort to conceal the fact that the NJ Neuro

billing was not reimbursable because it was submitted through a New Jersey professional corporation that was owned by a chiropractor with a suspended New Jersey chiropractic license.

120. Jacobson knew that, by the time insurer claims departments learned of his license suspension, and of the fact that Jacobson owned NJ Neuro, he already would have collected large sums of money on the unreimbursable NJ Neuro billing.

121. In order to conceal the fact that his New Jersey chiropractic license had been suspended, and thereby ensure his ability to collect the maximum amount possible on the fraudulent billing the Defendants submitted through NJ Neuro, Jacobson falsely testified, during a July 24, 2015 examination under oath, that he had not been subjected to any professional discipline in New Jersey since July 2014.

122. More generally, there is no legitimate reason why a legitimate chiropractor or group of chiropractors would need to submit their billing through five separate chiropractic professional corporations, as well as an unincorporated chiropractic practice, over the course of less than three years.

123. There is no legitimate reason why an individual chiropractor such as Jacobson would need to simultaneously operate five separate professional corporations, as well as an unincorporated chiropractic practice, in order to practice his profession.

124. The Defendants conducted their scheme through multiple chiropractic professional corporations and an unincorporated chiropractic practice, using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

**B.    The Multidisciplinary Clinics and Kickbacks**

125.    Jacobson and the PC Defendants did not advertise or market their services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide the Fraudulent Services.

126.    Instead, Jacobson, the PC Defendants, and the Treating Defendants operated on an itinerant basis from a large number of multidisciplinary clinics (the "Clinics") throughout the New York metropolitan area, including but not limited to Clinics at the following locations:

(i)      102-06 Metropolitan Avenue, Forest Hills, New York;

(ii)     109-17 46th Avenue, Corona, New York;

(iii)    1310 Pugsley Avenue, Bronx, New York;

(iv)     150-11 Hillside Avenue, Jamaica, New York;

(v)      2510 Westchester Avenue, Bronx, New York;

(vi)     443 Winthrop Street, Brooklyn, New York;

(vii)    1552 Ralph Avenue, Brooklyn, New York;

(viii)   172-17 Jamaica Avenue, Jamaica, New York;

(ix)     1730 Central Park Avenue, Yonkers, New York;

(x)      205-07 Hillside Avenue, Hollis, New York;

(xi)     2363 Ralph Avenue, Brooklyn, New York;

(xii)    4226A Third Avenue, Bronx, New York;

(xiii)   63-70 Woodhaven Boulevard, Rego Park, New York;

(xiv)    665 Pelham Parkway, Bronx, New York; and

(xv)     92-07 Roosevelt Avenue, Jackson Heights, New York.

127.    Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

128.    Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice gained access to the Clinics by paying kickbacks to the Referral Defendants, who were other healthcare services providers who operated from the Clinics and controlled access to the Clinics.

129.    The kickbacks were disguised as ostensibly legitimate fees to "lease" space or personnel from the Referral Defendants. In fact, these were "pay-to-play" arrangements that caused the Referral Defendants at the Clinics to provide access to Insureds and to refer the Insureds to the Defendants for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

130.    In exchange for these kickbacks from Jacobson and the PC Defendants, the Referral Defendants automatically referred Insureds to Jacobson and the PC Defendants for the medically-unnecessary Fraudulent Services, regardless of the Insureds' individual circumstances or presentment.

131.    In keeping with the fact that the "rent" that Jacobson and the PC Defendants paid to the Referral Defendants constituted kickbacks in exchange for patient referrals, the purported "rent" was far in excess of the fair market value of the putative leaseholds.

132.    For instance:

(i)    Jacobson, NJ Pain, BMJ, and Bruce PC collectively paid at least $4,500.00 per month to Morley for the non-exclusive use of space and personnel at the Clinic located at 1310 Pugsley Avenue, Bronx, New York, despite the fact that they shared the Clinic with multiple other healthcare services providers, despite the fact that the Clinic itself was a small storefront in an inexpensive neighborhood, and despite the fact that the actual fair market value for the non-exclusive use of space and personnel at the Clinic was far less than $4,500.00 per month.

(ii)    Jacobson, NJ Pain, and BMJ collectively paid at least $2,500.00 per month for the non-exclusive use of space and personnel at the Clinic located at 172-17 Jamaica Avenue, Jamaica, New York, despite the fact that they shared the Clinic with multiple other healthcare services providers, despite the fact that the Clinic itself was a small storefront in an inexpensive neighborhood, and despite the fact that the actual fair market value for the non-exclusive use of space and personnel at the Clinic was far less than $2,500.00 per month.

(iii)    Jacobson, NJ Pain, and BMJ collectively paid at least $2,500.00 per month to Sawhney for the non-exclusive use of space and personnel at the Clinic located at 443 Winthrop Street, Brooklyn, New York, despite the fact that they shared the Clinic with multiple other healthcare services providers, despite the fact that the Clinic itself was a small storefront in an inexpensive neighborhood, and despite the fact that the actual fair market value for the non-exclusive use of space and personnel at the Clinic was far less than $2,500.00 per month.

(iv)    Jacobson, NJ Pain, and BMJ collectively paid at least $2,500.00 per month to a physician named "Simmons" for the non-exclusive use of space and personnel at the Clinic located at 2363 Ralph Avenue, Brooklyn, New York, despite the fact that they shared the Clinic with multiple other healthcare services providers, despite the fact that the Clinic itself was a small storefront in an inexpensive neighborhood, and despite the fact that the actual fair market value for the non-exclusive use of space and personnel at the Clinic was far less than $2,500.00 per month.

(v)    Jacobson, NJ Pain, and BMJ collectively paid at least $2,500.00 per month to Ajudua for the non-exclusive use of space and personnel at the Clinic located at 63-70 Woodhaven Boulevard, Rego Park, New York, despite the fact that they shared the Clinic with multiple other healthcare services providers, despite the fact that the Clinic itself was a small storefront in an inexpensive neighborhood, and despite the fact that the actual fair market value for the non-exclusive use of space and personnel at the Clinic was far less than $2,500.00 per month.

(vi)    Jacobson, NJ Pain, and BMJ collectively paid at least $4,000.00 per month to Striano for the non-exclusive use of space and personnel at the Clinic located at 665 Pelham Parkway, Bronx, New York, despite the fact that they shared the Clinic with multiple other healthcare services providers, despite the fact that the Clinic itself was located in an inexpensive neighborhood, and despite the fact that the actual fair market value for the non-exclusive use of space and personnel at the Clinic was far less than $4,000.00 per month.

133.    In keeping with the fact that the "rent" Jacobson and the PC Defendants paid to the Referral Defendants was far in excess of the fair market value for the putative leaseholds at the Clinics, and in fact constituted kickbacks in exchange for patient referrals, Jacobson and the

PC Defendants operated from the various Clinics on a very occasional basis, notwithstanding the high "rent".

134.    For instance:

(i)     Though Jacobson, NJ Pain, and BMJ collectively paid at least $2,500.00 per month at the Clinic located at 172-17 Jamaica Avenue, Jamaica, New York, they only sporadically used any space at the Clinic. For example, Jacobson, NJ Pain, and BMJ used space at the Jamaica Avenue Clinic an average of less than three days each month.

(ii)    Though Jacobson, NJ Pain, and BMJ collectively paid at least $2,500.00 per month to Sawhney at the Clinic located at 443 Winthrop Street, Brooklyn, New York, they only sporadically used any space at the Clinic. For example, Jacobson, NJ Pain, and BMJ used space at the Winthrop Street Clinic an average of less than three days each month.

(iii)   Though Jacobson, NJ Pain, and BMJ collectively paid at least $2,500.00 per month to Ajudua at the Clinic located at 63-70 Woodhaven Boulevard, Rego Park, New York, they only sporadically used any space at the Clinic. For example, Jacobson, NJ Pain, and BMJ used space at the Woodhaven Boulevard Clinic an average of less than three days each month.

(iv)    Though Jacobson, NJ Pain, and BMJ collectively paid at least $4,000.00 per month to Striano at the Clinic located at 665 Pelham Parkway, Bronx, New York, they only sporadically used any space at the Clinic. For example, Jacobson, NJ Pain, and BMJ used space at the Pelham Parkway Clinic an average of less than four days each month.

135.    In keeping with the fact that the "rent" that Jacobson and the PC Defendants paid to the Referral Defendants at the Clinics constituted kickbacks in exchange for patient referrals, Jacobson repeatedly responded with dissembling, evasive, and totally implausible answers when questioned under oath regarding his and the PC Defendants' arrangements with the other healthcare services providers at the Clinics.

136.    For instance, during a July 7, 2014 examination under oath:

(i)     Jacobson gave testimony indicating that – pursuant to an agreement with James – Bruce PC, NJ Pain, and BMJ had been operating for approximately one year from the Clinic located at 102-06 Metropolitan Avenue, Forest Hills, New York, but

contended that neither he nor his entities had any written lease at the Clinic, and that neither he nor his entities paid any rent for their use of the Clinic.

(ii)     Jacobson gave testimony indicating that – pursuant to an agreement with a chiropractor named Michael Minick, D.C. – NJ Pain had been operating for at least seven months from the Clinic located at at 2510 Westchester Avenue, Bronx, New York, but contended that neither he nor NJ Pain had any written lease at the Clinic, and that neither he nor NJ Pain paid any rent for their use of the Clinic.

(iii)    Jacobson gave testimony indicating that NJ Pain had begun operating from a Clinic located on Southern Boulevard in the Bronx, New York within the preceding seven months. Though Jacobson testified that NJ Pain had begun operating from the Southern Boulevard Clinic at some point within the preceding seven months, and though Jacobson testified that NJ Pain paid between $1,000.00 and $1,500.00 per month to rent space at the Southern Boulevard Clinic, Jacobson testified that NJ Pain had no written lease at the Southern Boulevard Clinic, and professed not to recall the identity of the person or entity with whom NJ Pain had entered into a verbal lease at the Southern Boulevard Clinic.

(iv)    Jacobson gave testimony in which he contended that NJ Pain and BMJ had separate written leases at the Clinic located at at 172-17 Jamaica Avenue, Jamaica, New York, and contended that the leases were with an entity called Clover Associates Group, which supposedly was owned by a woman named "Sonya". Though Jacobson contended that the leases at the 172-17 Jamaica Avenue location were with Clover Associates Group, he contended that he did not negotiate the rent at the Clinic with Clover Associates Group or "Sonya". Rather, Jacobson testified that he negotiated the rent at the Clinic with Corona, who operated from the Clinic, and from whom NJ Pain and BMJ received patient referrals.

137.    Along similar lines, during a July 16, 2014 examination under oath:

(i)     Jacobson gave testimony indicating that – pursuant to an agreement with a chiropractor named "Michael Ginaton" – BMJ had been operating from the Clinic located at 4226A Third Avenue, Bronx, New York. Although, by that point, BMJ had been operating from the Clinic for more than a year, Jacobson contended that neither he nor BMJ had any written lease at the Clinic, and that neither he nor BMJ paid any rent for their use of the Clinic.

(ii)    Jacobson testified that neither he nor BMJ had any written lease for their use of space at the Clinic located at 109-17 46th Avenue, Corona, New York, and that he did not recall whether they paid any rent for the use of the Clinic, despite the fact that the billing submitted through BMJ to GEICO indicated that Jacobson and BMJ had operated from the Clinic on a continuous basis between mid-2013 and early 2014, shortly before the examination under oath.

(iii)     Jacobson testified that he could not recall whether BMJ had either a verbal or written lease for the Clinic located at 1730 Central Park Avenue, Yonkers, New York, or whether he or BMJ paid any rent for the use of the Clinic, despite the fact that BMJ first began operating from the Clinic only about 14 months prior to the examination under oath, and despite the fact that BMJ continued to operate from the Clinic at the time of the examination under oath.

138.    Then, during a July 24, 2015 examination under oath, Jacobson evasively refused to respond to direct questions regarding the exact dollar amounts that he and the PC Defendants paid in "rent" at various of the Clinics, other than to confirm that the "rent" at the various Clinics was less then $4,000.00 per month, but more than one dollar per month.

139.    In keeping with the fact that the "rent" that Jacobson and the PC Defendants paid to the Clinics constituted kickbacks in exchange for patient referrals, Jacobson and the PC Defendants did not pay the "rent" to the owners of the buildings from which the Clinics operated, but rather to other healthcare services providers operating from the Clinics who referred Insureds to Jacobson and the PC Defendants.

140.    For instance, during a July 7, 2014 examination under oath:

(i)      Jacobson gave testimony indicating that he, NJ Pain, BMJ, and Bruce PC paid their "rent" for the use of the Clinic at 1310 Pugsley Avenue, Bronx, New York to a professional corporation owned by Morley. Jacobson also gave testimony indicating that Morley was the source of the referrals to NJ Pain, BMJ, and Bruce PC at that Clinic. Though Jacobson, NJ Pain, BMJ, and Bruce PC paid their "rent" to Morley, Morley did not directly or indirectly own the property at 1310 Pugsley Avenue, Bronx, New York.

(ii)     Jacobson gave testimony indicating that he, NJ Pain, and BMJ paid their "rent" for the use of the Clinic at 2363 Ralph Avenue, Brooklyn, New York to a corporation owned by a physician who Jacobson identified as "Dr. Simmons". Jacobson also gave testimony indicating that "Dr. Simmons" was a source of the referrals to NJ Pain and BMJ at that Clinic. Though Jacobson, NJ Pain, and BMJ paid their "rent" to "Dr. Simmons", "Dr. Simmons" did not directly or indirectly own the property at 2363 Ralph Avenue, Brooklyn, New York.

(iii)    Jacobson gave testimony indicating that he, NJ Pain, and BMJ paid their "rent" for the use of the Clinic at 63-70 Woodhaven Boulevard, Rego Park, New York to a professional corporation owned by Ajudua. Jacobson also gave testimony

indicating that Ajudua was the source of the referrals to NJ Pain and BMJ at that Clinic. Though Jacobson, NJ Pain, and BMJ paid their "rent" to Ajudua, Ajudua did not directly or indirectly own the property at 63-70 Woodhaven Boulevard, Rego Park, New York.

(iv)     Jacobson gave testimony indicating that he, NJ Pain, and BMJ paid their "rent" for the use of the Clinic at 665 Pelham Parkway, Bronx, New York to a professional corporation owned by Striano. Jacobson also gave testimony indicating that Striano was the source of the referrals to NJ Pain and BMJ at that Clinic. Though Jacobson, NJ Pain, and BMJ paid their "rent" to Striano, Striano did not directly or indirectly own the property at 665 Pelham Parkway, Bronx, New York.

(v)     Jacobson gave testimony indicating that he, NJ Pain, and BMJ paid their "rent" for the use of the Clinic at 443 Winthrop Street, Brooklyn, New York to Sawhney. Jacobson also gave testimony indicating that Sawhney was the source of the referrals to NJ Pain and BMJ at that Clinic. Though Jacobson, NJ Pain, and BMJ paid their "rent" to Sawhney, Sawhney did not directly or indirectly own the property at 443 Winthrop Street, Brooklyn, New York.

141.     Along similar lines, during a July 24, 2015 examination under oath:

(i)     Jacobson have testimony indicating that he, NJ Neuro, and Bruce PC paid their "rent" for the use of the Clinic at 205-07 Hillside Avenue, Hollis, New York to a professional corporation owned by Ajudua. Jacobson also gave testimony indicating that Ajudua was the source of the referrals to NJ Neuro and Bruce PC at that Clinic. Though Jacobson, NJ Neuro, and Bruce PC paid their "rent" to Ajudua, Ajudua did not directly or indirectly own the property at 205-07 Hillside Avenue, Hollis, New York.

(ii)     Jacobson gave testimony indicating that he and Bruce PC paid their "rent" for the use of a Clinic at 5912 Flatlands Avenue, Brooklyn, New York to a professional corporation owned by Ajudua. Jacobson also gave testimony indicating that Ajudua was the source of the referrals to Bruce PC at that Clinic. Though Jacobson and Bruce PC paid their "rent" to Ajudua, Ajudua did not directly or indirectly own the property at 5912 Flatlands Avenue, Brooklyn, New York.

(iii)     Jacobson gave testimony indicating that he paid his "rent" for the use of the Clinic at 2363 Ralph Avenue, Brooklyn, New York to Soman. Jacobson also gave testimony indicating that Soman was the source of his referrals at that Clinic. Though Jacobson paid his "rent" to Soman, Soman did not directly or indirectly own the property at 2363 Ralph Avenue, Brooklyn, New York. Indeed, during his July 7, 2014 examination under oath, Jacobson testified that – at that time – he was paying his "rent" at the 2363 Ralph Avenue Clinic to a different physician at that Clinic, a "Dr. Simmons".

## C.    The Illegal Self-Referrals

142.    After obtaining their initial patient referrals through illegal kickbacks that Jacobson and the PC Defendants paid to the Referral Defendants, Jacobson and the PC Defendants then engaged in a subsequent pattern of illegal self-referrals designed to: (i) maximize their fraudulent billing opportunities with respect to each Insured; and simultaneously (ii) minimize the amount of fraudulent billing submitted through any one of the PC Defendants or Jacobson's unincorporated chiropractic practice with respect to any individual Insured, and thereby conceal and perpetuate their scheme.

143.    In the claims identified in Exhibits "1" – "6", the Defendants' pattern of illegal self-referrals for electrodiagnostic testing typically proceeded as follows:

(i)     Jacobson caused Insureds to be referred from Jacobson PC, Bruce PC, or his unincorporated chiropractic practice to BMJ for purported electrodiagnostic testing, despite the fact that New York law prohibits electrodiagnostic testing referrals to an entity in which the referring healthcare provider has an ownership interest; and

(ii)    neither Jacobson, the PC Defendants, the Treating Defendants, nor any other healthcare services provider associated with the Defendants disclosed Jacobson's ownership interest in BMJ to the Insureds, or advised the Insureds of their right to use any specifically identified alternative healthcare services provider for the electrodiagnostic testing.

