UNITED STATES DISTRICT COURT       **NOT FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK

GOVERNMENT EMPLOYEES
INSURANCE CO., et al.,           **MEMORANDUM & ORDER**

Plaintiffs,       15-CV-07236 (ERK) (RML)

– against –

BRUCE JACOBSON, D.C., et al.,

Defendants.

KORMAN, *J*.:

This case arises out of more than a million dollars' worth of allegedly fraudulent no-fault insurance charges that defendant Bruce Jacobson and five of his chiropractic practices[1] submitted to plaintiff Government Employees Insurance Company and three of its affiliates (collectively, "GEICO"). GEICO moves for partial summary judgment against Jacobson and his incorporated practices on causes of action for declaratory judgment, common law fraud, unjust enrichment, and violation of the New Jersey Insurance Fraud Prevention Act. GEICO also moves for an adverse inference to preclude defendants from relying on documents that they

---

[1] The five practices are (1) Jacobson Chiropractic, P.C. ("Jacobson Chiropractic"), (2) Dr. Bruce Jacobson DC, P.C. ("Dr. Bruce"), (3) BMJ Chiropractic, P.C. ("BMJ"), (4) NJ Pain Treatment, P.C. ("NJ Pain"), and (5) NJ Neuro & Pain, P.C. ("NJ Neuro").

1

never produced during discovery and to exclude the report and testimony of defendants' expert. Jacobson, his incorporated practices, and four licensed chiropractors who were associated with his practices[2] cross move for summary judgment on GEICO's claims for declaratory judgment, fraud, unjust enrichment, and civil RICO violations and RICO conspiracy.

## BACKGROUND

Both New York and New Jersey have adopted comprehensive statutory schemes that allow individuals injured in automobile accidents to recover the costs of their medical expenses regardless of fault. *See* N.Y. Ins. Law § 5101 *et. seq.*; N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1 *et. seq.*; N.J. Stat Ann. § 39:6A-1 *et seq.* In both states, automobile insurers must provide no-fault insurance benefits (also known as "personal injury protection" or "PIP" benefits) to their insureds for necessary medical expenses. N.Y. Ins. Law § 5103; N.J. Stat. Ann. §§ 39:6A-4. An insured's PIP benefits may be assigned to his or her healthcare provider, who in turn may submit requests for payment directly to the insurance company. N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11; N.J. Stat. Ann. § 39:6A-4.

GEICO claims that Jacobson unlawfully submitted bills for millions of dollars' worth of PIP benefits to which he is not entitled. Specifically, GEICO

---

[2] Those four chiropractors are Diana Beynin, Peter Albis, Jongdug Park, and Gerlando Zambuto.

argues that Jacobson's charges (1) were the result of illegal referrals among entities owned by Jacobson, (2) were the result of two of Jacobson's New Jersey practices' unlawful operation in New York, (3) were billed through one of Jacobson's practices during a time when his license was suspended, and (4) misrepresented the medical necessity of the underlying healthcare services, along with the nature and extent of the services provided.  ECF No. 238-27 at 8–9.[3]

## A. Allegedly Unlawful Referrals

New York law provides that a medical practitioner, such as a chiropractor, "may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner" has an ownership interest "without  disclosing to the patient such financial relationships."  N.Y. Pub. Health Law § 238-d.  The practitioner must maintain documentation of each instance that he makes such a financial-interest disclosure to his patients.  N.Y. Comp. Codes R. & Regs. tit. 10, § 34-1.5(d).  A practitioner is not eligible for PIP benefits arising from an illegal referral through an entity in which he has a financial interest.  *Fair Price Med. Supply Corp. v. ELRAC Inc.*, 12 Misc. 3d 119, 121–22 (N.Y. App. Term 2006).

Similarly, under New Jersey's Codey Law, chiropractors generally may not refer patients to any healthcare practice in which they have a "significant beneficial

---

[3] Record citations refer to ECF pagination.

interest." N.J. Stat. Ann. § 45:9-22.5. This rule is subject to certain exceptions, such as self-referrals for procedures performed in a chiropractor's own office for which a bill is issued directly in the name of the chiropractor's office. *Id.* § 45:9-22.5(c)(1). Moreover, self-referrals for procedures requiring anesthesia that are provided at ambulatory surgery centers are permissible, so long as (among other things) the chiropractor who makes the referral performs the resulting procedure, and advance written disclosure of the referring chiropractor's financial interest is made to the patient. *Id.* § 45:9-22.5(c)(3). Like in New York, chiropractors who engage in unlawful self-referrals are ineligible for PIP benefits in New Jersey. *See Allstate Ins. Co. v. Scott Greenberg, D.C.*, 871 A.2d 171, 179 (N.J. Super. Ct. Law Div. 2004).

GEICO has identified numerous instances in which it claims Jacobson engaged in allegedly unlawful self-referrals. Indeed, two of Jacobson's wholly-owned practices—Jacobson Chiropractic and Dr. Bruce—referred at least 158 GEICO insureds in New York to another wholly owned Jacobson entity (BMJ) for electrodiagnostic testing. ECF Nos. 238-2 ¶¶ 22–27, 238-33 ¶¶ 12, 16, 19, 25–29. GEICO issued $14,363.22 in payments to BMJ for such testing. *Id.* ¶ 28. Moreover, Jacobson Chiropractic and Dr. Bruce referred at least 45 GEICO insureds to two Jacobson-owned entities—NJ Pain and NJ Neuro—for pre-procedure examinations for a treatment called manipulation under anesthesia ("MUA"). ECF Nos. 233-3 ¶¶ 29–34, 233-34 ¶¶ 9, 23, 31–35. GEICO made over $1,300 in payments to NJ Pain

and NJ Neuro based on such referrals. ECF Nos. 238-2 ¶¶ 37–38. GEICO also identified 133 instances in which GEICO insureds, after receiving pre-MUA examinations at NJ Neuro or NJ Pain, were "referred for MUAs" at an ambulatory surgery center in New Jersey that were performed by a different chiropractor than the one who made the referral. ECF Nos. 238-2 ¶¶ 39–42. NJ Neuro and NJ Pain billed GEICO for the cost of the MUAs, and GEICO paid over $230,000 to NJ Neuro and NJ Pain for these procedures. ECF Nos. 238-2 ¶¶ 43–44.

The legality of these referrals depends on whether Jacobson provided advance written disclosures of his financial interest in his various practices. During discovery in this action, GEICO requested that defendants produce "[a]ll documents reflecting written disclosures provided to [GEICO's] Insureds pursuant to" the relevant New York law. ECF No. 239-2 ¶ 58. Defendants never produced such ownership disclosures during discovery despite (1) defendants' responses that they would produce the requested disclosures, *see* ECF Nos. 239-3 at 18, 239-6 at 6; (2) Jacobson's admission during his deposition that he made, and maintained copies of, such disclosures, *see* ECF Nos. 239-4 at 302–03, 239-5 at 55–56; and (3) a court order compelling production of all documents responsive to GEICO's document demands that defendants failed to turn over. *See* Oct. 20, 2016 Order.

Notwithstanding their failure to produce the ownership disclosure forms during discovery, defendants now attach 65 ownership disclosure forms to their

motion briefing. ECF No. 243-34. Only two of the 65 disclosure forms that defendants submit, however, relate to the over 200 patients that GEICO has identified as being the subject of illegal self-referrals. ECF No. 238-34 at 7; *compare* ECF Nos. 233-3 at 393–97, 613–14 *with* ECF No. 243-34. The other 63 forms relate to patients who have nothing to do with this litigation.

GEICO seeks to preclude defendants from relying on these disclosure forms, and it has filed a motion for an adverse inference based on defendants' failure to produce the requested documents during discovery. ECF No. 239. Defendants admit that they never produced the forms during discovery, but they argue that they were not required to do so because they produced the forms to GEICO before this litigation commenced. ECF Nos. 238-33 ¶ 37, 239-8 at 9.