144.    In the claims identified in Exhibits "1" – "6", the Defendants' pattern of illegal self-referrals for chiropractic manipulation under anesthesia typically proceeded as follows:

(i)     Jacobson caused Insureds to be referred from Jacobson PC, Bruce PC, or his unincorporated chiropractic practice to either NJ Pain or NJ Neuro for purported chiropractic manipulation under anesthesia;

(ii)    the chiropractic manipulation under anesthesia purportedly was provided in New Jersey through NJ Pain or NJ Neuro, which are New Jersey chiropractic professional corporations, and

(iii)   the practitioner who made the referral did not personally perform the chiropractic manipulation under anesthesia; and/or

(iv)     neither Jacobson, the PC Defendants, the Treating Defendants, nor any other healthcare services provider associated with the Defendants disclosed Jacobson's ownership interest in NJ Pain or NJ Neuro to the Insureds, in writing or otherwise.

145.     For example:

(i)      On or about July 24, 2014, Jacobson caused an Insured named "JA" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(ii)     On or about June 19, 2014, Jacobson caused an Insured named "CA" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about July 21, 2014, Jacobson caused "CA" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(iii)    On or about August 26, 2014, Jacobson caused an Insured named "MA" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(iv)     On or about September 26, 2013, Jacobson caused an Insured named "BA" to be referred from Jacobson PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about December 9, 2013, Jacobson caused "BA" to be referred from Jacobson PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(v)      On or about August 18, 2014, Jacobson caused an Insured named "DA" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for

purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(vi)     On or about May 21, 2014, Jacobson caused an Insured named "EA" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(vii)    On or about March 20, 2014, Jacobson caused an Insured named "GA" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about March 24, 2014, Jacobson caused "GA" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(viii)   On or about September 9, 2014, Jacobson caused an Insured named "NB" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(ix)     On or about January 7, 2014, Jacobson caused an Insured named "GB" to be referred from Jacobson PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(x)      On or about September 18, 2014, Jacobson caused an Insured named "WB" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(xi)     On or about July 1, 2014, Jacobson caused an Insured named "CB" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported

electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(xii)     On or about March 5, 2014, Jacobson caused an Insured named "FB" to be referred from Jacobson PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(xiii)    On or about September 28, 2014, Jacobson caused an Insured named "AC" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xiv)     On or about July 31, 2014, Jacobson caused an Insured named "FC" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about September 4, 2014, Jacobson caused "FC" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xv)      On or about April 17, 2014, Jacobson caused an Insured named "HC" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about July 21, 2014, Jacobson caused "HC" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xvi)     On or about March 13, 2014, Jacobson caused an Insured named "TC" to be referred from Jacobson PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about May 6,

2014, Jacobson caused "TC" to be referred from Jacobson PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xvii)    On or about July 21, 2014, Jacobson caused an Insured named "KD" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about July 29, 2014, Jacobson caused "KD" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xviii)    On or about October 30, 2014, Jacobson caused an Insured named "MD" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about November 3, 2014, Jacobson caused "MD" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xix)    On or about May 15, 2014, Jacobson caused an Insured named "SD" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about June 23, 2014, Jacobson caused "SD" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xx)    On or about November 9, 2013, Jacobson caused an Insured named "AF" to be referred from Jacobson PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xxi) On or about April 3, 2014, Jacobson caused an Insured named "TF" to be referred from Bruce PC, where he had been purporting to provide her with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about May 12, 2014, Jacobson caused "TF" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xxii) On or about May 5, 2014, Jacobson caused an Insured named "VM" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured. Then, on or about May 22, 2014, Jacobson caused "VM" to be referred from Bruce PC to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured.

(xxiii) On or about February 7, 2014, Jacobson caused an Insured named "AM" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about June 23, 2014, Jacobson caused "AM" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xxiv) On or about July 24, 2014, Jacobson caused an Insured named "WO" to be referred from Bruce PC, where he had been purporting to provide him with chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about September 13, 2014, Jacobson caused "WO" to be referred from Bruce PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Bruce PC, nor any other healthcare services providers associated with Jacobson or Bruce PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

(xxv) On or about December 10, 2013, Jacobson caused an Insured named "CP" to be referred from Jacobson PC, where he had been purporting to provide him with

chiropractic manipulation without anesthesia and physical therapy, to BMJ for purported electrodiagnostic testing. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in BMJ to the Insured. Then, on or about January 16, 2014, Jacobson caused "CP" to be referred from Jacobson PC to NJ Pain for purported chiropractic manipulation under anesthesia. Neither Jacobson, Jacobson PC, nor any other healthcare services providers associated with Jacobson or Jacobson PC disclosed Jacobson's ownership interest in NJ Pain to the Insured.

146.    In keeping with the fact that the Defendants failed to disclose Jacobson's ownership interest in BMJ, NJ Pain, and NJ Neuro when referring Insureds to BMJ, NJ Pain, and NJ Neuro, Jacobson has failed to produce proof of the disclosures to GEICO, despite GEICO's repeated requests that he do so.

147.    For instance, during a July 7, 2014 examination under oath, Jacobson contended that he provided a written disclosure of his ownership interest in NJ Pain to Insureds when referring them for chiropractic manipulation under anesthesia at NJ Pain.

148.    During a July 14, 2014 examination under oath, Jacobson not only contended that he provided a written disclosure of his ownership interest in BMJ to Insureds when referring them for electrodiagnostic testing at BMJ, but also contended that the written disclosures were signed by the Insureds and placed into the Insureds' patient files.

149.    Along similar lines, during a July 24, 2015 examination under oath, Jacobson not only contended that he provided a written disclosure of his ownership interest in NJ Neuro to Insureds when referring them for chiropractic manipulation under anesthesia at NJ Neuro, but also contended that the written disclosures were signed by the Insureds.

150.    However, despite GEICO's repeated requests that Jacobson and the PC Defendants produce copies of the disclosure forms that they purportedly provided to the Insureds when making referrals to BMJ, NJ Pain, and NJ Neuro, Jacobson and the PC Defendants failed to produce the signed disclosure forms in virtually every case.

**D.    The Defendants' Fraudulent Treatment and Billing Protocol**

151.    Virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

152.    Even so, the Defendants purported to subject virtually every Insured to a substantially identical, medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit through the PC Defendants or Jacobson's unincorporated chiropractic practice to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

153.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

154.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

155.    No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

156.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.      The Fraudulent Charges for Initial Examinations**

157.     Upon receiving a referral pursuant to the kickbacks that Jacobson and the PC Defendants paid to the other healthcare services providers that operated from the Clinics, or one of their own illegal self-referrals, the Defendants purported to provide virtually every Insured in the claims identified in Exhibits "1" – "6" with an initial examination.

158.     In keeping with the fact that the initial examinations were performed – to the extent that they were performed at all – pursuant to the kickbacks that Jacobson and the PC Defendants paid at the Clinics, or pursuant to one of their own illegal self-referrals, the Defendants virtually always purported to perform the initial examinations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

159.     The initial examinations were performed as a "gateway" in order to provide Insureds with phony, pre-determined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise unreimbursable electrodiagnostic testing, chiropractic manipulation under anesthesia, chiropractic manipulation without anesthesia, and physical therapy services.

160.     Typically, either Jacobson or one of the Treating Defendants purported to perform the initial examinations, which were billed to GEICO through one of the PC Defendants or through Jacobson's unincorporated chiropractic practice.

161.     The Defendants then virtually always billed the initial examinations to GEICO under current procedural terminology ("CPT") code: (i) 99244, typically resulting in a charge of

$190.00; (ii) 99243, typically resulting in a charge of $139.34; (iii) 99204, typically resulting in a charge of either $78.20, $148.69, or $175.00; or (iv) 99203, typically resulting in a charge of $54.74.

162.    The charges for the initial examinations were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that Jacobson and the PC Defendants paid at the Clinics, or pursuant to the Defendants' own illegal self-referrals, not to treat or otherwise benefit the Insureds.

163.    Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the extent of the initial examinations.

164.    For example, in every claim identified in Exhibits "1" – "6" for initial examinations under CPT codes 99244, 99243, 99204, and 99203, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor spent with the Insureds or the Insureds' families.

165.    The use of CPT code 99244 typically requires that a physician spend 60 minutes of face-to-face time with the Insured or the Insured's family.

166.    The use of CPT code 99204 typically requires that a physician spend 45 minutes of face-to-face time with the Insured or the Insured's family.

167.    The use of CPT code 99243 typically requires that a physician spend 40 minutes of face-to-face time with the Insured or the Insured's family.

168.    The use of CPT code 99203 typically requires that a physician spend 30 minutes of face-to-face time with the Insured or the Insured's family.

169.     Though the Defendants billed for their putative initial examinations under CPT codes 99244, 99204, 99243, or 99203, no chiropractor or other healthcare professional associated with the PC Defendants or Jacobson's unincorporated chiropractic practice ever spent 30 minutes on an initial examination, much less 40, 45, or 60 minutes.

170.     Rather, the initial examinations in the claims identified in Exhibits "1" – "6" rarely lasted more than 10 minutes, to the extent that they were conducted at all.

171.     In keeping with the fact that the initial examinations rarely lasted more than 10 minutes – to the extent that they were conducted at all – Jacobson and the Treating Defendants used checklist forms in purporting to conduct the initial examinations.

172.     The checklist forms that Jacobson and the Treating Defendants used in conducting the initial examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

173.     All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

174.     These interviews and examinations did not require Jacobson, the Treating Defendants, or any other chiropractor associated with the PC Defendants or Jacobson's unincorporated chiropractic practice to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

175.     In addition, pursuant to the NY Fee Schedule and the NJ Fee Schedule, when the Defendants submitted charges for initial examinations under CPT codes 99204 or 99244, or caused them to be submitted, they falsely represented that a chiropractor associated with one of the PC Defendants or Jacobson's unincorporated chiropractic practice: (i) took a

"comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

176.    Similarly, pursuant to the NY Fee Schedule and the NJ Fee Schedule, when the Defendants submitted charges for initial examinations under CPT codes 99203 or 99243, or caused them to be submitted, they falsely represented that a chiropractor associated with one of the PC Defendants or Jacobson's unincorporated chiropractic practice: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and engaged in medical decision-making of "low complexity".

**a.    Misrepresentations Regarding "Comprehensive" or "Detailed" Patient Histories**

177.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the NY Fee Schedule and the NJ Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician or chiropractor has conducted a "complete" review of the patient's systems.

178.    Pursuant to the CPT Assistant, a physician or chiropractor has not conducted a "complete" review of a patient's systems unless the physician or chiropractor has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

179.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)     constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)   ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)   allergic/immunologic.

180.    In the claims for initial examinations identified in Exhibits "1" – "6", when the Defendants billed for the initial examinations under CPT codes 99204 or 99244, they falsely represented that a chiropractor associated with one of the PC Defendants or Jacobson's unincorporated chiropractic practice took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

181.    In fact, in each of the claims for initial examinations identified in Exhibits "1" – "6", neither the Treating Defendants, Jacobson, nor any other healthcare services provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice ever documented a review of 10 organ systems unrelated to the history of the patients' present illnesses in their reports of the purported initial examinations.

182.    Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician or chiropractor take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

183.    Pursuant to the NY Fee Schedule and NJ Fee Schedule, a "detailed" patient history also requires that the healthcare provider take a past, family, and social history from the patient to the extent that the patient's past, family, and social history is related to the patient's presenting problems.

184.    However, in the claims for initial examinations identified in Exhibits "1" – "6", neither the Treating Defendants, Jacobson, nor any other healthcare services provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice even took a "detailed" patient history from Insureds during the initial examinations, inasmuch as they did not take a history of systems related to the patient's presenting problems, did not conduct any review of a limited number of additional systems, and did not take a past, family, and social history from the patient to the extent that the patient's past, family, and social history were related to the patient's presenting problems.

185.    Rather, after purporting to provide the initial examinations, the Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

186.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

**b.    Misrepresentations Regarding "Comprehensive" or "Detailed" Physical Examinations**

187.    Moreover, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

188.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a general examination of multiple patient organ systems unless the physician or chiropractor has documented findings with respect to at least eight organ systems.

189.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

190.    In the claims identified in Exhibits "1" – "6", when the Defendants billed for the initial examinations under CPT codes 99204 or 99244, they falsely represented that chiropractors

associated with one of the PC Defendants or Jacobson's unincorporated chiropractic practice performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

191.    In fact, with respect to the claims identified in Exhibits "1" – "6", neither Jacobson, the Treating Defendants, nor any other healthcare services provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

192.    For instance, in each of the claims under CPT codes 99204 and 99244 identified in Exhibits "1" – "6", neither Jacobson, the Treating Defendants, nor any other healthcare services provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

193.    Furthermore, although the Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "1" – "6", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(ii)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(iii)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(iv)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head

and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(v)      coordination, deep tendon reflexes, and sensation; and/or

(vi)      mental status, including orientation to time, place and person, as well as mood and affect.

194.      Pursuant to the NY Fee Schedule and NJ Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

195.      To the extent that the Insureds in the claims identified in Exhibits "1" – "6" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

196.      Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)      general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)      examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)      palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)      examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

197.    In the claims for initial examinations in Exhibits "1" – "6" in which the Defendants billed for the initial examinations under CPT codes 99243 or 99203, the Defendants falsely represented that Jacobson, one of the Treating Defendants, or some other healthcare provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice conducted a "detailed" patient examination of the Insureds they purported to treat during the initial examinations.

198.    In fact, neither Jacobson, the Treating Defendants, nor any other healthcare services provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice even conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

199.    For example, in the claims for initial examinations identified in Exhibits "1" – "6", neither Jacobson, the Treating Defendants, nor any other healthcare services provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice ever documented findings with respect to

(i)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(ii)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(iii) inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(iv) coordination;

(v) examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(vi) examination of sensation.

200. In keeping with the fact that the Defendants' putative patient examinations were not "detailed", much less "comprehensive", the purported results of the purported examinations were fabricated.

201. In many of the Defendants' claims for initial examinations identified in Exhibits "1" – "6", the data that the Defendants purported to obtain during the putative initial examinations were contravened by contemporaneous police reports and hospital records.

202. For example:

(i) On August 31, 2014, 2014, an Insured named "BJ" was involved in an automobile accident. The police report indicated that the accident was a low-speed, low-impact, collision, that the airbags in "BJ"'s vehicle did not deploy, and that "BJ"'s vehicle was drivable following the accident. The police report also indicated that no one was injured in the accident. In keeping with the fact that "BJ" was not injured in her minor accident, she did not go to the hospital following the accident. Even so, following a purported October 21, 2014 initial examination by Beynin at NJ Pain, Beynin, Jacobson, and NJ Pain falsely reported that "BJ" continued to suffer from high levels of pain in her neck, back, and shoulder as the result of her minor, seven week-old accident, and falsely reported major deficits in "BJ"'s cervical and lumbar range of motion, to an extent that would have prevented "BJ" from ambulating normally.

(ii) On July 17, 2014, an Insured named "OD" was involved in an automobile accident. The police report indicated that the accident was a low-speed, low-impact, collision, that the airbags in "OD"'s vehicle did not deploy, and that "OD"'s vehicle was drivable following the accident. The police report also stated that no one was injured in the accident, and that no one involved in the accident complained of pain. In keeping with the fact that "OD" was not injured in her

minor accident, she did not go to the hospital following the accident. Even so, following a purported October 22, 2014 initial examination by Beynin at NJ Pain, Beynin, Jacobson, and NJ Pain falsely reported that "OD" continued to suffer from very high levels of pain in her neck, back, and shoulder as the result of her minor, three month-old accident, and falsely reported major deficits in "OD"'s cervical and lumbar range of motion, to an extent that would have prevented "OD" from ambulating normally.

(iii)    On July 2, 2014, an Insured named "DW" was involved in an automobile accident. The police report indicated that the accident was a low-speed, low-impact rear end collision that occurred when "DW"'s vehicle was stopped at a traffic light. The police report further indicated that "DW"'s vehicle was drivable following the accident, and that no one was injured in the accident. In keeping with the fact that "DW" was not injured in his minor accident, he did not go to the hospital following the accident. Even so, following a purported September 24, 2014 initial examination by Beynin at NJ Pain, Beynin, Jacobson, and NJ Pain falsely reported that "DW" continued to suffer from high levels of pain in his neck and back as the result of his minor, almost three month-old accident, and falsely reported major deficits in "DW"'s cervical and lumbar range of motion, to an extent that would have prevented "DW" from ambulating normally.

(iv)    On June 20, 2014, an Insured named "KD" was involved in an automobile accident. The police report indicated that the accident was a low-speed, low-impact collision, that the airbags in "KD"'s vehicle did not deploy, and that "KD"'s vehicle was drivable following the accident. Nonetheless, later that day "KD" presented for treatment at Mercy Medical Center Hospital in Rockville Centre, New York. The hospital records likewise indicated that "KD"'s accident was a low-speed, low-impact collision in which the airbags in "KD"'s vehicle did not deploy. The hospital records further indicated that "KD" was fully ambulatory and had full, normal range of motion in his back and neck. Even so, following a purported June 25, 2014 initial examination by Zambuto at Bruce PC, Zambuto, Jacobson, and Bruce PC falsely reported major deficits in "KD"'s cervical, thoracic, and lumbar range of motion, to an extent that would have prevented "KD" from ambulating normally.

(v)    On May 10, 2014, an Insured named "RZ" was involved in an automobile accident. The police report indicated that the accident was a low-speed, low-impact collision, that the airbags in "RZ"'s vehicle did not deploy, and that "RZ"'s vehicle was drivable following the accident. The police report also indicated that no one was injured in the accident. In keeping with the fact that "RZ" was not injured in her minor accident, she did not go to the hospital following the accident. Even so, following a purported July 23, 2014 initial examination by Beynin at NJ Pain, Beynin, Jacobson, and NJ Pain falsely reported that "RZ" continued to suffer from high levels of pain in her neck and back as the result of her minor, two and a half month-old accident, and falsely

reported major deficits in "RZ"'s cervical and lumbar range of motion, to an extent that would have prevented "RZ" from ambulating normally.

(vi)     On May 6, 2014, an Insured named "DW" was involved in an automobile accident. The police report indicated that the accident was a low-speed, low-impact side swipe collision, that "DW"'s vehicle was drivable following the accident, and that "DW" was not injured in the accident. Even so, following a purported June 25, 2014 initial examination by Zambuto at Bruce PC, Zambuto, Jacobson, and Bruce PC falsely reported major deficits in "DW"'s cervical, thoracic, and lumbar range of motion, to an extent that would have prevented "DW" from ambulating normally.