## B. Unlawful Operations in New York

Under New York law, "medical professionals may incorporate a medical practice if they are the sole organizers, owners and operators of the corporation." *Gov't Emps. Ins. Co. v. Parkway Med. Care, P.C.*, 2017 WL 1133282, at *2 (E.D.N.Y. Feb. 21, 2017) (citing N.Y. Bus. Corp. Law §§ 1503(a)-(b), 1508), *report & recommendation adopted by* 2017 WL 1131901 (E.D.N.Y. Mar. 24, 2017). "New York law provides that a licensed medical professional undertaking such an incorporation must certify to the New York State Department of Education that each proposed shareholder, director and officer of the medical professional corporation is

authorized by law to practice in the medical profession." *Id.* (citing N.Y. Bus. Corp. Law § 1503(b)). "A corporate practice that shows willful and material failure to abide by licensing and incorporation statutes may support a finding that the provider is not eligible for" PIP benefits. *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 405 (2019) (internal quotations omitted).

As their names suggest, two of Jacobson's practices—NJ Pain and NJ Neuro—were incorporated in New Jersey, and neither has been incorporated in New York, nor have they received a certificate of authority from the New York Department of Education. ECF No. 238-33 ¶¶ 46–48, 51–53. Yet both practices leased office space and examined patients in New York. *Id.* ¶¶ 49–50, 54–55. NJ Pain and NJ Neuro billed GEICO over $4,000 for such examinations, which GEICO argues are not recoverable under New York's no-fault insurance statute due to the failure to incorporate those practices in the state. *Id.* ¶¶ 56–57. Jacobson concedes that, because he failed to file the required paperwork to obtain a certificate of authority from the New York Department of Education, he was not entitled to reimbursement for services NJ Pain and NJ Neuro performed in New York. ECF No. 238-29 at 33 n.3.

### C. Practicing with a Suspended License

GEICO also argues that it made $32,701.49 in payments to NJ Neuro for MUA services that were rendered between December 12, 2014 to October 27, 2015,

a period for which it contends Jacobson's license was suspended. ECF No. 238-33 ¶¶ 58–60, 68–69. New Jersey's State Board of Chiropractic Examiners (the "Board") has issued directives applicable to chiropractors who have had their licenses suspended. ECF No. 238-26. A chiropractor with a suspended license may not practice or provide a chiropractic opinion in New Jersey and may not charge, receive, or share in fees for professional services rendered by himself or others. *Id.* Chiropractors who practice or receive a fee for service while their licenses are suspended are not entitled to PIP benefits under New Jersey law. *See Liberty Mut. Ins. Co. v. Healthcare Integrated Servs.*, 2008 WL 2595922, at *2 (N.J. Super. Ct. App. Div. July 2, 2008) ("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); *Allstate Ins. Co. v. Greenberg*, 871 A.2d 171, 176 (N.J. Super. Ct. Law Div. 2004) ("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make[s] it ineligible to receive PIP reimbursement.") (internal quotation omitted).

The circumstances resulting in Jacobson's license suspension are as follows. On May 5, 2010, the Board ordered that Jacobson pay a fine of $5,740.83. ECF No. 238-5 at 2–3. Jacobson testified during his deposition that he was fined for referring a patient for an electrodiagnostic test without conducting a prerequisite exam as

required under New Jersey law.  ECF No. 238-3 at 62, 66–67.  On December 12, 2014, the Board issued a Provisional Order of Discipline suspending Jacobson's license for failure to pay the fine and forwarded a copy of the Provisional Order to his last known address and also attempted personal service.  ECF No. 238-5 at 3. Those mailings were returned as undeliverable and the service was unsuccessful, and Jacobson claims he never received them.  *Id.*; ECF No. 238-3 at 68.  On July 23, 2015, the Board issued a Final Order of Discipline suspending his license until he paid the fine.  ECF No. 238-5 at 4.

Jacobson claims that he paid the fine immediately after receiving the Final Order of Discipline and that his license was reinstated by the Board in October 2015. ECF No. 238-32 ¶ 12.  Jacobson also represents that he did not personally treat any patients, render any opinion regarding chiropractic practice in New Jersey, or receive any fees or share any office space with chiropractors in New Jersey during the time his license was suspended.  *Id.* ¶ 13. Moreover, Jacobson testified at his deposition that, after he became aware of his suspension, he had a phone call with a Deputy Attorney General who informed him that, while he could not personally treat patients during his suspension, his corporations could submit bills for treatment provided by other licensed chiropractors.  ECF No. 238-3 at 109–11.

Nevertheless, Jacobson's staff continued to use his personal tax identification number and signature on bills that were submitted to GEICO during the time his

license was suspended. *Id.* at 114–20, 133–42. Bank records also show that during his suspension, Jacobson paid himself at least $9,000 from NJ Neuro's corporate bank account, including $6,000 after the Board sent the Final Order of Discipline in July 2015. ECF No. 238-8. Jacobson claims that any payment he received from NJ Neuro during his suspension was for patients treated prior to his suspension. ECF. No. 238-33 ¶¶ 66–67. Jacobson testified at his deposition that he maintained a handwritten list of patients that NJ Neuro treated during his suspension to ensure that he was not paid for treatment provided to those patients, but he later stated in an affidavit that he was no longer in possession of the list. ECF Nos. 238-3 at 146–47; 238-7 ¶¶ 2–3.

### D. Billing Misrepresentations

GEICO also alleges that defendants misrepresented the nature and extent of patient examinations, as well as the medical necessity of certain tests and procedures, in bills that were sent to GEICO. These alleged misrepresentations fall into three categories: (1) use of improper current procedural terminology ("CPT") codes; (2) billing for unnecessary electrodiagnostic testing; and (3) billing for unnecessary MUA procedures.

### 1. CPT Codes

In New York, claims for PIP benefits are governed by a fee schedule adopted by the Chair of the Workers' Compensation Board and Superintendent of the

Department of Financial Services.  *Gov't Emps. Ins. Co. v. Avanguard Med. Grp., PLLC*, 27 N.Y.3d 22, 27 (2016) (citing N.Y. Ins. Law § 5108).  The fee schedule is based on the American Medical Association's ("AMA") guidelines explaining what codes (called "CPT" codes) healthcare providers should use when billing treatment to an insurer.  *In re. Glob. Liberty Ins. Co. v. McMahon*, 172 A.D.3d 500, 501 (1st Dept. 2019).  A PIP award rendered without consideration of the AMA's CPT billing guidelines is incorrect as a matter of law.  *Id.*

GEICO argues that Jacobson overbilled by using CPT codes indicating that patients received treatment that was more comprehensive and expensive than what they actually received.  When conducting initial patient examinations, Jacobson's practices always billed the examinations to GEICO under one of the following four CPT codes: 99203, 99204, 99243, or 99244.  ECF No. 238-33 ¶ 71.

Under AMA guidelines, a chiropractor who uses the CPT codes 99203 or 99243 to bill for an initial patient examination represents that (1) the examining chiropractor conducted a "detailed" physical examination, which requires the chiropractor to conduct and document an extended examination of the affected body areas and other symptomatic or related organ systems and (2) the examination requires the examining chiropractor to engage in legitimate "low complexity" medical decision-making.  *Id.* ¶ 73.  A chiropractor who uses CPT codes 99204 or 99244 to bill for an initial patient examination represents that (1) the chiropractor

who performed the patient examination took a "comprehensive" patient history, which requires the chiropractor to have documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems; (2) the physical examination was "comprehensive," which requires documentation of either a general examination of multiple organ systems or a complete examination of a single organ system; and (3) the examination required the examining chiropractor to engage in legitimate "moderate complexity" decision-making. *Id.* ¶ 72.