(vii)    On April 19, 2014, an Insured named "NP" was involved in an automobile accident, and thereafter presented for treatment at Lincoln Medical Center in the Bronx, New York. The hospital records indicated that "NP" had no pain complaints at all as the result of the accident, but came to the hospital anyway because he felt lightheaded. The hospital records further indicated that "NP" had full, normal range of motion throughout his body. Even so, following a purported June 3, 2014 initial examination by Beynin at NJ Pain, Beynin, Jacobson, and NJ Pain falsely reported that "NP" continued to suffer from high levels of pain in his neck, back, and shoulder as the result of his accident, and falsely reported major deficits in "NP"'s cervical and lumbar range of motion, to an extent that would have prevented "NP" from ambulating normally.

(viii)   On November 15, 2013, an Insured named "ER" was involved in an automobile accident. The police report indicated that the accident was a low-speed, low-impact collision, that the airbags in "ER"'s vehicle did not deploy, and that "ER"'s vehicle was drivable following the accident.The police report further indicated that no one was injured in the accident. In keeping with the fact that "ER" was not injured in his minor accident, he did not go to the hospital following the accident. Even so, following a purported December 20, 2013 initial examination by Beynin at BMJ, Beynin, Jacobson, and BMJ falsely reported that "ER" continued to suffer from high levels of pain in his back and knee as the result of his accident, and falsely reported major deficits in "ER"'s lumbar range of motion, to an extent that would have prevented "ER" from ambulating normally. Then, during another purported January 21, 2014 initial examination by Beynin at NJ Pain, Beynin, Jacobson, and NJ Pain falsely reported that "ER" continued to suffer from high levels of pain in his back as the result of his accident, and falsely reported major deficits in "ER"'s lumbar range of motion, to an extent that would have prevented "ER" from ambulating normally.

c.     **Misrepresentations Regarding the Extent of Medical Decision-Making**

203.    In addition, when the Defendants submitted charges for initial examinations under CPT codes 99244 or 99204, they represented that Jacobson, one of the Treating Defendants, or

some other healthcare provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice engaged in medical decision-making of "moderate complexity".

204. When the Defendants submitted charges for initial examinations under CPT codes 99243 or 99203, they represented that Jacobson, one of the Treating Defendants, or some other healthcare provider associated with the PC Defendants or Jacobson's unincorporated chiropractic practice engaged in medical decision-making of "low complexity".

205. Pursuant to the NY Fee Schedule and NJ Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

206. Though the Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" (when billed under CPT codes 99244 or 99204) or "low complexity" (when billed under CPT codes 99243 or 99203), in actuality the initial examinations did not involve any medical decision-making at all.

207. First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

208. When the Insureds presented to the PC Defendants and Jacobson's unincorporated chiropractic practice for treatment, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor provided any diagnostic tests.

209. Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

210. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

211. In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary chiropractic modalities and electrodiagnostic tests, neither of which was health- or life-threatening if properly administered.

212. Third, in virtually every case, neither Jacobson, the Treating Defendants, nor any other healthcare services provider associated with the PC Defendants or Jacobson's unincorporated chiropractic ever considered any significant number of diagnoses or treatment options for Insureds during the initial examinations.

213. Rather, to the extent that the initial examinations were conducted in the first instance, the Defendants provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

214. Specifically, in almost every instance, during the initial examinations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

215. Even so, the Defendants prepared initial examination reports in which they provided phony, boilerplate cervical sprain/strain, thoracic sprain/strain, lumbar sprain/strain,

and/or radiculopathy diagnoses to virtually every Insured, regardless of their individual circumstances or presentment.

216.     Then, based upon these supposed "diagnoses", the Defendants directed virtually every Insured to return to the PC Defendants and/or Jacobson's unincorporated chiropractic practice for medically unnecessary electrodiagnostic testing, chiropractic manipulation under anesthesia, chiropractic manipulation without anesthesia, and physical therapy services.

217.     In keeping with the fact that the Defendants' putative initial examinations involved no medical decision-making whatsoever, the Defendants' checklist initial examination reports set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

218.     Indeed, and in keeping with the fact that the Defendants' putative initial examinations involved no medical decision-making whatsoever, a boilerplate "treatment plan" for each Insured actually was pre-printed on the Defendants' checklist initial examination reports.

**d.      Misrepresentations as to the Eligibility of NJ Pain and NJ Neuro to Bill for Initial Examinations Purportedly Conducted in New York**

219.     Not only did the Defendants misrepresent the medical necessity for their purported initial examinations, and the extent of the initial examinations, but they also routinely misrepresented that NJ Pain and NJ Neuro were eligible to collect PIP Benefits in connection with initial examinations that purportedly were conducted in New York.

220.     As set forth above, NJ Pain and NJ Neuro are New Jersey chiropractic professional corporations, not New York chiropractic professional corporations.

221.    Pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), healthcare services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … ."

222.    Pursuant to the New York Education Law, chiropractic professional corporations operating in New York must have a certificate of authority from the New York Department of Education, and must be properly incorporated in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

223.    Neither NJ Pain nor NJ Neuro obtained a certificate of authority from the New York Education Department, and neither NJ Pain nor NJ Neuro was properly incorporated in New York.

224.    For instance, searches of the New York Department of State Division of Corporations website indicate that neither NJ Pain nor NJ Neuro are, or ever were, incorporated in New York or authorized to do business in New York.

225.    Likewise, searches of the New York Education Department's Office of the Professions website indicate that neither NJ Pain nor NJ Neuro received any certificate of authority from the Education Department.

226.    Even so, in the claims identified in Exhibits "2" and "5", the Defendants routinely billed GEICO through NJ Pain and NJ Neuro for initial examinations that purportedly were conducted in New York.

227.    Each such bill falsely represented that either NJ Pain or NJ Neuro was eligible to receive PIP Benefits in connection with the purported examinations, when in fact they were not.

228.    For example:

(i)        On or about January 20, 2015, Jacobson, Beynin, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured

named "MW" at the Clinic located at 443 Winthrop Street, Brooklyn, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(ii)     On or about January 20, 2015, Jacobson, Patel, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "DV" at the Clinic located at 172-17 Jamaica Avenue, Jamaica, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(iii)    On or about February 3, 2015, Jacobson, Beynin, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "AV" at the Clinic located at 92-07 Roosevelt Avenue, Jackson Heights, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(iv)    On or about March 19, 2015, Jacobson, Beynin, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "ZM" at the Clinic located at 1310 Pugsley Avenue, Bronx, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(v)     On or about April 8, 2015, Jacobson, Patel, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "EM" at the Clinic located at 205-07 Hillside Avenue, Hollis, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(vi)    On or about June 29, 2015, Jacobson, Patel, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "PF" at the Clinic located at 205-07 Hillside Avenue, Hollis, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(vii)   On or about June 29, 2015, Jacobson, Patel, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "CT" at the Clinic located at 205-07 Hillside Avenue, Hollis, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(viii)  On or about April 8, 2015, Jacobson, Beynin, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "RV" at the Clinic located at 92-07 Roosevelt Avenue, Jackson Heights, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(ix)     On or about March 19, 2015, Jacobson, Beynin, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "RO" at a Clinic located at 717 Southern Boulevard, Bronx, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(x)      On or about January 16, 2015, Jacobson, Beynin, and NJ Neuro billed GEICO for an initial examination purportedly provided through NJ Neuro to an Insured named "DW" at the Clinic located at 443 Winthrop Street, Brooklyn, New York, despite the fact that NJ Neuro was ineligible to receive PIP Benefits in connection with the putative examination.

(xi)     On or about August 6, 2014 Jacobson, Beynin, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "TR" at the Clinic located at 1310 Pugsley Avenue, Bronx, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xii)    On or about August 6, 2014 Jacobson, Beynin, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "SD" at the Clinic located at 1310 Pugsley Avenue, Bronx, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xiii)   On or about November 5, 2014 Jacobson, Beynin, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "CE" at the Clinic located at 443 Winthrop Street, Brooklyn, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xiv)    On or about September 15, 2014 Jacobson, Patel, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "GD" at the Clinic located at 172-17 Jamaica Avenue, Jamaica, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xv)     On or about December 8, 2014 Jacobson, Patel, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "LR" at the Clinic located at 1310 Pugsley Avenue, Bronx, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xvi)    On or about September 15, 2014 Jacobson, Patel, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "AM" at the Clinic located at 1310 Pugsley Avenue, Bronx, New York, despite

the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xvii)   On or about August 25, 2014 Jacobson, Patel, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "AS" at the Clinic located at 205-07 Hillside Avenue, Hollis, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xviii)  On or about September 15, 2014 Jacobson, Patel, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "WL" at the Clinic located at 205-07 Hillside Avenue, Hollis, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xix)    On or about July 28, 2014 Jacobson, Patel, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "JW" at the Clinic located at 2363 Ralph Avenue, Brooklyn, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

(xx)     On or about October 17, 2014 Jacobson, Beynin, and NJ Pain billed GEICO for an initial examination purportedly provided through NJ Pain to an Insured named "WO" at the Clinic located at 1310 Pugsley Avenue, Bronx, New York, despite the fact that NJ Pain was ineligible to receive PIP Benefits in connection with the putative examination.

229.    Moreover, and as set forth above, NJ Neuro never was eligible to bill for or to collect PIP Benefits in connection with any of the claims identified in Exhibit "5" – including but not limited to the claims for initial examinations – for the separate and independent reason that Jacobson's New Jersey chiropractic license was suspended at the time when the claims were submitted and at the time when the underlying Fraudulent Services purportedly were performed.

230.    Even so, the Defendants routinely falsely represented that the NJ Neuro claims were reimbursable, when in fact they were not.

**2.      The Fraudulent Charges for Electrodiagnostic Testing**

231.    As set forth in Exhibits "1", "3", and "6", based upon the fraudulent, pre-determined "diagnoses" provided during the initial examinations, the Defendants purported to

subject many Insureds to a series of medically unnecessary and useless electrodiagnostic ("EDX") tests, including nerve conduction velocity ("NCV") tests, electromyography ("EMG") tests, voltage nerve conduction threshold ("v-NCT") tests, and/or somatosensory evoked potential ("SSEP") tests.

232.    Typically, Jacobson, Beynin, Giorgio, or Klass purported to perform the EDX tests, which then were billed to GEICO through BMJ or Jacobson's unincorporated chiropractic practice.

233.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that Jacobson and the PC Defendants paid at the Clinics, or pursuant to the Defendants' own illegal self-referrals, not to treat or otherwise benefit the Insureds.

**a.    The Human Nervous System and Electrodiagnostic Testing**

234.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

235.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

236.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

237.     Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

238.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

239.     EMGs, NCVs, SSEPs, and v-NCTs are forms of EDX tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

240.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

241.     The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "9".

242.     According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three

motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies. <u>See</u> Exhibit "9".

243. According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs. <u>See</u> Exhibit "9".

244. The Recommended Policy does not identify SSEP tests as having any documented usefulness in diagnosing radiculopathies and the medical literature uniformly supports this position. <u>See</u> Exhibit "9".

245. The Recommended Policy does not identify v-NCT tests as having any documented usefulness in diagnosis radiculopathies. <u>See</u> Exhibit "9". In fact, v-NCT tests are not recognized as having any value in the diagnosis of any medical condition.

**b.     The Fraudulent NCV Tests**

246. NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

247. In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

248.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

249.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

250.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice routinely purported to test far more nerves than recommended by the Recommended Policy.

251.    Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide: (i) NCV tests of 10 motor nerves; (ii) NCV tests of 12 sensory nerves; (iii) multiple F-wave studies; and (iv) multiple H-reflex studies.

252.    For example, in the claims identified in Exhibits "1", "3", and "6", the Defendants purported to provide this massive and medically unnecessary amount of NCV tests to – among many others – the following Insureds:

(i)     "RA";

(ii)    "BA";

(iii)   "NA";

(iv)    "JA";

(v)     "JA";

(vi)    "CA";

(vii)   "MA";

(viii)  "DA";

(ix)    "LA";

(x)     "DA";

(xi)    "SA";

(xii)   "AA";

(xiii)  "LA";

(xiv)   "LA";

(xv)    "OA";

(xvi)   "MA";

(xvii)  "VA";

(xviii) "GA";

(xix)   "BA";

(xx)    "MB";

(xxi)   "GB";

(xxii)  "AB";

(xxiii) "PB";

(xxiv)  "AB";

(xxv)   "MB";

(xxvi)  "WB";

(xxvii) "NB";

(xxviii) "BB";

(xxix) "AB";

(xxx) "CB";

(xxxi) "LC";

(xxxii) "MC";

(xxxiii) "AC";

(xxxiv) "SC";

(xxxv) "DC";

(xxxvi) "FC";

(xxxvii) "EC";

(xxxviii) "MC";

(xxxix) "TC";

(xl) "OD";

(xli) "JD";

(xlii) "LG";

(xliii) "RG";

(xliv) "GG";

(xlv) "CG";

(xlvi) "WG";

(xlvii) "JJ";

(xlviii) "JJ";

(xlix) "GJ";

(l)     "AL";

(li)     "SL";

(lii)     "KL";

(liii)     "MB";

(liv)     "SM";

(lv)     "JM";

(lvi)     "AM";

(lvii)     "DM";

(lviii)     "DP";

(lix)     "DP";

(lx)     "SP";

(lxi)     "FP";

(lxii)     "LP";

(lxiii)     "KR";

(lxiv)     "DS";

(lxv)     "SS";

(lxvi)     "MS";

(lxvii)     "JS";

(lxviii) "OS";

(lxix)     "TS"; and

(lxx)     "SS".

253. Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice were concerned that the massive, medically unnecessary number of NCV tests they were purporting to provide would draw attention to their fraudulent scheme.

254. Accordingly, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice acted to conceal the number of NCV tests they provided to any individual Insured, by splitting the billing for the NCV tests into two separate bills for each individual Insured.

255. Other than to conceal the massive number of NCV tests they purported to provide to each individual Insured, there was no reason why Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice would split the billing for the NCV tests into two separate bills for each individual Insured. For instance, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice did not purport to provide the NCV tests to any individual insured on different dates of service, or at different locations, or through different entities.

256. The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

257. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

258. This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

See Exhibit "9".

259. This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

260. Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

261. Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibits "1", "3", and "6".

262. In particular, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to test some combination of the following peripheral nerves and nerve fibers – and, in most cases, all of them – in virtually all of the NCV test claims identified in Exhibits "1", "3", and "6":

(i)     left and right median motor nerves;

(ii)    left and right ulnar motor nerves;

(iii)   left and right peroneal motor nerves;

(iv)    left and right radial motor nerves;

(v)     left and right tibial motor nerves;

(vi)    left and right superficial peroneal sensory nerves;

(vii)   left and right sapheneous sensory nerves;

(viii)  left and right sural sensory nerves;

(ix)    left and right median sensory nerves;

(x)    left and right radial sensory nerves; and

(xi)    left and right ulnar sensory nerves.

263.    The cookie-cutter approach to the NCV tests that Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

264.    Assuming that all other conditions of coverage are satisfied, the NY Fee Schedule permitted lawfully licensed healthcare providers in the New York metropolitan area to submit maximum charges of: (i) $106.47 under CPT code 95904 for each sensory nerve in any limb on which an NCV test was performed; (ii) $166.47 under CPT code 95903 for each motor nerve in any limb on which an NCV test was performed; and (iii) $119.99 under CPT code 95934 for each H-Reflex test that was performed on the nerves of any limb.

265.    Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers, not because the NCV tests were medically necessary.

c.    The Fraudulent EMG Tests

266.    EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with

well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

267.    Though Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to provide and/or perform EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, virtually none of the Insureds in the claims identified in Exhibits "1" – "6" actually presented with any radiculopathy symptoms, or any other medical problems arising from any automobile accidents.

268.    In actuality, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to provide and/or perform EMGs to Insureds as part of their pre-determined, fraudulent treatment protocol designed to maximize the billing that they can submit for each Insured.

269.    There are many different muscles in the arms and legs that can be tested using EMG tests.

270.    The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMG tests as they are performed on each specific muscle.

271.    As a result, the number of limbs as well as the nature and number of the muscles tested through EMG tests should vary from patient-to-patient.

272.    In the claims for EMG tests identified in Exhibits "1", "3", and "6", Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each

patient. Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patient presentment.

273.     Specifically, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to test the following muscles in virtually every Insured who purportedly received EMG tests:

(i)      right and left extensor carpi radialis longus;

(ii)     right and left biceps;

(iii)    right and left triceps;

(iv)     right and left deltoids;

(v)      right and left C5 paraspinals;

(vi)     right and left C6 paraspinals;

(vii)    right and left C7 paraspinals;

(viii)   right and left C8 paraspinals;

(ix)     right and left medical gastrocnemius;

(x)      right and left anterior tibialis;

(xi)     right and left extensor hallucis longus;

(xii)    right and left vastus medialis;

(xiii)   right and left L2 paraspinals;

(xiv)    right and left L3 paraspinals;

(xv)     right and left L4 paraspinals;

(xvi)    right and left L5 paraspinals; and

(xvii)   right and left S1 paraspinals.

274. Furthermore, even if there were any need for any of the EMG tests, the nature and number of the EMG tests that Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to provide and/or perform virtually always grossly exceeded the maximum number of such tests – i.e., EMG tests of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

275. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform and/or provide EMG tests on all four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers.

276. For example, in the claims identified in Exhibits "1", "3", and "6", the Defendants purported to provide this massive and medically unnecessary amount of EMG tests to – among many others – the following Insureds:

(i)      "RA";

(ii)     "BA";

(iii)    "NA";

(iv)    "JA";

(v)     "JA";

(vi)    "CA";

(vii)   "MA";

(viii)  "DA";

(ix)    "LA";

(x)     "DA";

(xi)    "SA";

(xii)	"AA";

(xiii)	"LA";

(xiv)	"LA";

(xv)	"OA";

(xvi)	"MA";

(xvii)	"VA";

(xviii)	"GA";

(xix)	"BA";

(xx)	"MB";

(xxi)	"GB";

(xxii)	"AB";

(xxiii)	"PB";

(xxiv)	"AB";

(xxv)	"MB";

(xxvi)	"WB";

(xxvii)	"NB";

(xxviii)	"BB";

(xxix)	"AB";

(xxx)	"CB";

(xxxi)	"LC";

(xxxii)	"MC";

(xxxiii)	"AC";

(xxxiv)	"SC";

(xxxv) "DC";

(xxxvi)"FC";

(xxxvii)    "EC";

(xxxviii)    "MC";

(xxxix)"TC";

(xl)    "OD";

(xli)    "JD";

(xlii)    "LG";

(xliii)    "RG";

(xliv)    "GG";

(xlv)    "CG";

(xlvi)    "WG";

(xlvii)    "JJ";

(xlviii) "JJ";

(xlix)    "GJ";

(l)    "AL";

(li)    "SL";

(lii)    "KL";

(liii)    "MB";

(liv)    "SM";

(lv)    "JM";

(lvi)    "AM";

(lvii)    "DM";

(lviii)  "DP";

(lix)  "DP";

(lx)  "SP";

(lxi)  "FP";

(lxii)  "LP";

(lxiii)  "KR";

(lxiv)  "DS";

(lxv)  "SS";

(lxvi)  "MS";

(lxvii)  "JS";

(lxviii) "OS";

(lxix)  "TS"; and

(lxx)  "SS".