GEICO's expert, Dr. Edward Cremata, reviewed the billing records that Jacobson sent to GEICO and concluded that the CPT codes that Jacobson used were improper. First, it did not appear to Cremata that patients provided significant amounts of medical records prior to or during examinations, nor that the treating chiropractor requested or reviewed such records. ECF No. 238-9 at 20. Second, in Cremata's opinion, the problems patients reported and the treatments provided— typically ordinary chiropractic manipulation, physical therapy or MUA—did not carry an unusually high risk of significant complications, morbidity, or mortality. *Id.* at 20–21. Finally, Cremata opined that Jacobson did not consider a substantial number of diagnoses or treatment options for patients during examinations and, in fact, virtually every GEICO insured treated by Jacobson received largely identical soft-tissue injury diagnoses and were recommended substantially similar treatment

plans. *Id.* at 21. Against this backdrop, Cremata concluded that the CPT codes that Jacobson used to bill GEICO misrepresented the level of medical decision-making involved in initial patient examinations. *Id.* GEICO claims that it issued nearly $33,000 in payments to Jacobson-controlled entities based on his use of these challenged billing codes. ECF No. 238-33 ¶¶ 78–81.

In an affidavit submitted in opposition to GEICO's summary judgment motion, Jacobson claimed that he used the CPT billing codes appropriately. ECF No. 238-32 ¶ 7. He said the following about the initial examinations conducted at his practices:

> The examinations documented a complete examination of the musculoskeletal system, as well as an examination of other systems as required to recommend appropriate treatment. The examining chiropractor considered a number of treatment options, such as manipulative therapy, imaging studies, referrals to appropriate specialists, based on the patient[']s progress, nerve testing, orthopedics, pain management, neurologist, and if there is a suboptimal response to conservative treatment[,] MUA evaluation may be considered. MUA treatments, performed under anesthesia inherently risk significant complications, morbidity, or mortality, more or less so depending on the patient's underlying health and condition.

*Id.* In addition to his affidavit, Jacobson submitted arbitration decisions which upheld his use of the challenged billing codes. *See, e.g.*, ECF No. 243-17. Jacobson argues that the arbitration decisions demonstrate that reasonable minds may differ about the propriety of using the billing codes the way that he did, and that he believed that his use of those billing codes was justified. ECF No. 238-29 at 23.

Jacobson also submitted a rebuttal expert report of Dr. Donald T. Alosio, Jr. ECF No. 240-3. Alosio opined that the CPT codes that Jacobson utilized after conducting patient examinations comported with the New York fee schedule. *Id.* at 3. Yet Alosio admitted during his deposition that he did not review any of Jacobson's treatment reports or the bills that Jacobson sent to GEICO. ECF No. 240-4 at 21, 41–43. Indeed, Alosio conceded that it was "a fair statement" that he could not say whether Jacobson's reports met the requirements for the CPT codes he billed to GEICO because Alosio had not reviewed the reports. *Id.* at 42–43.

## 2. Electrodiagnostic Testing

GEICO also argues that Jacobson submitted close to $850,000 in charges for medically unnecessary or illusory electrodiagnostic testing. ECF No. 238-33 ¶¶ 92–94. To support its claim, GEICO submitted an expert report prepared by Dr. John Robinton. ECF. No. 238-10. Robinton explained that electrodiagnostic testing is used to evaluate patients with possible neuromuscular disorders. *Id.* at 8. GEICO claims that Jacobson inappropriately used three types of electrodiagnostic tests on patients: (1) electromyography ("EMG"), (2) nerve conduction velocity ("NCV"), and (3) somatosensory evoked potential ("SSEP") tests. ECF No. 238-33 ¶¶ 91–92.

EMG and NCV tests can be used to diagnose radiculopathy. *Id.* ¶ 82. Radiculopathy is a condition in which the nerve roots exiting the spinal cord have been damaged either by compression or because of disease. ECF No. 238-10 at 9.

Robinton explained in his report that radiculopathy is the most common diagnosis of motor vehicle accident victims and most often results from a herniated disc. *Id.* In an EMG examination, a needle is inserted through the skin and into the muscle to test and record limb and paraspinal muscle activity both at rest and while active. *Id.* at 13. NCV tests are conducted by taping an electrode over the muscle, stimulating a nerve to that muscle, and recording the muscle's response to the nerve stimulation. *Id.* at 11.

According to Robinton, treatment for radiculopathy does not require EMG or NCV testing unless a patient fails to respond to an initial treatment plan that might include medications or physical therapy. *Id.* at 23. If the patient fails to respond to initial treatment, the next step is for the patient to receive an MRI to determine how treatment should proceed. *Id.* EMG and NCV testing are infrequently used and are usually undertaken when the patient fails to respond to directed treatment or when a patient has symptoms that appear excessive compared to what an MRI shows. *Id.* Thus, Robinton opined that only a small percentage of patients require EMG testing to make a diagnosis of radiculopathy. *Id.* at 24. Indeed, Robinton explained that he rarely uses electrodiagnostic testing when diagnosing patients involved in motor vehicle accidents. *Id.* at 16. Even one of defendants' own experts, Robert Odell, testified that EMG and NCV tests are rarely prescribed. ECF No. 243-49 at 52–53. Yet Robinton observed that diagnosing radiculopathy was the primary reason why

Jacobson utilized EMG and NCV testing when evaluating GEICO insureds.  ECF No. 238-10 at 23–24.

After reviewing the medical records of Jacobson's patients, Robinton opined that Jacobson used EMG and NCV testing inappropriately.  First, Robinton found that Jacobson's use of electrodiagnostic testing did not comply with guidelines established by the American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM").  *Id.* at 24–25.  Jacobson concedes that AANEM guidelines state that the maximum number of EMG and NCV tests necessary to diagnose radiculopathy in 90% of patients are: (1) NCV tests of three motor nerves, (2) NCV tests of two sensory nerves; and (3) a two-limb EMG.  ECF No. 238-33 ¶ 83.  Despite these guidelines, Robinton noted that, in a majority of cases, Jacobson and his associates performed (1) NCV tests of 10 motor nerves, (2) NCV tests of 12 sensory nerves, and (3) EMGs of all four limbs.  ECF No. 238-10 at 25.  Thus, the extent of the tests that Jacobson conducted exceeded what the AANEM guidelines deemed medically necessary in 90% of cases.  Robinton opined that, while a physician might have reason to deviate from the AANEM guidelines occasionally, one would not expect a physician to deviate from the guidelines as a matter of course.  *Id.*  As a result of this excessive testing, Robinton believed that Jacobson was able to increase billing to GEICO "by an order of magnitude."  *Id.*

Moreover, in nearly half of the records Robinton reviewed, Jacobson's files contained electrodiagnostic tests that had deficient or medically impossible results. *Id.* at 27. Jacobson stated in his affidavit that his practices have performed thousands of electrodiagnostic tests over the years, which occasionally would yield the type of medically "impossible" results that Robinton observed. ECF No. 238-32 ¶ 6. Jacobson explained that the incorrect testing results could be caused by electrical interference, the patient's temperature, the use of skin cream, or an error in recording numbers. *Id.* Such defects, which Jacobson represented occurred "in a tiny percentage of the total electrodiagnostic testing my practices performed," did not alter his belief in the utility of the testing methods he employed. *Id*

Robinton also opined that Jacobson engaged in an inappropriate "cookie cutter" approach to NCV testing. ECF No. 238-10 at 24. The testing patterns of Jacobson and his associates revealed that they had established a predetermined course of testing. *Id.* Indeed, Stephen Giorgio, a chiropractor who worked for Jacobson, testified in his deposition that Jacobson had developed a protocol for conducting NCV tests on the same set of nerves on every patient who received testing, regardless of the patient's injuries. ECF No. 238-11 at 143–46, 150–51. Giorgio testified that conducting tests based on Jacobson's protocol was not common in his experience working for other doctors and that he thought Jacobson's approach would be a "red flag to the insurance company." *Id.* at 150–51. Giorgio

also testified that, while he performed the NCV tests in accordance with Jacobson's protocol, he believed the tests to be medically unnecessary. *Id.* at 151–55. Based on his review of medical records, Robinton also found that testing did not alter the care or treatment of patients in any way, which is further indication that the testing was medically useless. ECF No. 238-10 at 42.