277.    Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice were concerned that the massive, medically unnecessary number of EMG tests they were purporting to provide would draw attention to their fraudulent scheme.

278.    Accordingly, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice acted to conceal the number of EMG tests they provided to any individual Insured, by splitting the billing for the EMG tests into two separate bills for each individual Insured.

279.    Other than to conceal the massive number of EMG tests they purported to provide to each individual Insured, there was no reason why Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice would split the billing for the EMG tests into

two separate bills for each individual Insured. For instance, Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice did not purport to provide the EMG tests to any individual insured on different dates of service, or at different locations, or through different entities.

280. Assuming that all other conditions of coverage are satisfied, the NY Fee Schedule permitted lawfully licensed healthcare providers in the New York metropolitan area to submit maximum EMG charges of: (i) $127.04 under CPT code 95860 if an EMG was performed on at least five muscles of one limb; (ii) $165.19 under CPT code 95861 if an EMG was performed on at least five muscles in each of two limbs; (iii) $215.01 under CPT code 95863 if an EMG was performed on at least five muscles in each of three limbs; and (iv) $279.52 under CPT code 95864 if an EMG was performed on at least five muscles in each of four limbs.

281. Jacobson, Beynin, Giorgio, Klaas, BMJ, and Jacobson's unincorporated chiropractic practice purported to provide and/or perform EMG tests on far more limbs than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers, not because the EMG tests were medically necessary.

**d.    The Fraudulent SSEP Tests**

282. SSEP tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The potentials – brain waves – evoked by this electrical stimulation then are recorded by electrodes attached to the scalp.

283. SSEP tests are medically necessary only in limited instances in which an individual suffers from severe spinal impairment, and – in such cases – solely for the purpose of determining where within the spinal canal the patient requires decompression surgery, or as an intra-operative guide during the course of scoliosis surgery upon children.

284.     The Recommended Policy does not recommend SSEP tests for use in diagnosing radiculopathies. Consistent with the Recommended Policy, the Medicare guidelines promulgated by the United States Department of Health and Human Services also establish that SSEP tests are not useful in diagnosing radiculopathies.

285.     Even so, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice routinely purported to provide SSEP tests to Insureds, supposedly for use in diagnosing radiculopathies.

286.     As set forth in Exhibits "1", "3", and "6", Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice then billed the SSEP tests to GEICO under CPT codes 95925, 95926, and 95927,  typically resulting in charges of either $412.00 or $618.00 for each Insured on whom the SSEP tests purportedly were performed.

287.     Even if these SSEP tests had any medical usefulness in diagnosing radiculopathies, they were medically unnecessary in that they were duplicative of the NCV tests and EMG tests that the Defendants virtually always purported to provide to the Insureds contemporaneously with the SSEP tests.

288.     NCV tests and EMG tests, standing alone, provide a more than sufficient basis for a radiculopathy diagnosis, assuming that they are validly performed.

289.     Even so, the Defendants virtually always purported to provide EMG tests and NCV tests to the Insureds in the claims identified in Exhibits "1", "3", and "6" at or near the time when they purported to provide SSEP tests to the Insureds.

290.     For instance:

(i)       On March 12, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "VD", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "VD" on that same date.

(ii)     On February 2, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "JA", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "JA" on that same date.

(iii)    On February 2, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "KB", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "KB" on that same date.

(iv)     On June 7, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "JB", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "JB" on that same date.

(v)      On February 22, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "AB", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "AB" on that same date.

(vi)     On May 23, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "LB", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "LB" on that same date.

(vii)    On February 29, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "DB", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "DB" on that same date.

(viii)   On March 8, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "JC", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "JC" on that same date.

(ix)     On February 3, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "CC", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "CC" on that same date.

(x)      On March 20, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "OC", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "OC" on that same date.

(xi)     On June 7, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "TC", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "TC" on that same date.

(xii)    On May 9, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "MD", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "MD" on that same date.

(xiii)   On January 27, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "SE", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "SE" on that same date.

(xiv)    On February 2, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "RF", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "RF" on that same date.

(xv)     On May 30, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "JF", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "JF" on that same date.

(xvi)    On January 27, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "EF", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "EF" on that same date.

(xvii)   On march 5, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "GF", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "GF" on that same date.

(xviii)  On March 27, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "AG", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "AG" on that same date.

(xix)    On February 10, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "DG", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "DG" on that same date.

(xx)     On August 8, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "FG", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "FG" on that same date.

(xxi)    On February 20, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "SH", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "SH" on that same date.

(xxii)   On June 21, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "MH",  which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "MH" on that same date.

(xxiii)  On June 21, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "RH", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "RH" on that same date.

(xxiv)   On July 27, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "EH", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "EH" on that same date.

(xxv)    On February 27, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "NH" which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "NH" on that same date.

(xxvi)   On March 15, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "RH", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "RH" on that same date.

(xxvii)  On April 25, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "TJ", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "TJ" on that same date.

(xxviii) On March 15, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "BR", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "BR" on that same date.

(xxix) On February 20, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "AR", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "AR" on that same date.

(xxx) On February 10, 2012, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide SSEP tests to an Insured named "OR", which they then billed to GEICO, despite the fact that they purported to provide EMG and NCV tests to "OR" on that same date.

291.    Under the circumstances in which they were employed by Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice, the purported SSEP tests constituted a purposeful and unnecessary duplication of the NCV tests and EMG tests that they virtually always purported to conduct in tandem with the SSEP tests.

292.    The SSEP tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-determined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

293.    Even if SSEPs had any clinical utility in diagnosing radiculopathies – which they do not – the decision whether to use them to test the nerves running from the arms or legs to the brain should be tailored to each patient's unique circumstances. As a result, the type of SSEPs performed should vary from patient-to-patient.

294.    However, Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice did not tailor the SSEP tests that they purported to provide to the unique circumstances of any Insured. Instead, when Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice purported to provide the SSEP tests, they virtually always purported to test the nerves in every Insured.

295.     In keeping with the fact that the Defendants' purported SSEP tests were medically useless, the putative "results" of the Defendants' SSEP tests were not incorporated into any Insured's treatment plan, and the SSEP tests played no genuine role in the treatment or care of the Insureds.

**e.     The Fraudulent v-NCT Tests**

296.     Based upon the fraudulent, pre-determined "diagnoses" that the Defendants provided during the initial examinations, Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice  purported to subject many Insureds to a series of medically useless v-NCT tests.

297.     Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice then billed the v-NCT tests to GEICO as multiple charges under CPT codes 95999, generally resulting in charges of between $1,019.62 and $2,330.56 for each Insured on whom the v-NCT testing purportedly was performed.

**(i)     Legitimate Tools for Neuropathy Diagnosis**

298.     Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice supposedly provided the v-NCT tests to Insureds in order to diagnose radiculopathies, which are a type of neuropathy.

299.     There are three primary diagnostic tools that are well-established in the medical, neurological, and radiological communities for diagnosing the existence, nature, extent, and specific location of abnormalities (i.e., neuropathies) in the peripheral nerves and (radiculopathies) in the nerve roots.  These diagnostic tests are NCV tests, EMG tests, and magnetic resonance imaging tests ("MRIs").

300.     Except in very limited circumstances, for diagnostic purposes NCV tests and EMG tests are performed together if: (i) nerve damage is suspected following an auto accident; (ii) the damage cannot be fully evaluated through a physical examination or other generally accepted diagnostic technique; and (iii) the tests are necessary to determine an appropriate treatment plan.

301.     If NCV tests and EMG tests are necessary to diagnose nerve damage, they should be performed no fewer than 14-21 days following an auto accident because it typically takes at least that long for nerve damage to appear following a trauma.

302.     MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through images of the nerves, nerve roots and surrounding areas.

**(ii)     The Medically Useless v-NCT Tests**

303.     The v-NCT test is a type of non-invasive sensory nerve threshold test that purports to diagnose abnormalities only in the sensory nerves and sensory nerve roots. It does not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots.

304.     The v-NCT tests are performed by administering electricity through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet and/or face. The voltage amplitude is increased until the patient states that he or she perceives a sensation from the stimulus caused by the voltage. "Findings" then are made by comparing the minimum voltage stimulus required for the patient to announce that he or she perceives some sensation from it with purported normal ranges.

305. In actuality, however, there are no reliable, peer-reviewed data that establish normal response ranges in v-NCT testing.

306. If the patient's sensation threshold is greater than the purported normal range of amplitude required to evoke a sensation, it allegedly indicates that the patient has a hypoesthetic condition (i.e., that the patient's sensory nerves have decreased function). If the amplitude required for the patient to announce that he perceives a sensation is less than the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient has a hyperesthetic condition (i.e., that the patient's sensory nerves are in a hypersensitive state).

307. The sensory nerves are comprised of three different kinds of nerve fibers, the A-beta fibers, the A-delta fibers and the C fibers. The v-NCT tests allegedly can diagnose the existence, nature, extent and location of any abnormal condition in each of these specific nerve fibers by using three different frequencies of electrical current. Specifically, the use of electrical currents with frequencies of 5 Hz, 250 Hz and 2000 Hz allegedly stimulate and thereby test the C fibers, the A-delta fibers and the A-beta fibers, respectively.

308. Though Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice purported to subject many Insureds to v-NCT tests, supposedly to diagnose radiculopathies, the v-NCT tests were medically useless because virtually every Insured who purportedly was subjected to the v-NCT tests by Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice also received, at or about the same time, NCVs, EMGs, and/or MRIs.

309. Even if the v-NCT tests purportedly provided by Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice had any legitimate value in the diagnosis of neuropathies, they were duplicative of the NCV tests, EMG tests, and MRIs that the Insureds

received and that, in any case, provided far more specific, sensitive, and reliable diagnostic information than the v-NCT tests that Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice purported to provide.

310.    The supposed primary benefit of the v-NCT tests is that they allegedly can diagnose abnormalities in the sensory nerves less than 14-21 days following an accident, which is sooner than NCV tests and EMG tests can be used to effectively diagnose nerve damage following an accident.

311.    Jacobson himself made this claim during a July 14, 2014 examination under oath. Specifically, when questioned as to why there would be any reason to use a v-NCT test to diagnose a radiculopathy rather than an EMG test and NCV test, Jacobson gave testimony contending that v-NCT tests could provide a more expedited diagnosis than NCV tests and EMG tests.

312.    However, Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice frequently purported to provide v-NCT tests to Insureds after they purported to provide NCV test and EMG tests to those same Insureds, or contemporaneously with the NCV tests and EMG tests they purported to provide to the Insureds.

313.    For instance:

(i)     On May 1, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "CA" at Jacobson's unincorporated chiropractic practice. Then, on May 9, 2013, Jacobson purported to provide v-NCT tests to "CA" at his unincorporated chiropractic practice, which they billed to GEICO, despite the fact that "CA" purportedly already had received EMG and NCV tests.

(ii)    On July 22, 2014, Giorgio purported to provide EMG tests and NCV tests to an Insured named "MA" at BMJ. Then, on August 12, 2014, Jacobson purported to provide v-NCT tests to "MA" at BMJ, which they billed to GEICO, despite the fact that "MA" purportedly already had received EMG and NCV tests.

(iii)    On March 19, 2013, Klass purported to provide EMG tests and NCV tests to an Insured named "LA" at Jacobson's unincorporated chiropractic practice. Then, on June 12, 2013, Jacobson purported to provide v-NCT tests to "LA" at his unincorporated chiropractic practice, which they billed to GEICO, despite the fact that "LA" purportedly already had received EMG and NCV tests.

(iv)    On June 6, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "AA" at Jacobson's unincorporated chiropractic practice. Then, on June 25, 2013, Jacobson purported to provide v-NCT tests to "AA" at BMJ, which they billed to GEICO, despite the fact that "AA" purportedly already had received EMG and NCV tests.

(v)    On January 10, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "LA" at BMJ. Just one day earlier, on January 9, 2014, Jacobson had purported to provide v-NCT tests to "LA" at BMJ, which they billed to GEICO, despite the fact that "LA" purportedly received contemporaneous EMG and NCV tests from Beynin.

(vi)    On January 6, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "LA" at BMJ. Then, on January 23, 2014, Jacobson purported to provide v-NCT tests to "LA" at BMJ, which they billed to GEICO, despite the fact that "LA" purportedly already had received EMG and NCV tests.

(vii)    On July 31, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "BA" at BMJ. Then, on August 20, 2013, Jacobson purported to provide v-NCT tests to "BA" at BMJ, which they billed to GEICO, despite the fact that "BA" purportedly already had received EMG and NCV tests.

(viii)    On May 9, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "EB" at BMJ. Then, on May 19, 2014, Jacobson purported to provide v-NCT tests to "EB" at BMJ, which they billed to GEICO, despite the fact that "EB" purportedly already had received EMG and NCV tests.

(ix)    On August 28, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "LB" at BMJ. Then, on June 3, 2013, Jacobson purported to provide v-NCT tests to "LB" at BMJ, which they billed to GEICO, despite the fact that "LB" purportedly already had received EMG and NCV tests.

(x)    On March 14, 2013, Klass purported to provide EMG tests and NCV tests to an Insured named "RB" at Jacobson's unincorporated chiropractic practice. Then, on March 21, 2013, Jacobson purported to provide v-NCT tests to "RB" at Jacobson PC, which they billed to GEICO, despite the fact that "RB" purportedly already had received EMG and NCV tests.

(xi)    On May 1, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "AB" at Jacobson's unincorporated chiropractic practice. Then, on

May 9, 2013, Jacobson purported to provide v-NCT tests to "AB" at his unincorporated chiropractic practice, which they billed to GEICO, despite the fact that "AB" purportedly already had received EMG and NCV tests.

(xii)    On March 5, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "FB" at BMJ. Then, on March 6, 2014, Jacobson purported to provide v-NCT tests to "FB" at BMJ, which they billed to GEICO, despite the fact that "FB" purportedly already had received EMG and NCV tests.

(xiii)   On March 13, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "VC" at Jacobson's unincorporated chiropractic practice. Then, on March 27, 2013, Jacobson purported to provide v-NCT tests to "VC" at his unincorporated chiropractic practice, which they billed to GEICO, despite the fact that "VC" purportedly already had received EMG and NCV tests.

(xiv)   On April 4, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "LC" at BMJ. Then, on April 16, 2014, Jacobson purported to provide v-NCT tests to "LC" at BMJ, which they billed to GEICO, despite the fact that "LC" purportedly already had received EMG and NCV tests.

(xv)    On November 22, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "AC" at BMJ. Then, on December 18, 2013, Jacobson purported to provide v-NCT tests to "AC" at BMJ, which they billed to GEICO, despite the fact that "AC" purportedly already had received EMG and NCV tests.

(xvi)   On October 16, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "SC" at BMJ. Then, on November 5, 2013, Jacobson purported to provide v-NCT tests to "SC" at BMJ, which they billed to GEICO, despite the fact that "SC" purportedly already had received EMG and NCV tests.

(xvii)  On June 19, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "EC" at Jacobson's unincorporated chiropractic practice. Then, on June 20, 2013, Jacobson purported to provide v-NCT tests to "EC" at BMJ, which they billed to GEICO, despite the fact that "EC" purportedly already had received EMG and NCV tests.

(xviii) On July 21, 2014, Giorgio purported to provide EMG tests and NCV tests to an Insured named "RC" at BMJ. Then, on July 29, 2014, Jacobson purported to provide v-NCT tests to "RC" at BMJ, which they billed to GEICO, despite the fact that "RC" purportedly already had received EMG and NCV tests.

(xix)   On March 5, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "CH" at BMJ. Then, on March 6, 2014, Jacobson purported to provide v-NCT tests to "CH" at BMJ, which they billed to GEICO, despite the fact that "CH" purportedly already had received EMG and NCV tests.

(xx)     On August 12, 2013, Giorgio purported to provide EMG tests and NCV tests to an Insured named "MH" at BMJ. Then, on August 21 2013, Jacobson purported to provide v-NCT tests to "MH" at BMJ, which they billed to GEICO, despite the fact that "MH" purportedly already had received EMG and NCV tests.

(xxi)    On July 8, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "EH" at BMJ. Then, on July 9, 2013, Jacobson purported to provide v-NCT tests to "EH" at BMJ, which they billed to GEICO, despite the fact that "EH" purportedly already had received EMG and NCV tests.

(xxii)   On August 20, 2013, Giorgio purported to provide EMG tests and NCV tests to an Insured named "CM" at BMJ. Then, on August 21 2013, Jacobson purported to provide v-NCT tests to "CM" at BMJ, which they billed to GEICO, despite the fact that "CM" purportedly already had received EMG and NCV tests.

(xxiii)  On October 30, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "PM" at BMJ. Then, on November 5, 2013, Jacobson purported to provide v-NCT tests to "PM" at BMJ, which they billed to GEICO, despite the fact that "PM" purportedly already had received EMG and NCV tests.

(xxiv)   On April 3, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "SM" at Jacobson's unincorporated chiropractic practice. Then, on May 22, 2013, Jacobson purported to provide v-NCT tests to "SM" at Jacobson PC, which they billed to GEICO, despite the fact that "SM" purportedly already had received EMG and NCV tests.

(xxv)    On July 31, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "AN" at BMJ. Then, on August 13, 2014, Jacobson purported to provide v-NCT tests to "AN" at BMJ, which they billed to GEICO, despite the fact that "AN" purportedly already had received EMG and NCV tests.