Robinton likewise concluded that Jacobson's use of SSEP testing was medically unnecessary. SSEP testing measures the body's response to peripheral stimulation through the limb, up the spinal cord, and into the brain. *Id.* at 20. The test is conducted by performing low levels of electric shock in the limb. *Id.* According to Robinton, in the 1970s and 1980s, SSEP was considered clinically useful for diagnosing certain central nervous system disorders, such as multiple sclerosis, but has largely become obsolete due to improvements in MRI and CT scan technology. *Id.* at 20. Robinton explained that SSEP testing should only be utilized in cases when other types of testing have been inconclusive or when the patient is unconscious. *Id.* at 21. In Robinton's opinion, use of SSEP as an initial diagnostic test, as Jacobson used it, is not appropriate or consistent with good medical practice. *Id.* at 21, 35.

Jacobson did not submit an expert report to rebut Robinton. He did, however, submit decisions in arbitrations between GEICO and Jacobson in which arbitrators approved his use of electrodiagnostic testing. ECF Nos. 243-7, 243-8. He also

submitted affidavits in which he represented that he always tailored testing and treatments to the complaints of his patients and believed that all testing he conducted was medically necessary. ECF Nos. 238-32 ¶ 4, 243-33 ¶ 4.

### 3. Manipulation Under Anesthesia

GEICO also claims that Jacobson billed over $935,000 for medically unnecessary MUAs through NJ Pain and NJ Neuro. ECF No. 238–33 ¶¶ 111–12. MUA involves a series of chiropractic mobilization, stretching, and traction procedures on a patient's musculoskeletal system while the patient is under anesthesia. *Id.* ¶ 97. Under appropriate circumstances, MUA can be an effective treatment when applied to the spine, hip, or shoulder, as well as other areas of the body. *Id.* ¶ 98. According to GEICO's expert, Dr. Cremata, however, due to the risks from anesthesia, MUA would almost never be an appropriate first-line treatment. ECF No. 238-9 at 7. Rather, he opined that MUA should be reserved only for patients who have already received more conservative treatment, such as ordinary chiropractic manipulation without anesthesia, but who nonetheless fail to respond to such treatment. *Id.* In Cremata's opinion, except in rare cases, a minimum of six weeks of conservative treatment should be provided to a patient before MUA is even considered. *Id.* Nor would Cremata expect to see more than 3 to 10% of car accident victims examined by an MUA provider be referred for an MUA procedure. *Id.* at 7–8.

A patient may require only a single MUA procedure. *Id.* at 8. Nevertheless, multiple MUA treatments may be appropriate when a patient's condition could be characterized as chronic or incalcitrant. *Id.* If a patient regains 80% of his or her biomechanical function, a second MUA procedure would typically be considered unnecessary. *Id.* at 9. But if a patient recovers only 50 to 70% of biomechanical function, follow-up MUA procedures may be appropriate. *Id.* Cremata would not expect a large percentage of patients to recover similar amounts of biomechanical function following a first or second MUA procedure given differences in age, physical condition, and injuries. *Id.*

Several aspects of Jacobson's MUA practices suggested to Cremata that he made MUA referrals automatically without regard for an individual patient's circumstances. *Id.* at 21. Contrary to Cremata's clinical experience—in which only 3 to 10% of patients examined by an MUA provider would be referred for MUA treatment—NJ Pain and NJ Neuro recommended more than 90% of their patients for the procedure. *Id.* Indeed, more than 90% of patients who received one MUA treatment were referred for serial MUA. *Id.* The majority of Jacobson's patients were recorded as experiencing between a 50 to 70% improvement in biomechanical function after a single MUA—just within the range of improvement necessary to justify serial MUA. *Id.* at 21–22. According to Cremata, that consistency among patients is so statistically improbable that he believes the data was fabricated so that

Jacobson could bill GEICO for more MUA procedures than were medically necessary. *Id.* at 22. Moreover, in most of the cases Cremata reviewed, MUA was prescribed through self-referrals among Jacobson-controlled entities. *Id.* at 28. In Cremata's opinion, an unusually high percentage of Jacobson's MUA patients—at least 35%—received MUA within six to eight weeks of receiving more conservative treatment, often from one of Jacobson's other practices. *Id.* at 27–28. That led Cremata to conclude that Jacobson referred patients for MUA for financial reasons and not based on medical necessity. *Id.* at 28.

Cremata also opined that Jacobson misrepresented the nature of MUA services billed to GEICO. Jacobson virtually always used the CPT code 27194 when billing for MUA services that his practices performed on GEICO-insured patients. *Id.* That CPT code is used to bill for the treatment of "pelvic ring fracture, dislocation, diastasis, or subluxation." ECF No. No. 238-33 ¶ 109. The medical reports that Cremata reviewed, however, indicated that these patients suffered injury to their sacroiliac joint, which is located at the bottom of the spine by the tailbone. ECF Nos. 238-4 at 70, 238-9 at 28. Jacobson concedes that he used the 27194 CPT code to bill for MUA related to injuries to the sacrum but argues that he considers the sacrum to be part of the pelvic ring and that his use of the CPT code was therefore appropriate. ECF Nos. 238-4 at 72; 238-32 ¶ 8. Although Jacobson claims that the sacrum is part of the pelvic ring, Peter Albis, one of the chiropractors who worked

for Jacobson, testified at his deposition that the sacroiliac and pelvic joints are separate. ECF No. 243-54 at 52.

Cremata further reviewed numerous cases in which patients were treated by doctors other than Jacobson for weeks or months with no indication of injury to the pelvic ring or sacroiliac joint but then, when the patients were treated by Jacobson for the first time, they suddenly were identified as having pelvic or sacroiliac injury symptoms. ECF No. 238-9 at 30–31. In Cremata's opinion, it is "improbable to the point of impossibility" that such a sizeable group of patients, most of whom were involved in minor accidents, would fail to exhibit symptoms of pelvic or sacroiliac injury for weeks or months before being treated by Jacobson. *Id.* at 31.

Jacobson points to evidence that, he argues, disputes GEICO's position that the MUA treatments he performed were medically unnecessary. First, Jacobson relies on the report of his expert, Dr. Alosio, to argue that his MUA treatments were proper. ECF No. 238-29 at 30. But, as described above, Alosio admitted that he did not review any of the medical records in this case. Jacobson also submits arbitration decisions in which his use of MUA was upheld over GEICO's objections. ECF No. 243-16. Moreover, in an affidavit, Jacobson represents that NJ Neuro and NJ Pain specialize in MUA treatment, which explains why patients referred to these practices receive substantially more MUA treatment than the general patient population. ECF

No. 238-32 ¶ 10. Jacobson also claims that he believed the MUA treatments provided to his patients were medically necessary. *Id.*

## LEGAL STANDARD

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Id.* at 325. By contrast, "[w]here the movant has the burden" of proof at trial, "its own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).

## DISCUSSION

### I.  GEICO's Motions

GEICO moves for summary judgment on its causes of action for declaratory judgment (Count 1), common law fraud (Counts 4, 9, 24, and 29), unjust enrichment (Counts 6, 11, 26, and 31), and violation of the New Jersey Insurance Fraud

Prevention Act (Count 34). In addition, GEICO makes two evidentiary motions: (1) a motion for an adverse inference with respect to certain documents Jacobson did not produce to GEICO during discovery, and (2) a motion to exclude defendants' expert, Dr. Alosio. "Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law, . . . it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal quotation omitted). Exclusion of defendants' evidence may affect whether a genuine dispute of material fact exists, and thus I address GEICO's evidentiary motions before turning to its summary judgment motion.