(xxvi)   On June 25, 2014, Beynin purported to provide EMG tests and NCV tests to an Insured named "DN" at BMJ. Then, on August 27, 2014, Jacobson purported to provide v-NCT tests to "DN" at BMJ, which they billed to GEICO, despite the fact that "DN" purportedly already had received EMG and NCV tests.

(xxvii)  On September 27, 2013, Jacobson purported to provide EMG tests and NCV tests to an Insured named    "RO" at BMJ. Then, on October 30, 2013, Jacobson purported to provide v-NCT tests to "RO" at BMJ, which they billed to GEICO, despite the fact that "RO" purportedly already had received EMG and NCV tests.

(xxviii) On May 27, 2014, Jacobson purported to provide EMG tests and NCV tests to an Insured named "DP" at BMJ. Then, on June 5, 2014, Jacobson purported to provide v-NCT tests to "DP"  at BMJ, which they billed to GEICO, despite the fact that "DP" purportedly already had received EMG and NCV tests.

(xxix)  On November 22, 2013, Beynin purported to provide EMG tests and NCV tests to an Insured named "LP" at BMJ. Then, on December 4, 2013, Jacobson purported to provide v-NCT tests to "LP" at BMJ, which they billed to GEICO, despite the fact that "LP" purportedly already had received EMG and NCV tests.

(xxx)  On February 28, 2013, Klass purported to provide EMG tests and NCV tests to an Insured named "TR" at Jacobson's unincorporated chiropractic practice. Then, on March 12, 2013, Jacobson purported to provide v-NCT tests to "TR" at Jacobson PC, which they billed to GEICO, despite the fact that "TR" purportedly already had received EMG and NCV tests.

314.  Under the circumstances in which they were employed by Jacobson, Beynin, and Jacobson's unincorporated chiropractic practice, the purported v-NCT tests constituted a purposeful and unnecessary duplication of the NCV tests and EMG tests that the Insureds virtually always supposedly received contemporaneously with the v-NCT tests, and in many cases before the v-NCT tests.

315.  Even assuming that there was some diagnostic value for v-NCT tests, the v-NCT tests in these circumstances could not possibly have provided any diagnostic information of any value beyond that which was produced through NCVs, EMGs and/or MRIs.

316.  In any case, there are no legitimate data to support the use of v-NCT tests to diagnose neuropathies in general or radiculopathies in particular.

317.  There is no reliable evidence of the existence of normal ranges of intensity or amplitude required to evoke a sensation using a v-NCT test device. Given the lack of evidence of normal ranges of intensity required to evoke a sensation, it is impossible to determine whether any given Insured's personal v-NCT test results are or are not abnormal.

318.  Even if there was some evidence of the existence of normal ranges of intensity required to evoke a sensation using a v-NCT test device, there is no reliable evidence to prove that a sensation threshold greater than the normal range would indicate a <u>hypo</u>esthetic condition or that sensation threshold less than the normal range would indicate a <u>hyper</u>esthetic condition.

319. Even if an abnormal sensation threshold indicated either a <u>hypo</u>esthetic or <u>hyper</u>esthetic condition, there is no reliable evidence to prove that the extent or cause of any such conditions could be identified from v-NCT tests. Indeed, there are numerous pathological and physiological conditions other than peripheral nerve damage that can cause hyperesthesia and hypoesthesia.

320. Furthermore, even if v-NCT tests could produce any valid diagnostic information regarding the sensory nerve fibers:

(i)     there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and physical examination of the patient;

(ii)    there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots;

(iii)   there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways;

(iv)    v-NCT tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an auto accident; and

(v)     there would be no legitimate diagnostic advantage to using v-NCT tests to obtain information regarding the sensory nerve fibers where, as here, the v-NCT tests were duplicative of contemporaneously-provided NCV tests, EMG tests, and MRIs.

321. In keeping with the fact that the Defendants' purported v-NCT tests were medically useless, the Centers for Medicare & Medicaid Services ("CMS") have determined that v-NCT tests are not medically reasonable and necessary for diagnosing sensory neuropathies (<u>i.e.</u>, abnormalities in the sensory nerves) and radiculopathies and are therefore not compensable. Copies of the pertinent CMS Decision Memo and National Coverage Determination are annexed hereto as Exhibit "10".

322.     In keeping with the fact that the Defendants' putative v-NCT tests were medically unnecessary, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for v-NCT tests.

323.     In keeping with the fact that the Defendants' purported v-NCT tests were medically useless, the putative "results" of the Defendants' v-NCT tests were not incorporated into any Insured's treatment plan, and the v-NCT tests played no genuine role in the treatment or care of the Insureds.

**(iii)     Each of the Two Main v-NCT Test Device Manufacturers Claims the Other is a Fraud**

324.     Until 2004, about the same time that CMS was considering the medical benefits of v-NCT testing before ultimately issuing its National Coverage Determination that denied Medicare coverage of v-NCT tests, the two primary manufacturers of sensory nerve conduction threshold devices were Neurotron, Inc., and Neuro Diagnostic Associates, Inc.

325.     Neurotron, Inc. manufactured a device called the "Neurometer". Neuro Diagnostic Associates, Inc. manufactured a device called the "Medi-Dx 7000". While the physics and engineering behind the Neurometer and the Medi-Dx 7000 differ, each of the devices purported to provide quantitative data on sensory nerve conduction threshold. See Exhibit "11".

326.     In or about 2004, following the issuance of the CMS National Coverage Determination, Neuro Diagnostic Associates, Inc. renamed and/or reorganized itself as PainDx, Inc., and re-branded its Medi-Dx 7000 device as the "Axon-II".

327.     Neuro Diagnostic Associates, Inc.'s last known business address and telephone number is identical to that currently used by PainDx, Inc. Moreover, the technical specifications

of the Medi-Dx 7000 are virtually identical to the Axon-II. True and accurate printouts of PainDx, Inc.'s current website and Neuro Diagnostic Associates, Inc.'s archived website are annexed hereto as Exhibit "12".

328.    To the extent that the Defendants actually provided any v-NCT tests to Insureds in the first instance, they were provided using an Axon-II or re-branded Medi-Dx 7000 device.

329.    Notwithstanding the Medi-Dx 7000's cosmetic re-branding as the Axon-II, Neurotron, Inc. claims that neither device produces valid data or results, and that both the Medi-Dx 7000 and Axon-II have been fraudulently marketed. For its part, Neuro Diagnostic Associates, Inc. had asserted the same claims regarding Neurotron, Inc.'s Neurometer device.

330.    Among the charges made by Neurotron, Inc. against the Medi-Dx 7000 are that: (i) there is no reliable evidence that the type of electrical wave forms (asymmetrical wave forms) used by the Medi DX 7000 stimulate or provide any useful diagnostic information regarding any specific kind of sensory nerve fiber; (ii) the alternating output of electrical current used by the Medi-Dx 7000 is "severely distorted by skin impedance" (e.g., texture, thickness, temperature of the skin etc.) making it "impossible" to determine the true intensity levels of the electrical current being delivered by the Medi-Dx 7000; (iii) the Medi-Dx 7000 protocols are "incapable of measuring the thresholds in the sensory nerves"; and (iv) there are no peer-reviewed studies that validate the tests performed using the Medi-Dx 7000.

331.    Because the Axon-II is virtually identical to the Medi-Dx 7000, any and all of Neurotron, Inc.'s criticisms of the Medi-Dx 7000 also apply to the Axon-II/Medi-DX 7000 that was used by Defendants.

### (iv)    The Defendants' Fraudulent v-NCT Test "Reports"

332.    In support of their fraudulent charges for the v-NCT tests,   Jacobson,         BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice submitted phony v-NCT test "reports" which falsely represented that an actual chiropractor had some role in performing and interpreting the tests.

333.    The Defendants' bills for the v-NCT tests likewise falsely represented that an actual chiropractor had some role in performing and interpreting the tests.

334.    In actuality, to the extent that the v-NCT tests were performed in the first instance, they were performed by unlicensed technicians, and neither Jacobson, nor any other licensed healthcare provider associated with the BMJ, Jacobson PC, or Jacobson's unincorporated chiropractic practice, had any role whatsoever in interpreting the test results.

335.    In keeping with the fact that the v-NCT tests were performed – to the extent that they were performed at all – by unlicensed technicians, rather than by a licensed chiropractor associated with BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice, the putative test "reports" did not contain any genuine interpretation of the test data.

336.    Instead, aside from reporting the putative v-NCT data that supposedly were derived from the respective Insureds' tests, the boilerplate v-NCT test "reports" each contained identical, boilerplate "Diagnostic Discussion" and "Diagnostic Summary" sections that did not vary from patient-to-patient and were included solely to foster the illusion that a licensed healthcare professional had some role in performing or interpreting the tests.

337.    For instance, each of the Defendants' purported v-NCT test reports contained the following, identical "Diagnostic Discussion" section:

> On the graph, the nerve with the highest amplitude is the injured nerve that the source of the patient's dysfunction. As a result of spinal cord interconnectivity, sensory pathology

influences conduction in adjacent nerves so adjacent nerves will also show higher amplitudes. However, the highest amplitude is the injured nerve.

Below normal amplitudes correlate with irritation and may suggest possible adjacent inflammatory activity, which may warrant investigation to rule in/rule out concomitant pathology. However, it is not uncommon to find irritation adjacent to the injured nerve.

The uninjured side will mirror the injured side very closely in an acute injury. However, in the case of chronic pain, the uninjured side will no longer mirror and will be closer to the normal range due to disinhibition of nerve signals over time.

Normal findings do not rule out non-neurogenic etiologies. For example, if the results do not indicate any neurological involvement then the doctor can be confident that the source of the patient's pain can be narrowed to the other structures that are commonly injured following cervical trauma. This would most commonly include the muscles and ligamentous structures.

338.    Along similar lines, each of the Defendants' purported v-NCT test reports contained the following, identical "Diagnostic Summary" section:

These findings are seen in and are suggestive of small sensory pain fiber radiculopathy. Dysfunction in these fibers is causing proprioceptive dyskinesia and segmental biomechanical dysfunction specifically causing pathomechanical vertebral segmental coupled motion. It is these levels of abnormal coupled motion that is at the root of the patient's pain and dysfunction and where chiropractic high velocity low amplitude manipulative techniques should be performed.

339.    Other than the boilerplate "Diagnostic Discussion" and "Diagnostic Summary" sections of the purported v-NCT test reports, the reports did not contain any interpretation of the data that Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice purported to obtain from the tests.

340.    In keeping with the fact that no licensed chiropractor or other licensed healthcare provider had anything whatsoever to do with the v-NCT tests that were billed to GEICO through BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice, Jacobson gave testimony during a July 16, 2014 examination under oath which indicated that:

(i)      the actual physical performance of the v-NCT tests was done by unlicensed technicians, rather than by licensed chiropractors or other licensed healthcare services providers;

(ii)     in at least some cases, no licensed chiropractor or other licensed healthcare services provider was even present when the v-NCT tests were performed; and

(iii)    the raw data derived from the v-NCT tests was "interpreted" by software sold with the v-NCT machine, rather than by licensed chiropractors, other licensed healthcare services providers, or even the unlicensed technicians who actually physically performed the tests.

341. Jacobson, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice billed for the v-NCT tests as if they were provided by licensed healthcare providers, rather than by the unlicensed technicians, to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**f.    The Fraudulent Radiculopathy "Diagnoses"**

342. Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

343. Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

344. As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

345. Virtually none of the Insureds whom the Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy.

346. Even so, Jacobson, Beynin, Giorgio, and Klass falsely purported to diagnose radiculopathies in the substantial majority of the Insureds that purportedly received EDX testing from the Defendants.

347. Jacobson, Beynin, Giorgio, and Klass purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services provided through the Defendants, including pain-management injections, manipulations under anesthesia, chiropractic treatment, physical therapy, and acupuncture.

**3. The Fraudulent Charges for Chiropractic Manipulation Without Anesthesia and Physical Therapy Services**

348. As set forth in Exhibits "3", "4", and "6", based upon the fraudulent, pre-determined "diagnoses" provided during the initial examinations, and the phony, pre-determined "results" of the purported EDX tests, the Defendants purported to subject most Insureds to many months of medically unnecessary chiropractic manipulation without anesthesia and physical therapy treatments.

349. In most cases, Jacobson, Park, or Zambuto purported to provide the chiropractic and physical therapy treatments, which were billed to GEICO through Jacobson PC, Bruce PC,

or Jacobson's unincorporated chiropractic practice as multiple charges under CPT codes 97124, 97139, 98940, and 98941.

350.    Like all of the Defendants' other charges for the Fraudulent Services, the charges for the chiropractic manipulation without anesthesia and physical therapy treatments were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that Jacobson and the PC Defendants paid at the Clinics, or pursuant to the Defendants' own illegal self-referrals, not to treat or otherwise benefit the Insureds.

351.    As set forth above, virtually all of the Insureds in the claims identified in Exhibits "3", "4", and "6" were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

352.    Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or continuing health problems as a result of the relatively minor accidents they experienced or purported to experience.

353.    In keeping with the fact that the Insureds in the claims identified in Exhibits "3", "4", and "6" were not seriously injured in their minor automobile accidents, and suffered from no significant injuries or continuing health problems as the result of their accidents, they virtually always either did not visit any hospital at all following their accidents, or else were observed on an outpatient basis for a few hours at a hospital and released with an ordinary sprain or strain diagnosis.

354.    Ordinary strains and sprains virtually always resolve after a brief course of conservative treatment, or no treatment at all.

355. Even so, and as set forth in Exhibits "3", "4", and "6", Jacobson, Zambuto, Jacobson PC, Bruce PC, and Jacobson's unincorporated chiropractic practice routinely purported to provide the Insureds with dozens of individual chiropractic and physical therapy treatments, spanning several months, despite the fact that the Insureds did not require them.

356. In many cases, Jacobson, Zambuto, Jacobson PC, Bruce PC, and Jacobson's unincorporated chiropractic practice used the bogus EDX test "results" generated by Jacobson, Beynin, Giorgio, Klass, BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice as a false basis to justify the continued performance of medically unnecessary chiropractic and physical therapy treatments, long after any of the trivial soft tissue injuries the Insureds sustained in their automobile accidents would have resolved.

357. For example:

(i)     On July 28, 2014, Jacobson, Zambuto, and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "MA". Jacobson, Zambuto, and Bruce PC knew that "MA" had not been seriously injured in her automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on August 26, 2014 – Jacobson purported to provide v-NCT tests to "MA" through BMJ, and then used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "MA" until at least January 16, 2015. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "MA" on at least 40 individual dates spanning a period of more than five and a half months, all of which were billed to GEICO.

(ii)    On October 14, 2013, 2014, Jacobson and Jacobson PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "NA". Jacobson and Jacobson PC knew that "NA" had not been seriously injured in her automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on November 14, 2013 – Jacobson purported to provide v-NCT tests to "NA" through BMJ, and then used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "NA" until January 9, 2014. Then, on January 13, 2014, Jacobson and Beynin purported to provide EMG and NCV tests to "NA" through

BMJ, and used the bogus "results" of the EMG and NCV tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "NA" until at least April 24, 2014. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "NA" on at least 34 individual dates spanning a period of more than six months, all of which were billed to GEICO.

(iii)    On June 23, 2014, Jacobson, Zambuto, and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "NB". Jacobson, Zambuto, and Bruce PC knew that "NB" had not been seriously injured in her automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on July 28, 2014 – Jacobson purported to provide v-NCT tests to "NB" through BMJ, and then used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "NB" until at least March 30, 2015. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "NB" on at least 100 individual dates spanning a period of more than eight months, all of which were billed to GEICO.

(iv)    On June 10, 2014, Jacobson, Zambuto, and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "YB". Jacobson, Zambuto, and Bruce PC knew that "YB" had not been seriously injured in her automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on July 25, 2014 – Jacobson purported to provide v-NCT tests to "YB" through BMJ, and then used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "YB" until at least December 10, 2014. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "YB" on at least 68 individual dates spanning a period of six months, all of which were billed to GEICO.

(v)    On June 20, 2014, Jacobson and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "AC". Jacobson and Bruce PC knew that "AC" had not been seriously injured in his automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on July 17, 2014 – Jacobson purported to provide v-NCT tests to "AC" through BMJ, and then he and Zambuto used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "AC" until at least October 17, 2014. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "AC" on at least 34 individual dates

spanning a period of approximately four months, all of which were billed to GEICO.

(vi)     On January 24, 2014, Jacobson, his unincorporated chiropractic practice, and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "JC". Jacobson, his unincorporated chiropractic practice, and Bruce PC knew that "JC" had not been seriously injured in his automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on February 27, 2014 – Jacobson purported to provide v-NCT tests to "JC" through BMJ, and then he used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "JC" until at least August 7, 2014. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "JC" on at least 61 individual dates spanning a period of more than six months, all of which were billed to GEICO.

(vii)    On February 20, 2014, Jacobson and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "JC". Jacobson and Bruce PC knew that "JC" had not been seriously injured in her automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on March 6, 2014 – Jacobson purported to provide v-NCT tests to "JC" through BMJ, and then he used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "JC" until at least August 12, 2014. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "JC" on at least 72 individual dates spanning a period of more than five and a half months, all of which were billed to GEICO.

(viii)   On April 15, 2014, Jacobson and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "SD". Jacobson and Bruce PC knew that "SD" had not been seriously injured in her automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on May 15, 2014 – Jacobson purported to provide v-NCT tests to "SD" through BMJ, and then he used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "SD" until at least November 3, 2014. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "SD" on at least 71 individual dates spanning a period of more than five and a half months, all of which were billed to GEICO.

(ix)     On April 7, 2014, Jacobson and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured

named "GG". Jacobson and Bruce PC knew that "GG" had not been seriously injured in his automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on April 10, 2014 – Jacobson purported to provide v-NCT tests to "GG" through BMJ, and then he used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "GG" until at least October 23, 2014. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "GG" on at least 67 individual dates spanning a period of more than six months, all of which were billed to GEICO.