### A. GEICO's Motion for an Adverse Inference

First, GEICO moves under Fed. R. Civ. P. 37 for an adverse inference and to preclude Jacobson from introducing evidence that he disclosed his ownership interests in his various practices to GEICO insureds to whom he made self-referrals. ECF No. 239. Specifically, GEICO seeks to preclude Jacobson from relying on 65 ownership disclosure forms that he attached to his motion papers but that he concedes he never produced to GEICO in discovery. Jacobson argues that he was not required to produce these disclosure forms in discovery because they were made available to GEICO prior to the commencement of this litigation.

As mentioned above, the disclosure forms that Jacobson attached to his motion papers are largely irrelevant to disposing of the pending summary judgment motions. Only two of the forms relate to the more than 200 examples of allegedly illegal self-referrals that GEICO has identified. *Compare* ECF Nos. 238-3 at 393–97, 613–14 *with* ECF No. 243-34. The other 63 forms were signed by patients who have nothing to do with GEICO's claims. Indeed, it is unclear from the disclosure forms whether most of the patients are even GEICO insureds. Thus, even assuming that Jacobson had an obligation to produce the disclosure forms during discovery, an adverse inference as a sanction for Jacobson's failure to satisfy his discovery obligations is unnecessary. Rule 37 sanctions are not warranted where, as here, a failure to disclose is harmless, meaning that the omission does not prejudice the offended party. *Aboeid v. Saudi Arabian Airlines Corp.*, 2011 WL 5117733, at *2 (E.D.N.Y. Sept. 6, 2011).

### B. GEICO's Motion to Exclude Jacobson's Expert

GEICO also moves to preclude defendants from offering any opinions or testimony from their expert, Dr. Alosio, "relating to (i) the Defendants' purported performance of MUAs and patient examinations; and (ii) the Defendants' billing submissions to GEICO for MUAs and patient examinations." ECF No. 240-5 at 5. GEICO argues that Alosio's expert report should not be considered when resolving the parties' summary judgment motions because it violates Fed. R. Evid. 702.

Specifically, GEICO contends that the opinions in Alosio's report are conclusory speculations, given his admission that he did not review any of Jacobson's treatment reports or billing submissions. GEICO's motion is granted in part.

Fed. R. Evid. 702 provides that a witness who is "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." In determining expert admissibility, district courts act as gatekeepers against unreliable expert opinion. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "The court performs the same [gatekeeper] role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." *Raskin*, 125 F.3d at 66.

Alosio's failure to review any treatment reports or the bills submitted to GEICO renders his opinions about Jacobson's billing and treatment practices unreliable. For example, he opined that the number of patients on whom Jacobson performed MUA was not unusually high because they "had been referred to the MUA specialist only after undergoing a trial of conservative therapy," including

"chiropractic, physical therapy, acupuncture, and pain management, with accompanying MRI studies." ECF No. 238-31 at 3. But it is unclear how Alosio could render such an opinion without having reviewed any medical records. Indeed, when asked at his deposition how he could determine whether patients underwent sufficient conservative therapy before undergoing MUA treatment if he did not review the underlying medical records, Alosio responded, "[h]onestly, I don't remember, but I would not give something informationally that I didn't feel was accurate, so there must have been either information given from Dr. Cremata's report, which I reviewed and it was present. I'm assuming that's where I got it from." ECF No. 240-4 at 46. Moreover, Alosio admitted that he could not opine on whether Jacobson satisfied the guidelines for when MUA procedures are appropriate because he did not review the underlying medical records. *Id.* at 51.

Similarly, in his expert report, Alosio opined that the CPT codes that Jacobson used "comport with the New York fee schedule description." ECF No. 240-3 at 3. Yet, as described above, Alosio admitted at his deposition that it was a "fair statement" that he could not actually say whether any of Jacobson's treatment reports satisfied the CPT requirements because he never reviewed the reports. ECF No. 240-4 at 42–43.

"[T]here appear to be very few cases in the Second Circuit in which the court has been presented with an expert medical opinion where the expert . . . did not

consult the patient's medical records. And in these very few cases, courts have invariably found such opinions to be unreliable." *El Ansari v. Graham*, 2019 WL 3526714, at *5 n.5 (S.D.N.Y. Aug. 2, 2019) (collecting cases). Jacobson's argument for why this case should turn out differently is unconvincing. He contends that the purpose of Alosio's report and testimony is solely to rebut GEICO's expert and his opinions are not "predicated on a review of a [sic] Defendants' medical or billing records." ECF No. 240-6 at 11. While "there is no requirement that a rebuttal expert himself offer a competing analysis," and "his opinions may properly concern criticizing that presented by another party," *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015), rebuttal experts must still "meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016).

To the extent that Alosio opines about Jacobson's treatment or billing practices, his opinion is inadmissible. For example, Alosio claims that "[n]one of the patients treated deviates from any of the guidelines or articles that [GEICO's expert] cites and, in fact, all of these patients are within the accepted current guidelines and literature." ECF No. 240-3 at 4. Alosio cannot have reliably formed that rebuttal opinion without reviewing any of the patients' medical records or

Jacobson's treatment reports. His opinion with respect to whether Jacobson properly used CPT codes or performed MUAs thus will not be considered in resolving the summary judgment motions and will be inadmissible at trial.

Nevertheless, Alosio's opinions are likely admissible to the extent that he challenges Cremata's opinion about the general standards chiropractors should use when treating patients and billing insurers. For example, Alosio disagrees with Cremata's opinion that a minimum of six weeks of conservative treatment is necessary before a chiropractor could reasonably provide MUA treatment to a patient. ECF No. 239-31 at 2. Moreover, Alosio opines that subluxation of the pelvis is an ailment that a chiropractor can properly bill under CPT code 27194. *Id.* at 4–5. Such opinions about the general standards that chiropractors should satisfy before treating patients or billing insurers does not require review of Jacobson's medical records and are likely admissible, assuming that a proper foundation is laid at trial.

### C. GEICO's Summary Judgment Motion

#### 1. The Fraud Claims (Counts 4, 9, 24, and 29)

GECIO argues that it is entitled to summary judgment against Jacobson and his incorporated practices on its common law fraud claims under New York law. To prevail on a claim of fraud, a plaintiff must prove "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin.*

*(Jersey) No. 3 Ltd. v. Wells Fargo Secs. Litig.*, 797 F.3d 160, 170 (2d Cir. 2015) (applying New York law).

Defendants' argument against granting summary judgment rests principally on their assertion that GEICO has failed to demonstrate knowledge of falsity and intent to defraud. ECF No. 238-29 at 34. Under New York law, "[i]ntent to deceive must be shown by evidence of guilty knowledge or willful ignorance." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007) (internal quotation omitted). "[F]raudulent intent is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and the legitimate inference arising therefrom." *Barkley v. United Homes, LLC*, 2012 WL 2357295, at *8 (E.D.N.Y. June 20, 2012) (internal quotation omitted). An inference of fraudulent intent can be established "by a showing of a motive for committing fraud or by 'identifying . . . conscious behavior by the [accused party].'" *Enzo Biochem, Inc. v. Johnson & Johnson*, 1992 WL 309613, at *11 (S.D.N.Y. Oct. 15, 1992) (internal quotation omitted) (alteration in original).