(x)     On June 13, 2014, Jacobson, Zambuto, and Bruce PC first purported to provide chiropractic manipulation without anesthesia and physical therapy services to an Insured named "HI". Jacobson, Zambuto, and Bruce PC knew that "HI" had not been seriously injured in his automobile accident and did not require long-term chiropractic or physical therapy treatment, and so – on June 30, 2014 – Jacobson purported to provide v-NCT tests to "HI" through BMJ, and then used the bogus "results" of the v-NCT tests as a false basis to continue to provide medically-unnecessary chiropractic manipulation without anesthesia and physical therapy services to "HI" until at least January 23, 2015. Overall, the Defendants purported to provide medically unnecessary chiropractic manipulation without anesthesia and physical therapy services to "HI" on at least 87 individual dates spanning a period of more than six months, all of which were billed to GEICO.

## 4.      The Fraudulent Charges for Chiropractic Manipulation Under Anesthesia

358.    As set forth in Exhibits "2" and "5", based upon the fraudulent, pre-determined "diagnoses" provided during the initial examinations, and the phony, pre-determined "results" of the purported EDX tests, the Defendants purported to subject many Insureds to purported chiropractic manipulation under anesthesia ("MUA").

359.    In most cases, Jacobson, Albis, Beynin, or Zambuto purported to provide the MUA, which was billed to GEICO through NJ Pain or NJ Neuro as multiple charges under CPT codes 22505, 27275, 23700, and 27194.

360.    Like the Defendants' charges for all of the other Fraudulent Services, their charges for the MUA were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks that

Jacobson and the PC Defendants paid at the Clinics, the Defendants' own illegal self-referrals, and the phony boilerplate "diagnoses" that the Defendants purported to provide following the purported initial examinations and EDX testing, not to treat or otherwise benefit the Insureds.

361.    MUA involves a series of mobilization, stretching, and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation.

362.    Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in an unsedated patient.

363.    MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as arthrofibrosis of the knee and adhesive capsulitis, as well as to reduce displaced fractures.

364.    MUA is experimental, investigational, and unproven for use on most areas of the body, including the spine, hip, and shoulder. There is a dearth of quality supportive scientific evidence for spinal, hip, or shoulder MUA. There are no randomized controlled trials or published cohort studies on management of specific diagnoses of the spine, hip, or shoulder via MUA.

365.    No evidence exists showing the long-term benefits of MUA.

a.    **The Defendants' Medically Unnecessary Chiropractic Manipulation Under Anesthesia**

366.    Virtually every Insured who purportedly received MUA from Jacobson, Albis, Beynin, Zambuto, NJ Pain, and NJ Neuro supposedly had their spine, hip, and/or shoulder manipulated.

367.    Given the lack of quality scientific evidence supporting the use of MUA on the spine, hip, or shoulder, the MUA purportedly provided by Jacobson, Albis, Beynin, Zambuto, NJ Pain, and NJ Neuro to GEICO Insureds plainly was not medically necessary.

368.    Furthermore, MUA only should be considered in cases where more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, has proved ineffective.

369.    This is because: (i) there is a large body of quality scientific evidence supporting the use of more conservative treatment, such as chiropractic manipulation without anesthesia or physical therapy, to treat soft tissue injuries to the spine, hip, and shoulder; (ii) there is a lack of quality scientific evidence supporting the use of MUA on the spine, hip, or shoulder; and (iii) procedures requiring anesthesia – including MUA – involve a level of risk to the patient that are not present in procedures that do not require anesthesia.

370.    Even if MUA was a recognized form of treatment for soft tissue injuries to the spine, hip, or shoulder – and it is not – the MUA purportedly provided by Jacobson, Albis, Beynin, Zambuto, NJ Pain, and NJ Neuro was provided without regard to whether more conservative treatment had been effective.

371.    In keeping with the fact that the MUA purportedly provided by Jacobson, Albis, Beynin, Zambuto, NJ Pain, and NJ Neuro was provided without regard to whether more conservative treatment had been effective, the Defendants routinely purported to continue to provide conservative treatment to Insureds long after they purported to provide MUA to the Insureds.

372.    For instance:

(i)    Albis, Jacobson, and NJ Pain purported to provide MUA to an Insured named "BA" on December 9, 2013 and again on December 23, 2013. In keeping with the fact that the Defendants did not wait until "BA" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "BA" on an ongoing basis for more than three months after the purported MUA.

(ii)     Albis, Zambuto, Jacobson, and NJ Pain purported to provide MUA to an Insured named "GA" on March 24, 2014. In keeping with the fact that the Defendants did not wait until "GA" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "GA" on an ongoing basis for more than three months after the purported MUA.

(iii)    Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named "MA" on October 18, 2014. In keeping with the fact that the Defendants did not wait until "MA" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "MA" on an ongoing basis for more than three months after the purported MUA.

(iv)     Albis, Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named "AB" on three separate occasions between July 12, 2013 and July 19, 2013. In keeping with the fact that the Defendants did not wait until "AB" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "AB" on an ongoing basis for almost six months after the purported MUA.

(v)      Albis, Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named "TC" on May 15, 2014. In keeping with the fact that the Defendants did not wait until "TC" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "TC" on an ongoing basis for two and a half months after the purported MUA.

(vi)     Albis, Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named "KD" on August 2, 2014. In keeping with the fact that the Defendants did not wait until "KD" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "KD" on an ongoing basis for more than three months after the purported MUA.

(vii)    Beynin, Zambuto, Jacobson, and NJ Pain purported to provide MUA to an Insured named "SD" on June 28, 2014. In keeping with the fact that the Defendants did not wait until "SD" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "SD" on an ongoing basis for more than four months after the purported MUA.

(viii)   Beynin, Zambuto, Jacobson, and NJ Pain purported to provide MUA to an Insured named "AF" on November 9, 2013. In keeping with the fact that the Defendants did not wait until "AF" had failed a course of more conservative

treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "AF" on an ongoing basis for more than three months after the purported MUA.

(ix)     Albis, Jacobson, and NJ Pain purported to provide MUA to an Insured named "TF" on June 12, 2014. In keeping with the fact that the Defendants did not wait until "TF" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "TF" on an ongoing basis for two months after the purported MUA.

(x)      Albis, Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named "JI" on November 30, 2013. In keeping with the fact that the Defendants did not wait until "JI" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "JI" on an ongoing basis for more than three months after the purported MUA.

(xi)     Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named "CJ" on August 14, 2014. In keeping with the fact that the Defendants did not wait until "CJ" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "CJ" on an ongoing basis for more than six months after the purported MUA.

(xii)    Beynin, Zambuto, Jacobson, and NJ Pain purported to provide MUA to an Insured named "MJ" on May 10, 2014. In keeping with the fact that the Defendants did not wait until "MJ" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "MJ" on an ongoing basis for more than a month after the purported MUA.

(xiii)   Albis, Beynin, Zambuto, Patel, Jacobson, and NJ Pain purported to provide MUA to an Insured named "WL" on three separate occasions between August 25, 2014 and August 29, 2014. In keeping with the fact that the Defendants did not wait until "WL" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "WL" on an ongoing basis for more than two months after the purported MUA.

(xiv)    Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named "KM" on three separate occasions between August 2, 2014 and August 14, 2014. In keeping with the fact that the Defendants did not wait until "KM" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical

therapy services to "KM" on an ongoing basis for almost three months after the purported MUA.

(xv)    Beynin, Zambuto, Jacobson, and NJ Pain purported to provide MUA to an Insured named "VM" on May 10, 2014. In keeping with the fact that the Defendants did not wait until "VM" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "VM" on an ongoing basis for two months after the purported MUA.

(xvi)   Albis, Jacobson, and NJ Pain purported to provide MUA to an Insured named "CP" on January 16, 2014. In keeping with the fact that the Defendants did not wait until "CP" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "CP" on an ongoing basis for more than three months after the purported MUA.

(xvii)  Albis, Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named  "GR" on June 21, 2014 and again on June 28, 2014. In keeping with the fact that the Defendants did not wait until "GR" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "GR" on an ongoing basis for more than a month and a half after the purported MUA.

(xviii) Albis, Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named  "TR" on June 21, 2014 and again on June 28, 2014. In keeping with the fact that the Defendants did not wait until "TR" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "TR" on an ongoing basis for more than a month and a half after the purported MUA.

(xix)   Albis, Beynin, Jacobson, and NJ Pain purported to provide MUA to an Insured named  "MR" on December 23, 2013 and again on January 9, 2014. In keeping with the fact that the Defendants did not wait until "MR" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic manipulation without anesthesia and physical therapy services to "MR" on an ongoing basis for more than three months after the purported MUA.

(xx)    Beynin, Zambuto, Jacobson, and NJ Pain purported to provide MUA to an Insured named  "MR" on June 28, 2014. In keeping with the fact that the Defendants did not wait until "MR" had failed a course of more conservative treatment prior to the MUA, the Defendants purported to provide chiropractic

manipulation without anesthesia and physical therapy services to "MR" on an ongoing basis for a month and a half after the purported MUA.

373.    In virtually of the claims for MUA identified in Exhibits "2" and "5", the Insureds had not failed any course of conservative treatment before the Defendants purported to subject them to MUA.

374.    To the contrary, in virtually every case in which the Defendants purported to subject an Insured to MUA, the Defendants' treatment notes, or the treatment notes from other healthcare services providers who treated the Insureds, indicated that the Insureds' conditions were improving through more conservative treatments such as chiropractic manipulation without anesthesia and physical therapy.

**b.    The Defendants' Fraudulent Billing for Treatment of Non-Existent Pelvic Ring Injuries**

375.    To the extent that the Defendants ever provided any MUA to Insureds in the first instance, the MUA purportedly was provided in New Jersey through NJ Pain or NJ Neuro and therefore was subject to the NJ Fee Schedule.

376.    While the NJ Fee Schedule does permit licensed healthcare services providers to bill for MUA in the very limited cases in which MUA is medically necessary, it also imposes significant limits on the amounts that providers can bill for MUA.

377.    For example, the NJ Fee Schedule rules provide, among other things, that CPT code 22505 – which covers spinal manipulation under anesthesia – can be billed only once per Insured, per date of service, assuming that it is medically necessary, which it is not.

378.    What is more, pursuant to the NJ Fee Schedule, chiropractors in northern New Jersey – where the Defendants purported to provide their MUA – can bill only $214.24 under

CPT code 22505, assuming that the underlying spinal MUA is medically necessary, which it is not.

379.     Along similar lines, pursuant to the NJ Fee Schedule, chiropractors in northern New Jersey can bill only $470.07 for CPT code 23700, which covers MUA of the shoulder, assuming that the underlying shoulder MUA is medically necessary, which it is not.

380.     Likewise, pursuant to the NJ Fee Schedule, chiropractors in northern New Jersey can bill only $323.19 for CPT code 27275, which covers MUA of the hip, assuming that the underlying hip MUA is medically necessary, which it is not.

381.     Jacobson, Albis, Beynin, Zambuto, NJ Pain, and NJ Neuro were dissatisfied with these limitations on their fraudulent billing for medically unnecessary MUA.

382.     In an attempt to maximize the amount of fraudulent billing that they could submit to GEICO for their medically unnecessary MUA procedures, Jacobson, Albis, Beynin, Zambuto, NJ Pain, and NJ Neuro routinely falsely represented that the purported MUA involved a procedure billable under CPT code 27194.

383.     Pursuant to the NJ Fee Schedule and the CPT Assistant, CPT code 27194 is the code used to bill for the treatment of "pelvic ring fracture, dislocation, diastasis or subluxation".

384.     In northern New Jersey, healthcare services providers can bill $2,095.30 under CPT code 27194, in keeping with the fact that "pelvic ring fracture, dislocation, diastasis or subluxation" are serious problems that are difficult and time-consuming to properly treat.

385.     Not a single one of the Insureds in the MUA claims identified in Exhibits "1" – "6" suffered from any pelvic ring fracture, dislocation, diastasis, or subluxation or – indeed – any other injury to their respective pelvic rings.

386.     Even so, and as set forth in Exhibits "2" and "5", Jacobson, Albis, Beynin, Zambuto, NJ Pain, and NJ Neuro routinely billed for their purported MUA using CPT code 27194, and thereby falsely represented that the Insureds suffered from some sort of pelvic ring fracture, dislocation, diastasis, or subluxation.

387.     For instance:

(i)     On or about September 15, 2014, Jacobson, Beynin, and NJ Pain submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "CA", and thereby falsely represented that they treated "CA"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "CA" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(ii)     On or about September 15, 2014, Jacobson, Albis, and NJ Pain submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "BA", and thereby falsely represented that they treated "BA"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "BA" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(iii)     On or about November 10, 2014, Jacobson, Beynin, and NJ Pain submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "SB", and thereby falsely represented that they treated "SB"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "SB" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(iv)     On or about June 23, 2014, Jacobson, Beynin, Albis, and NJ Pain submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "JB", and thereby falsely represented that they treated "JB"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "JB" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her pelvic ring at all.

(v)     On or about April 14, 2014, Jacobson, Beynin, Albis, and NJ Pain submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "JB", and thereby falsely represented that they treated "JB"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "JB" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her pelvic ring at all.

(vi)     On or about September 16, 2013, Jacobson, Albis, and NJ Pain submitted a bill to
         GEICO for CPT code 27194 with respect to an Insured named "MC", and thereby
         falsely represented that they treated "MC"'s purported pelvic ring fracture,
         dislocation, diastasis, or subluxation. In fact, "MC" had not suffered any pelvic
         ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her
         pelvic ring at all.

(vii)    On or about May 18, 2015, Jacobson, Albis, and NJ Neuro submitted a bill to
         GEICO for CPT code 27194 with respect to an Insured named "BD", and thereby
         falsely represented that they treated "BD"'s purported pelvic ring fracture,
         dislocation, diastasis, or subluxation. In fact, "BD" had not suffered any pelvic
         ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her
         pelvic ring at all.

(viii)   On or about April 27, 2015, Jacobson, Albis, and NJ Neuro submitted a bill to
         GEICO for CPT code 27194 with respect to an Insured named "JD", and thereby
         falsely represented that they treated "JD"'s purported pelvic ring fracture,
         dislocation, diastasis, or subluxation. In fact, "JD" had not suffered any pelvic
         ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his
         pelvic ring at all.

(ix)     On or about June 29, 2015, Jacobson, Albis, and NJ Neuro submitted a bill to
         GEICO for CPT code 27194 with respect to an Insured named "AD", and thereby
         falsely represented that they treated "AD"'s purported pelvic ring fracture,
         dislocation, diastasis, or subluxation. In fact, "AD" had not suffered any pelvic
         ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her
         pelvic ring at all.

(x)      On or about April 8, 2015, Jacobson, Beynin, and NJ Neuro submitted a bill to
         GEICO for CPT code 27194 with respect to an Insured named "FD", and thereby
         falsely represented that they treated "FD"'s purported pelvic ring fracture,
         dislocation, diastasis, or subluxation. In fact, "FD" had not suffered any pelvic
         ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his
         pelvic ring at all.

(xi)     On or about April 17, 2015, Jacobson, Zambuto, and NJ Neuro submitted a bill to
         GEICO for CPT code 27194 with respect to an Insured named "DG", and thereby
         falsely represented that they treated "DG"' purported pelvic ring fracture,
         dislocation, diastasis, or subluxation. In fact, "DG" had not suffered any pelvic
         ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her
         pelvic ring at all.

(xii)    On or about January 20, 2015, Jacobson, Zambuto, and NJ Neuro submitted a bill
         to GEICO for CPT code 27194 with respect to an Insured named "KG", and
         thereby falsely represented that they treated "KG"'s purported pelvic ring
         fracture, dislocation, diastasis, or subluxation. In fact, "KG" had not suffered any

pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(xiii)    On or about March 2, 2015, Jacobson, Zambuto, and NJ Neuro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "RJ", and thereby falsely represented that they treated "RJ"' purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "RJ" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(xiv)    On or about March 2, 2015, Jacobson, Zambuto, and NJ Neuro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "NL", and thereby falsely represented that they treated "NL"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "NL" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her pelvic ring at all.

(xv)    On or about October 28, 2014, Jacobson, Beynin, and NJ Pain submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "KN", and thereby falsely represented that they treated "KN"' purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "KN" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her pelvic ring at all.

(xvi)    On or about June 29, 2015, Jacobson, Zambuto, and NJ Neuro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "AM", and thereby falsely represented that they treated "AM"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "AM" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to her pelvic ring at all.

(xvii)    On or about January 20, 2015, Jacobson, Beynin, and NJ Neuro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "AP", and thereby falsely represented that they treated "AP"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "AP" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(xviii)    On or about June 29, 2015, Jacobson, Zambuto, and NJ Neuro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "AS", and thereby falsely represented that they treated "AS"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "AS" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(xix) On or about July 15, 2015, Jacobson, Beynin, and NJ Neuro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "CT", and thereby falsely represented that they treated "CT"' purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "CT" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

(xx) On or about June 29, 2015, Jacobson, Beynin, and NJ Neuro submitted a bill to GEICO for CPT code 27194 with respect to an Insured named "LV", and thereby falsely represented that they treated "LV"'s purported pelvic ring fracture, dislocation, diastasis, or subluxation. In fact, "LV" had not suffered any pelvic ring fracture, dislocation, diastasis, subluxation, or – indeed – any injury to his pelvic ring at all.

388.    In keeping with the fact that none of the Insureds who purportedly received MUA in the claims identified in Exhibits "2" and "5" actually suffered from any injury to their pelvic rings, and in keeping with the fact that none of those Insureds actually received any services from the Defendants that were billable under CPT code 27194, none of the MUA treatment notes generated by Jacobson, Beynin, Zambuto, NJ Pain, or NJ Neuro actually reflected any injuries to, or treatment of, the Insureds' pelvic rings.

389.    The Defendants' use of CPT code 27194 to bill for their putative MUA procedures constituted a deliberate misrepresentation of the service that was provided, so as to maximize the amount of fraudulent billing that they could submit for each purported MUA procedure.

E.    **The Fraudulent Billing for Independent Contractor Services**

390.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors.

391.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors

– the healthcare services must be provided by the professional corporations, themselves, or by their employees.

392. Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

393. Jacobson was the only healthcare services provider employed by the PC Defendants and by his unincorporated chiropractic practice.

394. Even so, the Defendants routinely submitted charges to GEICO and other insurers on behalf of the PC Defendants and Jacobson's unincorporated chiropractic practice for Fraudulent Services that purportedly were performed by chiropractors and unlicensed technicians other than Jacobson, including but not limited to the Treating Defendants.

395.     To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers other than Jacobson were performed by chiropractors and unlicensed technicians whom Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice treated as independent contractors.