GEICO argues that there is sufficient evidence demonstrating defendants' motive to commit fraud and conscious behavior that serves as circumstantial evidence of fraudulent intent. First, it argues that Jacobson had a financial motive to commit fraud because GEICO's discovery of the various billing misrepresentations described above would have resulted in GEICO's non-payment

of millions of dollars in no-fault billing. ECF No. 238-27 at 32. Moreover, GEICO argues that Jacobson's submission of bills through six different entities and his failure to submit income tax returns for his incorporated practices is further evidence of his fraudulent intent. *Id.* at 32–33.

Based on the evidence GEICO has presented, a reasonable jury might conclude that Jacobson acted with fraudulent intent. Courts have regularly held that a medical professional's financial motive to obtain no-fault insurance benefits by making intentional misrepresentations to an insurance company is sufficient to demonstrate scienter. *See, e.g.*, *Gov't Emps. Ins. Co. v. Badia*, 2015 WL 1258218, at *15 (E.D.N.Y. Mar. 18, 2015); *Allstate Ins. Co. v. Etienne*, 2010 WL 4338333, at *10 (E.D.N.Y. Oct. 26, 2010).

Jacobson argues that the opinion of his expert, Dr. Alosio, and decisions in his favor in arbitrations against GEICO raise triable issues for the jury. For the reasons stated above, Dr. Alosio's opinions about Jacobson's treatment and billing practices are inadmissible and are not considered here. With respect to the arbitration decisions, the arbitrators only considered individual cases of Jacobson's billing practices in isolation. But GEICO argues that Jacobson "systematically and concertedly administered treatments in a rote fashion, independent of the clinical needs of the patient, in such a combination as to maximize reimbursements while minimizing the possibility of detection through the use of various controlled

entities." *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 229 (E.D.N.Y. 2018). "[T]hese alleged violations may not be apparent if the claims and their supporting documentation are examined in isolation on a case-by-case basis. Facially legitimate treatments may be provided with little variance across multiple patients, but it is only by analyzing the claims as a whole that the irresistible inference arises that the treatments are not being provided on the basis of medical necessity." *Id.* Thus, the arbitration decisions are of little probative value in determining whether Jacobson engaged in widespread fraud by submitting hundreds of bills to GEICO for PIP reimbursement for cookie-cutter treatments without regard for medical necessity.

Nevertheless, as GEICO concedes, "in many instances, summary judgment may be inappropriate on fraud-based claims because knowledge and fraudulent intent typically present fact questions." ECF No. 238-27 at 32 n.6. Such triable disputes are present here. While a jury may find that Jacobson intentionally made fraudulent representations in his no-fault submissions to GEICO, a jury may also find—based on Jacobson's testimony—that Jacobson had a good-faith belief that he properly billed GEICO for medically necessary testing and treatment. While GEICO points to circumstantial evidence from which a jury could find scienter, this case will likely turn on a jury's assessment of Jacobson's credibility and whether he possessed the requisite intent to defraud. "Ordinarily, the issue of fraudulent intent cannot be

resolved on a motion for summary judgment, being a factual question involving the parties' states of mind." *Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201–02 (2d Cir. 1991); *see also* Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2730 (4th ed. 2016) ("[I]t frequently has been observed that when state of mind, or 'consciousness and conscience' is involved, credibility often will be central to the case and summary judgment inappropriate."). Indeed, GEICO cites no case in which a court has granted summary judgment in favor of a plaintiff on an insurance fraud claim like the one it alleges here. Thus, GEICO's motion for summary judgment on its common law fraud claims is denied.

### 2. The Unjust Enrichment Claims (Counts 6, 11, 26, and 31)

To establish Jacobson's liability on an unjust enrichment theory, GEICO must establish "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). Jacobson argues that GEICO's unjust enrichment claim is duplicative of its fraud claim. ECF No. 238-29 at 36–37. Indeed, GEICO requests the same damages under an unjust enrichment theory as it does for common law fraud. ECF No. 238-27 at 34, 36. Because GECIO's "unjust enrichment claims arise from the same factual predicates as [its] other claims, it is unnecessary to explore the unjust enrichment claim at length. If one of a number of integrally related causes of action must be tried, it makes little sense to grant a motion for summary judgment

as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion for summary judgment was improperly granted." *Eviner v. Eng,* 2015 WL 4600541, at *13 (E.D.N.Y Jul. 29, 2015). As observed by Judge Clark in an analogous context: "[T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue." *Audi Vision, Inc. v. RCA Mfg. Co.,* 136 F.2d 621, 625 (2d Cir. 1943).

The one exception concerns payment that NJ Neuro and NJ Pain received from GEICO for services provided in New York. Jacobson concedes that he "submitted those bills believing them to be properly reimbursable, [but] he now understands that they were not because he failed to file the paperwork to obtain a certificate of authority that would allow NJ Pain or NJ Neuro to bill for the New York services." ECF No. 238-29 at 33 n.3. Given Jacobson's concession that he was never entitled to those payments, holding a trial on this issue is unnecessary, and GEICO is granted summary judgment on its unjust enrichment claim for the $4,018.33 in payments that it made to NJ Pain and NJ Neuro's unlawful operations in New York. ECF No. 238-33 ¶¶ 56–57. The remainder of GEICO's summary judgment motion on its unjust enrichment claim is denied.

### 3. The New Jersey Insurance Fraud Prevention Act Claim (Count 34)

GEICO argues that all the MUA charges that Jacobson submitted through NJ Pain and NJ Neuro violate New Jersey's Insurance Fraud Prevention Act ("NJIFPA"). Specifically, GEICO argues that all of the charges NJ Pain and NJ Neuro purported to provide to GEICO insureds in New Jersey falsely represented (1) the medical necessity of the MUAs, (2) the nature and extent of services billed under code 27914 related to pelvic ring treatment, and (3) in 133 cases, that the MUAs were provided in compliance with New Jersey law when in fact those cases were the result of illegal self-referrals.

The NJIFPA is violated when a practitioner "[p]resents or causes to be presented any written or oral statement as part of, or in support of . . . a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim." N.J. Stat. Ann. § 17:33A–4(a)(1). To prove a violation of the NJIFPA, a plaintiff must demonstrate (1) knowledge, (2) falsity, and (3) materiality. *Gov't Emps. Ins. Co. v. Zuberi*, 2017 WL 4790383, at *4 (D.N.J. Oct. 23, 2017). "Unlike common law fraud, proof of fraud under the [NJIFPA] does not require proof of reliance on the false statement or resultant damages . . . nor proof of intent to deceive." *Id.* (alterations in original).

Jacobson argues that GEICO is not entitled to summary judgment on its

NJIFPA claim because no rational juror could find that Jacobson knowingly submitted a false statement to GEICO. Jacobson overstates his case. Based on the circumstantial evidence described above, a reasonable jury could conclude that Jacobson knowingly performed medically unnecessary MUAs on his patients and billed them incorrectly to inflate the PIP benefits he would receive from GEICO. A reasonable jury could also conclude that Jacobson knowingly made unlawful self-referrals to NJ Pain and NJ Neuro. Yet, as the New Jersey Supreme Court held in applying the NJIFPA in analogous circumstances, "[i]nferring mental state from circumstantial evidence is among the chief tasks of factfinders." *Allstate Ins. Co. v. Northfield Med. Ctr., P.C.*, 159 A.3d 412, 427 (N.J. 2017) (internal quotation omitted). As is the case with the New York state common law fraud claims, whether Jacobson possessed the requisite knowledge will turn on a jury's assessment of his credibility. GEICO's summary judgment motion with respect to its NJIFA claim is thus denied.