396.     For instance, Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice:

(i)     paid the chiropractors and unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the chiropractors and unlicensed technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the chiropractors and unlicensed technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the chiropractors and unlicensed technicians;

(v)     failed to withhold federal, state or city taxes on behalf of the chiropractors and unlicensed technicians;

(vi)    compelled the chiropractors and unlicensed technicians to pay for their own malpractice insurance at their own expense;

(vii)   permitted the chiropractors and unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)  permitted the chiropractors and unlicensed technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the chiropractors and unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the chiropractors and unlicensed technicians were independent contractors.

397.     By electing to treat the chiropractors and unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the chiropractors and unlicensed technicians.

398.     In keeping with the fact that – except for services actually performed by Jacobson – the Fraudulent Services were provided by independent contractors:

(i)     During a July 7, 2014 examination under oath, Jacobson gave testimony indicating that the unlicensed technicians who purported to perform the EDX testing at BMJ, Jacobson PC, and Jacobson's unincorporated chiropractic practice were paid on a 1099 basis.

(ii)    During a July 7, 2014 examination under oath, Jacobson gave testimony indicating that the chiropractors who purported to provide services on behalf of the PC Defendants and his unincorporated chiropractic practice did not receive any fixed salary, and instead were paid on a per diem basis.

(iii)   Jacobson was only rarely physically present at the locations from which the PC Defendants and his unincorporated chiropractic practice operated, and could not have supervised the Treating Defendants or the unlicensed technicians who purported to provide services on behalf of the PC Defendants.

399.     Because the chiropractors and unlicensed technicians were independent contractors and performed the Fraudulent Services, Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice never had any right to bill for or collect PIP Benefits in connection with those services.

400.    Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice billed for the Fraudulent Services as if they were provided by actual employees of the PC Defendants and Jacobson's unincorporated chiropractic practice to make it appear as if the services were eligible for reimbursement.

401.    Jacobson's, the PC Defendants', and Jacobson's unincorporated chiropractic practice's misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

402.    In some cases, Jacobson, the PC Defendants, and Jacobson's unincorporated chiropractic practice attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Jacobson on the billing as the treating provider, when in fact he did not provide the underlying treatments.

403.    For instance, during a July 24, 2015 examination under oath, Jacobson gave testimony indicating that he typically did not personally treat patients through Bruce PC, and could not recall whether he ever personally treated patients through Bruce PC.

404.    Even so, GEICO received bills for more than 6,000 individual treatments that Jacobson purported to personally provide to Insureds through Bruce PC between April 2014 and April 2015.

**F.    The Fraudulent Billing for Services Purportedly Provided Through NJ Neuro After December 12, 2014**

405.    As set forth above, on December 12, 2014, the NJ Chiropractic Board entered a provisional order suspending Jacobson's license to practice chiropractic in New Jersey. See Exhibit "8".

406.    Then, on July 23, 2015, the NJ Chiropractic Board entered a final order of discipline suspending Jacobson's license to practice chiropractic in New Jersey. See Exhibit "8".

407.    Jacobson purportedly was the owner and sole shareholder of NJ Neuro, a New Jersey chiropractic professional corporation.

408.    As a result, once Jacobson's New Jersey chiropractic license was suspended on December 12, 2014, NJ Neuro no longer was eligible to receive PIP Benefits because it no longer was owned by a properly licensed chiropractor.

409.    Even so, and as set forth in Exhibit "5", between January 2015 and at least July 2015, Jacobson, Beynin, Albis, Patel, and Zambuto submitted hundreds of thousands of dollars in charges through NJ Neuro to GEICO for purported MUA procedures.

410.    Each and every one of these charges falsely represented that NJ Neuro was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

411.    In fact, NJ Neuro was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, because it was a chiropractic professional corporation owned by Jacobson, whose chiropractic license was suspended.

**G.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

412.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through the PC Defendants and Jacobson's unincorporated chiropractic practice to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

413.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO

that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants through NJ Pain and NJ Neuro for patient examinations that purportedly were conducted in New York uniformly misrepresented that NJ Pain and NJ Neuro met the applicable New York licensing requirements necessary to perform the services. In fact, NJ Pain and NJ Neuro did not meet the applicable New York licensing requirements necessary to perform the services, inasmuch as they did not have certificates of authority from the New York Department of Education, were not properly incorporated in New York.

(v) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants through NJ Pain and NJ Neuro uniformly misrepresented that NJ Pain and NJ Neuro, and Jacobson's unincorporated chiropractic practice were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and that the Fraudulent Services were provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. In fact, NJ Pain and NJ Neuro were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, inasmuch as NJ Pain and NJ Neuro obtained their patients through an illegal kickback and self-referral scheme, and inasmuch as NJ Neuro was not owned by a properly licensed chiropractor.

(vi) With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Jacobson, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the PC Defendants and Jacobson's unincorporated chiropractic practice were eligible to receive PIP Benefits

pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the PC Defendants and Jacobson's unincorporated chiropractic practice were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent that they were provided at all.

### III.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

414.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

415.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

416.    Specifically, they knowingly misrepresented and concealed facts related to the PC Defendants and Jacobson's unincorporated chiropractic practice in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

417.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal that fact that the Defendants unlawfully exchanged kickbacks for patient referrals and engaged in illegal self-referral arrangements.

418.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

419.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the chiropractors and technicians associated with the PC Defendants

and Jacobson's unincorporated chiropractic practice in order to prevent GEICO from discovering that the chiropractors and technicians performing most of the Fraudulent Services – to the extent that they were performed at all – were not employed by the PC Defendants or Jacobson's unincorporated chiropractic practice. In many cases, the Defendants actually misrepresented the identity of the individual who purportedly performed the Fraudulent Services, in order to conceal the fact that the services were performed by independent contractors.

420. What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

421. Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

422. GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

423. In accordance with the New York no-fault insurance laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending

claims for PIP Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for PIP Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

424.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

425.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,000,000.00 based upon the fraudulent charges.

426.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the PC Defendants and Jacobson's Unincorporated Chiropractic Practice
(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

427.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 426 above.

428.    There is an actual case in controversy between GEICO, the PC Defendants, and Jacobson's unincorporated chiropractic practice regarding more than $1,400,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

429.     The PC Defendants and Jacobson's unincorporated chiropractic practice have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

430.     The PC Defendants and Jacobson's unincorporated chiropractic practice have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

431.     The PC Defendants and Jacobson's unincorporated chiropractic practice have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

432.     The PC Defendants and Jacobson's unincorporated chiropractic practice have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

433.     NJ Pain and NJ Neuro have no right to receive payment for any pending bills submitted to GEICO for initial examinations purportedly conducted in New York, because NJ Pain and NJ Neuro failed to meet the applicable New York licensing requirements necessary to provide services in New York.

434.     NJ Pain and NJ Neuro have no right to receive payment for any pending bills submitted to GEICO because neither NJ Pain, NJ Neuro, nor the underlying Fraudulent Services

were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

435.    The PC Defendants and Jacobson's unincorporated chiropractic practice have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants and Jacobson's unincorporated chiropractic practice.

436.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants and Jacobson's unincorporated chiropractic practice have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Jacobson**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

437.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 436 above.

438.    BMJ Chiropractic, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

439.    Jacobson knowingly has conducted and/or participated, directly or indirectly, in the conduct of BMJ's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that BMJ was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent

treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) BMJ obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in most cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by BMJ's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

440. BMJ's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jacobson operates BMJ, insofar as BMJ is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for BMJ to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through BMJ to the present day.

441. BMJ is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by BMJ in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

442.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $306,000.00 pursuant to the fraudulent bills submitted through BMJ.

443.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Jacobson, the Treating Defendants and the Referral Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

444.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 443 above.

445.    BMJ Chiropractic, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

446.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" are employed by or associated with the BMJ enterprise.

447.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of BMJ's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that BMJ was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-

for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) BMJ obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by BMJ's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

448.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

449.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $306,000.00 pursuant to the fraudulent bills submitted through BMJ.

450.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against BMJ and Jacobson
### (Common Law Fraud)

451.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 450 above.

452.     BMJ and Jacobson intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

453.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that BMJ was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained its patient referrals through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; and (iii) in every claim for services not actually performed by Jacobson, the representation that the billed-for services were performed by BMJ's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

454.     BMJ and Jacobson intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BMJ that were not compensable under the New York no-fault insurance laws.

455. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $306,000.00 pursuant to the fraudulent bills submitted through BMJ.

456. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

457. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against the Treating Defendants and the Referral Defendants**
**(Aiding and Abetting Fraud)**

458. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 457 above.

459. Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by BMJ and Jacobson.

460. The acts of James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included knowingly referring Insureds to BMJ and Jacobson, or causing them to be referred to BMJ and Jacobson, for treatment in exchange for kickbacks from BMJ and Jacobson, despite the Insureds' lack of any actual injuries arising from any automobile accidents.

461. The acts of Beynin, Albis, Zambuto, Giorgio, Klass, Park, and Patel in furtherance of the fraudulent scheme included knowingly referring Insureds to BMJ and Jacobson, or causing them to be referred to BMJ and Jacobson, for treatment pursuant to the Defendants' illegal self-

referral scheme.

462.    In addition, Beynin, Giorgio, and Klass acted in furtherance of the fraudulent scheme by knowingly recommending and purporting to perform medically unnecessary EDX tests and issuing fraudulent reports in exchange for payment of money from BMJ and Jacobson.

463.    The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  in furtherance of the fraudulent scheme was significant and material. The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for BMJ or Jacobson to obtain payment from GEICO and from other insurers.

464.    Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to BMJ and Jacobson for medically unnecessary, illusory, or otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

465.    The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" caused GEICO to pay more than $306,000.00 pursuant to the fraudulent bills submitted through BMJ.

466.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

467.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against BMJ, Jacobson, the Treating Defendants and the Referral Defendants**
**(Unjust Enrichment)**

468.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 467 above.

469.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

470.    When GEICO paid the bills and charges submitted by or on behalf of BMJ for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

471.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

472.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

473.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $306,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Jacobson**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

474.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 473 above.

475. NJ Pain Treatment, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

476. Jacobson knowingly has conducted and/or participated, directly or indirectly, in the conduct of NJ Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that NJ Pain was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) NJ Pain obtained its patients through the Defendants' illegal kickback and self-referral scheme; (vi) NJ Pain billed for services that purportedly were provided in New York, despite the fact that it was not properly licensed in New York; and (vii) in most cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by NJ Pain's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

477. NJ Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jacobson operates NJ Pain, insofar as NJ Pain is not engaged in a

legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for NJ Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through NJ Pain to the present day.

478. NJ Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NJ Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

479. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $65,000.00 pursuant to the fraudulent bills submitted through NJ Pain.

480. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Against Jacobson, the Treating Defendants and the Referral Defendants
(Violation of RICO, 18 U.S.C. § 1962(d))**

481. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 480 above.

482. NJ Pain Treatment, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

483.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" are associated with the NJ Pain enterprise.

484.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of NJ Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that NJ Pain was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) NJ Pain obtained its patients through the Defendants' illegal kickback and self-referral scheme; (vi) NJ Pain billed for services that purportedly were provided in New York, despite the fact that it was not properly licensed in New York; and (vii) in most cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by NJ Pain's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this

Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

485.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

486.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $65,000.00 pursuant to the fraudulent bills submitted through NJ Pain.

487.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against NJ Pain and Jacobson
### (Common Law Fraud)

488.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 487 above.

489.    NJ Pain and Jacobson intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

490.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim for services allegedly provided in New York, the representation that NJ Pain was properly licensed, and therefore, eligible to receive No-Fault

Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was not properly licensed in that it did not have the requisite certificate of authority, was not properly incorporated in New York, and obtained its patient referrals through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that NJ Pain was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when NJ Pain was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey because it obtained its patient referrals through an illegal kickback and self-referral scheme; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; and (iv) in every claim for services not actually performed by Jacobson, the representation that the billed-for services were performed by NJ Pain's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

491.    NJ Pain and Jacobson intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NJ Pain that were not compensable under the New York and New Jersey no-fault insurance laws.

492.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $65,000.00 pursuant to the fraudulent bills submitted through NJ Pain.

493.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

494.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against the Treating Defendants and the Referral Defendants**
**(Aiding and Abetting Fraud)**

495.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 494 above.

496.    Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by NJ Pain and Jacobson.

497.    The acts of James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included knowingly referring Insureds to NJ Pain and Jacobson, or causing them to be referred to NJ Pain and Jacobson, for treatment in exchange for kickbacks from NJ Pain and Jacobson, despite the Insureds' lack of any actual injuries arising from any automobile accidents.

498.    The acts of Beynin, Albis, Zambuto, Giorgio, Klass, Park, and Patel in furtherance of the fraudulent scheme included knowingly referring Insureds to NJ Pain and Jacobson, or causing them to be referred to NJ Pain and Jacobson, for treatment pursuant to the Defendants' illegal self-referral scheme.

499.    In addition, Albis, Beynin, Patel, and Zambuto acted in furtherance of the fraudulent scheme by knowingly recommending and purporting to perform medically unnecessary MUA and issuing fraudulent reports and bills in exchange for payment of money from NJ Pain and Jacobson.

500.    The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material. The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for NJ Pain or Jacobson to obtain payment from GEICO and from other insurers.

501.    Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to NJ Pain and Jacobson for medically unnecessary, illusory, or otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

502.    The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" caused GEICO to pay more than $65,000.00 pursuant to the fraudulent bills submitted through NJ Pain.

503.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

504.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against NJ Pain, Jacobson, the Treating Defendants and the Referral Defendants**
**(Unjust Enrichment)**

505.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 504 above.

506.   As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

507.   When GEICO paid the bills and charges submitted by or on behalf of NJ Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

508.   The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

509.   The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

510.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $65,000.00.

## TWELFTH CAUSE OF ACTION
### Against Jacobson
### (Violation of RICO, 18 U.S.C. § 1962(c))

511.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 510 above.

512.   Jacobson Chiropractic, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

513.   Jacobson knowingly has conducted and/or participated, directly or indirectly, in the conduct of Jacobson's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous

basis for over two years seeking payments that Jacobson PC was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Jacobson PC obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in most cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Jacobson PC's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

514.    Jacobson PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jacobson operates Jacobson PC, insofar as Jacobson PC is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Jacobson PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Jacobson PC to the present day.

515.    Jacobson PC is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.

These inherently unlawful acts are taken by Jacobson PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

516.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $78,000.00 pursuant to the fraudulent bills submitted through Jacobson PC.

517.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Jacobson, the Treating Defendants and the Referral Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

518.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 517 above.

519.     Jacobson Chiropractic, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

520.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" are employed by or associated with the Jacobson PC enterprise.

521.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Jacobson PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous

basis for over two years seeking payments that Jacobson PC was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Jacobson PC obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Jacobson PC's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

522.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

523.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $78,000.00 pursuant to the fraudulent bills submitted through Jacobson PC.

524.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper

**FOURTEENTH CAUSE OF ACTION**
**Against Jacobson PC and Jacobson**
**(Common Law Fraud)**

525.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 524 above.

526.     Jacobson PC and Jacobson intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

527.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Jacobson PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained its patient referrals through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; and (iii) in every claim for services not actually performed by Jacobson, the representation that the billed-for services were performed by Jacobson PC's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

528.     Jacobson PC and Jacobson intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Jacobson PC that were not compensable under the New York no-fault insurance laws.

529.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $78,000.00 pursuant to the fraudulent bills submitted through BMJ.

530.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

531.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against the Treating Defendants and the Referral Defendants
### (Aiding and Abetting Fraud)

532.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 531 above.

533.     Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Jacobson PC and Jacobson.

534.     The acts of James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included knowingly referring Insureds to Jacobson PC and Jacobson, or causing them to be referred to Jacobson PC and Jacobson, for treatment in exchange for kickbacks from Jacobson PC and Jacobson, despite the

Insureds' lack of any actual injuries arising from any automobile accidents.

535.     The acts of Beynin, Albis, Zambuto, Giorgio, Klass, Park, and Patel in furtherance of the fraudulent scheme included knowingly referring Insureds to Jacobson PC and Jacobson, or causing them to be referred to Jacobson PC and Jacobson, for treatment pursuant to the Defendants' illegal self-referral scheme.

536.     In addition, Beynin acted in furtherance of the fraudulent scheme by knowingly recommending and purporting to perform medically unnecessary Fraudulent Services and issuing fraudulent reports in exchange for payment of money from Jacobson PC and Jacobson.

537.     The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  in furtherance of the fraudulent scheme was significant and material. The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no  opportunity for Jacobson PC or Jacobson to obtain payment from GEICO and from other insurers.

538.     Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Jacobson PC and Jacobson for medically unnecessary, illusory, or otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

539.     The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" caused

GEICO to pay more than $78,000.00 pursuant to the fraudulent bills submitted through Jacobson PC.

540.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

541.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<b><u>SIXTEENTH CAUSE OF ACTION</u></b><br><b>Against BMJ, Jacobson, the Treating Defendants and the Referral Defendants</b><br><b>(Unjust Enrichment)</b>

542.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 541 above.

543.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

544.     When GEICO paid the bills and charges submitted by or on behalf of Jacobson PC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

545.     The Defendants have been enriched at GEICO's expense by GEICO's  payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

546.     The Defendants' retention of GEICO's  payments violates fundamental principles of justice, equity and good conscience.

547.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $78,000.00.

## SEVENTEENTH CAUSE OF ACTION
### Against Jacobson
### (Violation of RICO, 18 U.S.C. § 1962(c))

548.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 547 above.

549.    Dr. Bruce Jacobson DC, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

550.    Jacobson knowingly has conducted and/or participated, directly or indirectly, in the conduct of Bruce PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Bruce PC was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Bruce PC obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in most cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Bruce PC's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

551.     Bruce PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jacobson operates Bruce PC, insofar as Bruce PC is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Bruce PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bruce PC to the present day.

552.     Bruce PC is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bruce PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

553.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $354,000.00 pursuant to the fraudulent bills submitted through Bruce PC.

554.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Jacobson, the Treating Defendants and the Referral Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

555.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 554 above.

556.     Dr. Bruce Jacobson DC, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

557.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" are employed by or associated with the Bruce PC enterprise.

558.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Bruce PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Bruce PC was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Bruce PC obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Bruce PC's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity

identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

559.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

560.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $354,000.00 pursuant to the fraudulent bills submitted through Bruce PC.