### 4. The Declaratory Judgment Claim (Count 1)

GEICO argues that it is entitled to a declaratory judgment that it is not obligated to pay $1.4 million in pending PIP benefits to Jacobson in connection with charges (1) that were the result of illegal self-referrals; (2) for services provided by NJ Pain and NJ Neuro's operations in New York without a certificate of authority from the New York Department of Education, (3) for services provided by NJ Neuro

for services provided in New Jersey while Jacobson's chiropractic license was suspended; (4) for initial patient examinations utilizing improper CPT codes; (5) for EMG, NCV, and SSEP tests; and (6) for MUAs. ECF Nos. 1 ¶ 428; 238-27 at 30–31. Because a jury will decide whether Jacobson was entitled to the PIP benefits that GEICO already paid to him, it also should resolve whether GEICO is obligated to pay the pending claims. For that reason, except for any outstanding payments to NJ Neuro and NJ Pain for services it performed in New York, to which Jacobson concedes he is not entitled, GEICO's summary judgment motion on its declaratory judgment claim is denied. GEICO's motion for declaratory judgment related to outstanding payments for services rendered by NJ Pain and NJ Neuro in New York is granted.

## II. Defendants' Summary Judgment Motion

### A. The Declaratory Judgment, Common Law Fraud, Unjust Enrichment, and NJIFPA Claims (Counts 1, 4–5, 11, 14–16, 19–21, 24–26, 29–31, & 34–35)

As described above, genuine issues of material fact exist with respect to GEICO's declaratory judgment, common law fraud, unjust enrichment, and NJIFPA claims. Defendants' motion for summary judgment is thus denied with respect to those causes of action.

### B. Civil RICO and RICO Conspiracy Claims (Counts 2–3, 12–13, 17–18, 22–23, 27–28, & 32–33)

Defendants also move for summary judgment on GEICO's substantive RICO

claims against Jacobson, and RICO conspiracy claims against Jacobson and four chiropractors who worked for him—Diana Beynin, Peter Albis, Jongdug Park, and Gerlando Zambuto. A plaintiff is entitled to damages under 18 U.S.C. § 1964(c) if it can demonstrate "(1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation." *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 131 (2d Cir. 2010) (internal quotation omitted). To prove a substantive RICO claim under 18 U.S.C. § 1962(c), a plaintiff must demonstrate "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an[] interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123–24 (2d Cir. 2018) (internal quotation omitted). To prove a RICO conspiracy, GEICO must show "the existence of an agreement to violate RICO's substantive provisions." *Id.* at 124 (internal quotation omitted). For the reasons described below, defendants' summary judgment motion is denied with respect to the civil RICO and RICO conspiracy claims.

### 1. GEICO Has Standing to Pursue its Civil RICO Claims

First, defendants argue that GEICO lacks standing to pursue its civil RICO claims. ECF No. 243-2 at 17–20. Defendants argue that "a subset of the no-fault

claims GEICO relies upon are currently pending in arbitration and litigation," and thus it cannot demonstrate that its injuries are concrete or definite. *Id.* at 20. GEICO responds that its RICO damages are based only on payments that it has already made on Defendants' no-fault claims. ECF No. 243-43 at 12. Because its RICO claims are limited to the no-fault payments that it has already made to defendants, GEICO has standing to pursue these claims. *See Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 374 (E.D.N.Y. 2012).

## 2. There is Sufficient Evidence of a "Pattern" of Racketeering Activity

Second, defendants argue that GEICO cannot prove the continuity necessary to demonstrate a pattern of racketeering activity. To prove a pattern, GEICO must show "at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1) [in this case, mail fraud], and they must be related, and [either] amount to or pose a threat of continuing criminal activity." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotation omitted) (second alteration in original). A plaintiff can demonstrate a pattern by either showing "closed-ended" continuity or an "open-ended" continuity. *Id.*

"To satisfy closed-ended continuity, the plaintiff must prove 'a series of

related predicates extending over a substantial period of time.'" *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989)). "Predicate acts separated by only a few months will not do; this Circuit generally requires that the crimes extend over at least two years" to support a finding of closed-ended continuity. *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) (internal citation omitted). "[W]hile two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004). Other factors relevant to determining closed-ended continuity include "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes." *Id.*

"To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit, S.A.,* 187 F.3d at 242. A continuing threat is "presumed when the enterprise's business is primarily or inherently unlawful." *Spool*, 520 F.3d at 185. When "the enterprise primarily conducts a legitimate business, however, no presumption of continued threat arises" and open-ended continuity can only be inferred when there is evidence "that the predicate acts were the regular way of operating that business, or the nature of the predicate acts

themselves implies a threat of continued criminal activity." *Id.* (quoting *Cofacrèdit*, 187 F.3d at 243).

GEICO concedes that it cannot prove closed-ended continuity with respect to the RICO claims involving Jacobson's incorporated practices. ECF No. 243-43 at 13 n.2. It does argue, however, that closed-ended continuity can be established with respect to Jacobson's unincorporated practice. *Id.* at 13–14. Defendants do not dispute that Jacobson's unincorporated practice sent no-fault bills to GEICO for a period exceeding two years. Rather, they argue that GEICO cannot establish closed-ended continuity because Jacobson's "standard billing for his unincorporated practice's treatments was non-complex, involved few participants, and just one purported victim." ECF No. 243–64 at 11. Defendants' argument is unpersuasive. Courts have routinely held in similar situations that a closed-ended continuity pattern is cognizable when a healthcare provider commits numerous acts of mail fraud by submitting hundreds of fraudulent no-fault insurance claims to an insurer over a period of more than two years. *See, e.g.*, *Gov't. Emps. Ins. Co. v. Simalovsky*, 2015 WL 5821407, at *8 (E.D.N.Y. Oct. 5, 2015); *Gov't. Emps. Ins. Co. v. Hollis Med. Care, P.C.*, 2011 WL 5507426, at *9 (E.D.N.Y. Nov. 9, 2011). A jury could thus find a closed-ended continuity pattern at trial with respect to Jacobson's unincorporated practice.

GEICO has also submitted sufficient evidence to demonstrate open-ended

continuity with respect to Jacobson's unincorporated practice and his five incorporated practices. A jury could infer that engaging in a pattern of illegal self-referrals and sending inflated and fraudulent invoices to insurers was its regular way of conducting business. A jury could thus find an open-ended pattern of racketeering activity based on the evidence that Jacobson has submitted. *See Lyons*, 843 F. Supp. 2d at 369–70; *Allstate Ins. Co. v. Nazarov*, 2015 WL 5774459, at *14 (E.D.N.Y. Sept. 30, 2015).

### 3. There is Sufficient Evidence of an "Enterprise"

Defendants argue that GEICO failed to produce evidence of an "association-in-fact" enterprise consisting of Jacobson's five incorporated practices and his unincorporated practice. ECF No. 243-2 at 26–29. As an initial matter, Defendants' argument only relates to Counts 32 and 33. ECF No. 1 ¶¶ 660, 671. For the remaining RICO counts, GEICO alleges that each individual practice is its own enterprise. *Id.* ¶¶ 438, 445, 475, 482, 512, 519, 549, 556, 586, 593, 623, 630. Defendants do not argue that each of the individual practices themselves fail to constitute an enterprise under the RICO statute.

Nor would such an argument have merit. An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "A RICO enterprise 'is proved by evidence of an ongoing organization,

42

formal or informal, and by evidence that the various associates function as a continuing unit.'" *United States v. Applins*, 637 F.3d 59, 73 (2d Cir. 2011) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The enterprise requirement "is most easily satisfied when the enterprise is a formal legal entity." *Satinwood, Inc.*, 385 F.3d at 173. In an almost identical context, a medical practice that sought over two million dollars in allegedly fraudulent no-fault benefits was found to satisfy the enterprise requirement as a formal legal entity. *Hollis Med. Care, P.C*, 2011 WL 5507426, at *5. Thus, for the RICO claims outside of Counts 32 and 33, the evidence that GEICO has produced relating to the existence of separate medical practices is sufficient to demonstrate that each practice is its own enterprise.