561.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Bruce PC and Jacobson
### (Common Law Fraud)

562.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 561 above.

563.     Bruce PC and Jacobson intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

564.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Bruce PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

NYCRR § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained its patient referrals through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; and (iii) in every claim for services not actually performed by Jacobson, the representation that the billed-for services were performed by Bruce PC's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

565.    Bruce PC and Jacobson intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bruce PC that were not compensable under the New York no-fault insurance laws.

566.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $354,000.00 pursuant to the fraudulent bills submitted through BMJ.

567.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

568.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against the Treating Defendants and the Referral Defendants**
**(Aiding and Abetting Fraud)**

569.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 568 above.

570.     Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Bruce PC and Jacobson.

571.     The acts of James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  in furtherance of the fraudulent scheme included knowingly referring Insureds to Bruce PC and Jacobson, or causing them to be referred to Bruce PC and Jacobson, for treatment in exchange for kickbacks from Bruce PC and Jacobson, despite the Insureds' lack of any actual injuries arising from any automobile accidents.

572.     The acts of Beynin, Albis, Zambuto, Giorgio, Klass, Park, and Patel in furtherance of the fraudulent scheme included knowingly referring Insureds to Bruce PC and Jacobson, or causing them to be referred to Bruce PC and Jacobson, for treatment pursuant to the Defendants' illegal self-referral scheme.

573.     In addition, Klass, Beynin, Park, and Zambuto acted in furtherance of the fraudulent scheme by knowingly recommending and purporting to perform medically unnecessary Fraudulent Services and issuing fraudulent reports in exchange for payment of money from Bruce PC and Jacobson.

574.     The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  in furtherance of the fraudulent scheme was significant and material. The conduct of Beynin, Albis,

Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Soman, and John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Bruce PC or Jacobson to obtain payment from GEICO and from other insurers.

575.    Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Bruce PC and Jacobson for medically unnecessary, illusory, or otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

576.    The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" caused GEICO to pay more than $354,000.00 pursuant to the fraudulent bills submitted through Bruce PC.

577.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

578.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against BMJ, Jacobson, the Treating Defendants and the Referral Defendants
(Unjust Enrichment)**

579.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 578 above.

580.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

581.    When GEICO paid the bills and charges submitted by or on behalf of Bruce PC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

582.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

583.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

584.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $354,000.00.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Jacobson**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

585.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 584 above.

586.    NJ Neuro & Pain, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

587.    Jacobson knowingly has conducted and/or participated, directly or indirectly, in the conduct of NJ Neuro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over 10 months seeking payments that NJ Neuro was not eligible to receive under the

New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) NJ Neuro obtained its patients through the Defendants' illegal kickback and self-referral scheme; (vi) NJ Neuro billed for services that purportedly were provided in New York, despite the fact that it was not properly licensed in New York; (vii) NJ Neuro was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey; and (viii) in most cases, the billed-for-services were provided – to the extent that they were provided at all – by independent contractors, rather than by NJ Neuro's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

588.    NJ Neuro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jacobson operates NJ Neuro, insofar as NJ Neuro is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for NJ Neuro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through NJ Neuro to the present day.

589.     NJ Neuro is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NJ Neuro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

590.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,000.00 pursuant to the fraudulent bills submitted through NJ Neuro.

591.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Jacobson, the Treating Defendants and the Referral Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

592.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 591 above.

593.     NJ Neuro & Pain, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

594.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" are associated with the NJ Neuro enterprise.

595.     Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of NJ Neuro's affairs through a pattern of racketeering activity consisting of repeated violations

of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that NJ Neuro was not eligible to receive under the New York or New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) NJ Neuro obtained its patients through the Defendants' illegal kickback and self-referral scheme; (vi) NJ Neuro billed for services that purportedly were provided in New York, despite the fact that it was not properly licensed in New York; (vii) NJ Neuro was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey; and (viii) in most cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by NJ Neuro's employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

596. Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

597.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,000.00 pursuant to the fraudulent bills submitted through NJ Neuro.

598.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
### Against NJ Neuro and Jacobson
### (Common Law Fraud)

599.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 598 above.

600.    NJ Neuro and Jacobson intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

601.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim for services allegedly provided in New York, the representation that NJ Neuro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was not properly licensed in that it did not have the requisite certificate of authority, was not properly incorporated in New York, and obtained its patient referrals through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that NJ Neuro was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when NJ Neuro was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey because it obtained its patient referrals through an illegal kickback and self-referral scheme

and because it was not owned by a properly licensed chiropractor; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; and (iv) in every claim for services not actually performed by Jacobson, the representation that the billed-for services were performed by NJ Neuro's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

602.     NJ Neuro and Jacobson intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NJ Neuro that were not compensable under the New York and New Jersey no-fault insurance laws.

603.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,000.00 pursuant to the fraudulent bills submitted through NJ Neuro.

604.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

605.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**Against the Treating Defendants and the Referral Defendants**
**(Aiding and Abetting Fraud)**

606.     GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 605 above.

607.  Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by NJ Neuro and Jacobson.

608.  The acts of James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included knowingly referring Insureds to NJ Neuro and Jacobson, or causing them to be referred to NJ Neuro and Jacobson, for treatment in exchange for kickbacks from NJ Neuro and Jacobson, despite the Insureds' lack of any actual injuries arising from any automobile accidents.

609.  The acts of Beynin, Albis, Zambuto, Giorgio, Klass, Park, and Patel in furtherance of the fraudulent scheme included knowingly referring Insureds to NJ Neuro and Jacobson, or causing them to be referred to NJ Neuro and Jacobson, for treatment pursuant to the Defendants' illegal self-referral scheme.

610.  In addition, Albis, Beynin, Patel, and Zambuto acted in furtherance of the fraudulent scheme by knowingly recommending and purporting to perform medically unnecessary MUA and issuing fraudulent reports and bills in exchange for payment of money from NJ Neuro and Jacobson.

611.  The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material. The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for

NJ Neuro or Jacobson to obtain payment from GEICO and from other insurers.

612. Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to NJ Neuro and Jacobson for medically unnecessary, illusory, or otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

613. The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" caused GEICO to pay more than $147,000.00 pursuant to the fraudulent bills submitted through NJ Neuro.

614. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

615. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against NJ Neuro, Jacobson, the Treating Defendants and the Referral Defendants**
**(Unjust Enrichment)**

616. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 615 above.

617. As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

618.     When GEICO paid the bills and charges submitted by or on behalf of NJ Neuro for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

619.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

620.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

621.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $147,000.00.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against Jacobson**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

622.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 621 above.

623.     Jacobson's unincorporated chiropractic practice is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

624.     Jacobson knowingly has conducted and/or participated, directly or indirectly, in the conduct of his unincorporated chiropractic practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Jacobson's unincorporated chiropractic practice was not eligible to receive under the New York no-fault

insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Jacobson's unincorporated chiropractic practice obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in most cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of Jacobson's unincorporated chiropractic practice. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

625.    Jacobson's unincorporated chiropractic practice's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jacobson operates his unincorporated chiropractic practice, insofar as Jacobson's unincorporated chiropractic practice is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for the unincorporated chiropractic practice to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the unincorporated chiropractic practice to the present day.

626. Jacobson's unincorporated chiropractic practice is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Jacobson's unincorporated chiropractic practice in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

627. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $29,000.00 pursuant to the fraudulent bills submitted through Jacobson's unincorporated chiropractic practice.

628. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against Jacobson, the Treating Defendants and the Referral Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

629. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 628 above.

630. Jacobson's unincorporated chiropractic practice is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

631. Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" are employed by or associated with Jacobson's unincorporated chiropractic practice.

632. Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly have

agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the unincorporated chiropractic practice's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Jacobson's unincorporated chiropractic practice was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Jacobson's unincorporated chiropractic practice obtained its patients through the Defendants' illegal kickback and self-referral scheme; and (vi) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by employees of Jacobson's unincorporated chiropractic practice. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

633.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO

and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

634.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $29,000.00 pursuant to the fraudulent bills submitted through Jacobson's unincorporated chiropractic practice.

635.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper

**TWENTY-NINTH CAUSE OF ACTION**
**Against Jacobson**
**(Common Law Fraud)**

636.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 635 above.

637.     Jacobson intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of his submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

638.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Jacobson was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact he was not properly licensed in that he obtained his patient referrals through an illegal kickback and self-referral scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not

performed at all; and (iii) in every claim for services not actually performed by Jacobson, the representation that the billed-for services were performed by Jacobson's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

639.  Jacobson intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Jacobson's unincorporated chiropractic practice that were not compensable under the New York no-fault insurance laws.

640.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $29,000.00 pursuant to the fraudulent bills submitted through Jacobson's unincorporated chiropractic practice.

641.  The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

642.  Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTIETH CAUSE OF ACTION**
**Against the Treating Defendants and the Referral Defendants**
**(Aiding and Abetting Fraud)**

643.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 642 above.

644.  Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Jacobson's unincorporated

chiropractic practice and Jacobson.

645.    The acts of James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included knowingly referring Insureds to Jacobson's unincorporated chiropractic practice and Jacobson, or causing them to be referred to Jacobson's unincorporated chiropractic practice and Jacobson, for treatment in exchange for kickbacks from Jacobson's unincorporated chiropractic practice and Jacobson, despite the Insureds' lack of any actual injuries arising from any automobile accidents.

646.    The acts of Beynin, Albis, Zambuto, Giorgio, Klass, Park, and Patel in furtherance of the fraudulent scheme included knowingly referring Insureds to Jacobson's unincorporated chiropractic practice and Jacobson, or causing them to be referred to Jacobson's unincorporated chiropractic practice and Jacobson, for treatment pursuant to the Defendants' illegal self-referral scheme.

647.    In addition, Klass, Beynin, Park, and Zambuto acted in furtherance of the fraudulent scheme by knowingly recommending and purporting to perform medically unnecessary Fraudulent Services and issuing fraudulent reports in exchange for payment of money from Jacobson's unincorporated chiropractic practice and Jacobson.

648.    The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material. The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Jacobson's unincorporated chiropractic practice or Jacobson to obtain payment from GEICO and

from other insurers.

649.    Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Jacobson's unincorporated chiropractic practice and Jacobson for medically unnecessary, illusory, or otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

650.    The conduct of Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" caused GEICO to pay more than $29,000.00 pursuant to the fraudulent bills submitted through Jacobson's unincorporated chiropractic practice.

651.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

652.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTY-FIRST CAUSE OF ACTION
**Against Jacobson, the Treating Defendants and the Referral Defendants**
**(Unjust Enrichment)**

653.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 652 above.

654.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

655. When GEICO paid the bills and charges submitted by or on behalf of Jacobson's unincorporated chiropractic practice for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

656. The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

657. The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

658. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $29,000.00.

### THIRTY-SECOND CAUSE OF ACTION
**Against Jacobson**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

659. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 658 above.

660. BMJ Chiropractic, P.C., NJ Pain Treatment, P.C., Jacobson Chiropractic, P.C., Dr. Bruce Jacobson DC P.C., NJ Neuro & Pain, P.C., and Jacobson's unincorporated chiropractic practice together constitute an association-in-fact "enterprise" (the "Jacobson Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

661. The members of the Jacobson Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry

out and facilitate its common purpose. Specifically, BMJ, NJ Pain, Jacobson PC, Bruce PC, NJ Neuro, and Jacobson's unincorporated chiropractic practice ostensibly are independent entities and an unincorporated sole proprietorship – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers.

662. The Jacobson Fraud Enterprise has been operated under at least six different names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one source. The Jacobson Fraud Enterprise also has been operated under at least six names in order to give the false appearance that the patient referrals between and among the members of the Jacobson Fraud Enterprise for the Fraudulent Services were arm's-length, legitimate referrals for medically necessary services, when in fact they were not. Accordingly, the execution of this scheme would be beyond the capacity of each member of the Jacobson Fraud Enterprise acting singly or without the aid of the others.

663. The Jacobson Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds,

and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

664.     Jacobson was employed by and/or associated with the Jacobson Fraud Enterprise.

665.     Jacobson knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Jacobson Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the Jacobson Fraud Enterprise was not eligible to receive under the No-Fault Laws because the billed-for services were illusory, medically unnecessary, and otherwise unreimbursable. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "6".

666.     The Jacobson Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jacobson operates the Market Street Fraud Enterprise, insofar as the enterprise is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Jacobson Fraud Enterprise to the present day.

667.    The Jacobson Fraud Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Jacobson Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent PIP billing.

668.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through the Jacobson Fraud Enterprise.

669.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRTY-THIRD CAUSE OF ACTION
**Against Jacobson, the Treating Defendants, and the Referral Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

670.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 669 above.

671.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" are employed by and/or associated with the Jacobson Fraud Enterprise.

672.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Jacobson Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon

the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that the Jacobson Fraud Enterprise was not eligible to receive under the No-Fault Laws because the billed-for services were illusory, medically unnecessary, and otherwise unreimbursable. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "6". Each such mailing was made in furtherance of the mail fraud scheme.

673.    Jacobson, Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

674.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,000,000.00 pursuant to the fraudulent bills submitted through the Jacobson Fraud Enterprise.

675.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-FOURTH CAUSE OF ACTION
**Against Jacobson and the PC Defendants**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

676.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 675 above.

677. In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibits "1" – "6", Defendants Jacobson, BMJ, NJ Pain, Jacobson PC, Bruce PC, and NJ Neuro knowingly submitted or caused to be submitted NF-3 forms, HCFA-1500 forms, and treatment reports to GEICO that were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and self-referral arrangements amongst the Defendants and others.

(iv) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants through NJ Pain and NJ Neuro for patient examinations that purportedly were conducted in New York uniformly misrepresented that NJ Pain and NJ Neuro met the applicable New York licensing requirements necessary to perform the services. In fact, NJ Pain and NJ Neuro did not meet the applicable New York licensing requirements necessary to perform the services, inasmuch as they did not have certificates of authority from the New York Department of Education, were not properly incorporated in New York.

(v) The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants through NJ Pain and NJ Neuro uniformly misrepresented that NJ Pain and NJ Neuro, and Jacobson's unincorporated chiropractic practice were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and that the Fraudulent Services were provided in compliance with all relevant laws and regulations governing healthcare practice in

New Jersey. In fact, NJ Pain and NJ Neuro were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, inasmuch as NJ Pain and NJ Neuro obtained their patients through an illegal kickback and self-referral scheme, and inasmuch as NJ Neuro was not owned by a properly licensed chiropractor.

(vi)     With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Jacobson, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the PC Defendants and Jacobson's unincorporated chiropractic practice were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the PC Defendants and Jacobson's unincorporated chiropractic practice were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent that they were provided at all.

678.    The Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**THIRTY-FIFTH CAUSE OF ACTION**
**Against the Treating Defendants and the Referral Defendants**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

679.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 678 above.

680.    Defendants Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  knowingly assisted, conspired with, and urged Defendants Jacobson, BMJ, NJ Pain, Jacobson PC, Bruce

PC, and NJ Neuro to submit their billing for the Fraudulent Services to GEICO, by: (i) knowingly performing the Fraudulent Services and creating fraudulent treatment reports on behalf of the PC Defendants and Jacobson's unincorporated chiropractic practice despite the lack of medical necessity for those services, and their actual knowledge that the Fraudulent Services were not reimbursable; and (ii) referring Insureds to the PC Defendants and Jacobson's unincorporated chiropractic practice despite their actual knowledge that there was no medical necessity for the referrals, and their actual knowledge that the referrals were procured through an illegal kickback and self-referral scheme.

681.     Defendants Beynin, Albis, Zambuto, Giorgio, Klass, Patel, Park, James, Morley, Corona, Ajudua, Striano, Sawhney, Soman, and John Doe Defendants "1" – "10"  knowingly benefitted, directly or indirectly, from the proceeds derived from the billing for the Fraudulent Services.

682.     The Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act.  See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## **JURY DEMAND**

683.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the PC Defendants and Jacobson's unincorporated chiropractic practice, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants and Jacobson's unincorporated chiropractic practice have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$306,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$306,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Jacobson and BMJ, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$306,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against the Treating Defendants and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$306,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Jacobson, BMJ, the Treating Defendants, and the Referral Defendants, more than $306,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $65,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $65,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Jacobson and NJ Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $65,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against the Treating Defendants and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $65,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against NJ Pain, Jacobson, the Treating Defendants, and the Referral Defendants, more than $65,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $78,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteenth Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $78,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Jacobson and Jacobson PC, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $78,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against the Treating Defendants and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $78,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Jacobson, Jacobson PC, the Treating Defendants, and the Referral Defendants, more than $78,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $354,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.	On the Eighteenth Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $354,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.	On the Nineteenth Cause of Action against Jacobson and Bruce PC, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $354,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.	On the Twentieth Cause of Action against the Treating Defendants and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $354,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.	On the Twenty-First Cause of Action against Jacobson, Bruce PC, the Treating Defendants, and the Referral Defendants, more than $354,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

V.	On the Twenty-Second Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.	On the Twenty-Third Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.     On the Twenty-Fourth Cause of Action against Jacobson and NJ Neuro, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.     On the Twenty-Fifth Cause of Action against the Treating Defendants and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Z.     On the Twenty-Sixth Cause of Action against Jacobson, NJ Neuro, the Treating Defendants, and the Referral Defendants, more than $147,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

AA.     On the Twenty-Seventh Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $29,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.     On the Twenty-Eighth Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $29,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.     On the Twenty-Ninth Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $29,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

DD.     On the Thirtieth Cause of Action against the Treating Defendants and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $29,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, more than $29,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

FF.     On the Thirty-Second Cause of Action against Jacobson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.     On the Thirty-Third Cause of Action against Jacobson, the Treating Defendants, and the Referral Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.     On the Thirty-Fourth Cause of Action against Jacobson and the PC Defendants, damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $1,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7; and

II.     On the Thirty-Fifth Cause of Action against the Treating Defendants and the Referral Defendants, damages in the form of disgorgement of the PIP Benefits paid in an amount

to be established at trial, but exceeding $1,000,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

Dated: December 18, 2015

RIVKIN RADLER LLP

By: _/s/ Max Gershenoff_

      Barry I. Levy (BL 2190)
      Max Gershenoff (MG 4648)
      Ryan Goldberg (RG 7570)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co, GEICO General Insurance Company and GEICO Casualty Co.*