For Counts 32 and 33, GEICO has produced sufficient evidence of an association-in-fact enterprise comprised of all of Jacobson's practices. "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). A jury could conclude that Jacobson's medical practices "shar[ed] a common purpose to engage in a fraudulent course of conduct, namely, to defraud plaintiffs of money by exploiting the payment formulas of the No-Fault laws." *AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 WL 3710370, at *7 (E.D.N.Y. Feb. 22, 2005). This case is indistinguishable from *Gov't Emps. Ins. Co. v. AMD*

*Chiropractic, P.C.*, 2013 WL 5131057, at *6 (E.D.N.Y. Sept. 12, 2013), in which Judge Gershon held that an "ad hoc association" of three chiropractic practices, all owned by the same chiropractor, and through which the chiropractor submitted fraudulent no-fault charges to insurers, could constitute an association-in-fact enterprise. *See also Allstate Ins. Co. v. Etienne*, 2010 WL 4338333, at *6 (E.D.N.Y. 2010).

### 4.   There is Sufficient Evidence of Mail Fraud

GEICO argues that repeated violations of the mail fraud statute, 18 U.S.C. § 1341, constitute the racketeering activity that supports its RICO claim.  To prove mail fraud, a plaintiff must demonstrate "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails . . .  in furtherance of the scheme."  *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  Defendants argue that they are entitled to summary judgment because GEICO cannot prove mail fraud. Defendants' arguments lack merit.

First, defendants argue that GEICO's claims related to bills Jacobson submitted based on improper CPT codes or for medically unnecessary treatment sound in contract, not fraud, and thus cannot be the basis of a mail fraud scheme. ECF No. 243-2 at 30–34.  This argument has previously been rejected in a similar case involving medical practitioners who submitted allegedly fraudulent no-fault

bills to insurers. In *Allstate Ins. Co. v. Ahmed Halima*, 2009 WL 750199, at *8 (E.D.N.Y. Mar. 19, 2009), Judge Irizarry held that a scheme by defendants "to charge insurers for medically unnecessary diagnostic tests [was] extraneous to any contract between Plaintiffs and the . . . Defendants because it d[id] not concern disputes over a contractual obligation between the parties. Instead, Plaintiffs' claims sound[ed] in tort, not in contract." *Id.* (internal quotation marks omitted). Indeed, courts have regularly concluded that healthcare providers who "routinely ordered a pre-determined protocol of medical services for their patients without regard to those patients' unique circumstances" and "intentionally billed for services that were not rendered as represented" could be liable for mail fraud. *See, e.g.*, *Yehudian,* 2018 WL 1767873, at *9; *see also Allstate Ins. Co. v. Smirnov*, 2014 WL 4437287, at *7 (E.D.N.Y. Jul. 21, 2014), *report & recommendation adopted by* 2014 WL 4437291 (E.D.N.Y. Sept. 8, 2014).

Second, defendants argue that GEICO cannot demonstrate that they acted with scienter. "[A] court may not grant [summary judgment for] lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive." *Gov't Emps. Ins. Co. v. Strutsovskiy*, 2017 WL 4837584, at *5 (W.D.N.Y. Oct. 26, 2017) (quoting *Wechsler v. Steinberg*, 733 F.2d 1054, 1059 (2d Cir. 1984)). Defendants frame this dispute as a reasonable disagreement about the proper use of billing codes and the

medical necessity of treatment that they performed on their patients. If the jury finds defendants to be credible, it might conclude that they believed their billing for treatment was appropriate. But GEICO has presented an abundance of evidence, described earlier in this opinion, from which a jury can conclude that defendants provided medically unnecessary treatment in order to inflate their bills and collect no-fault benefits to which they were not entitled. Under these circumstances, summary judgment is inappropriate. *See id.* (declining to grant summary judgment in insurance fraud case where there was evidence that "defendants routinely misrepresented the complexity of the problems presented by GEICO insureds whom the defendants purported to treat" in order to obtain no-fault insurance payments).

Third, defendants argue that GEICO cannot demonstrate reliance. This argument lacks merit. Reliance "will typically be a necessary step in the causal chain linking the defendant's alleged misrepresentation to the plaintiff's injury" in a civil RICO case. *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015). A jury could find that GEICO relied on the representations in the bills that defendants submitted and that, but for those representations, GEICO would not have suffered injury by paying PIP benefits to which defendants were not entitled.

Courts have consistently held that insurers are entitled to rely on a healthcare provider's billing representations in similar circumstances. *See Strutsovskiy,* 2017

WL 4837584, at *5 (denying summary judgment and holding that "GEICO is entitled to rely upon the verifications submitted by healthcare providers for purposes of paying no-fault claims—perhaps even as it investigates the veracity of those verifications for purposes of a broader fraud claim."); *Lyons*, 843 F. Supp. 2d at 375 ("It is . . . incorrect to claim that [an insurer] was remiss in relying on defendants' facially reasonable diagnoses and claims for payment and failing to uncover their falsity."). GEICO's reliance on defendants' billing submissions is particularly justified in this context, since New York's no-fault laws only provide an insurer with "30 days to review and investigate claims before paying them without risk of penalties for denying or delaying a claim." *Matter of Med. Soc'y of N.Y. v. Serio*, 100 N.Y.2d 854, 860–861 (2003); *see also Lyons*, 843 F. Supp. 2d at 375. Ultimately, it will be for the jury to decide whether it was reasonable for GEICO to rely on defendants' billing representations for as long as it did or whether it should have discovered any possible fraud sooner. *Strutsovskiy,* 2017 WL 4837584, at *5.

In sum, numerous courts in the Second Circuit have permitted insurers to bring civil RICO claims against healthcare providers who abuse the no-fault system to obtain payment through the submission of fraudulent bills in the regular course of their business. I agree. GEICO has produced substantial evidence from which a jury could conclude that defendants have engaged in such misconduct. Defendants' motion for summary judgment on GEICO's substantive civil RICO claims is denied.

### 5. There is Sufficient Evidence of RICO Conspiracy

Finally, a jury could find that Jacobson, Beynin, Park, Albis, and Zambuto engaged in a RICO conspiracy. To prove the existence of a RICO conspiracy, GEICO must prove the existence "(a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018). As described above, GEICO has presented evidence of a scheme, orchestrated by Jacobson, to engage in hundreds of instances of mail fraud in order to collect millions of dollars in no-fault insurance benefits to which he was not entitled. GEICO also submitted evidence that Beynin, Park, Albis, and Zambuto performed medically unnecessary treatment and made improper referrals on behalf of Jacobson's practices. *See, e.g.*, ECF Nos. 243-54 at 16–18 (Albis testifying that he performed MUAs on behalf of Jacobson); 243-55 at 8–12, 31–34 (Park testifying that he conducted initial patient evaluations, provided chiropractic treatment on behalf of Jacobson's practices, and made referrals for sensory testing); 243-56 at 9–13, 16–17, 28–29, 62–63 (Beynin testifying that she performed MUAs and electrodiagnostic testing on behalf of Jacobson's practices); 243-57 at 14–16, 35–36 (Zambuto testifying that he performed MUA's on behalf of Jacobson and referred

patients for sensory testing). Given this evidence, a factual issue exists for the jury concerning whether defendants participated in a RICO conspiracy. Accordingly, defendants' motion to deny summary judgment on GEICO's RICO conspiracy claims is denied.

## CONCLUSION

GEICO's motion for an adverse inference is denied. GEICO's motion to preclude defendants' expert Dr. Donald T. Alosio, Jr. is granted in part. GEICO's motion for partial summary judgment is denied, except that its unjust enrichment claims and declaratory judgment claims relating to work performed by NJ Pain and NJ Neuro in New York are granted. Defendants' motion for summary judgment is denied.

**SO ORDERED.**

*Edward R. Korman*
Edward R. Korman
United States District Judge

Brooklyn, New York
June 24, 2021